Strategic Legal Group, Pc
Alan Eighmey, Esq. (CSBN 278782)
alan@norcal-law.com
Claudine Sherron, Esq. (CSBN 296499)
claudine@norcal-law.com
121 West Main Street, Ste. F
Turlock, CA 95380
Tel: (209) 683-1616
Fax: (209) 250-1991
Attorney for Plaintiff

# United States District Court

## For The Central District Of California

### Western Division

**Liz Banks,**

                    *Plaintiff,*

vs.

**JPMorgan JPMC Bank, N.A.,**
and Does 1 to 100, inclusive,

                    *Defendants.*

Case No.:        2:14-cv-06429 JAK-FFM

**Plaintiff Liz Banks' Memorandum in Opposition To Defendant's Motion for Summary Judgement**

[Filed concurrently with Plaintiff Liz Banks' Opposition to Defendant's Statement of Uncontroverted Facts]

Complaint Filed:   July 15, 2014
        FAC Filed:   November 26, 2014
        Trial Date:   September 22, 2015

Table of Contents

I. Introduction and Factual Background ...........................................................................1

    A.        Pursuant to Rule 56(d) of the Federal Rules of Procedure the Court Should Deny the Motion or Defer Decision, Allow Additional Discovery, and Extend the Trial Deadlines Because Of JPMC's Delay and Bad Faith Efforts to Bar Plaintiff's Discovery before the Cutoff Date ...........................................................................4

II. Argument...........................................................................5

    A.        There Are Triable Issues of Fact as to Whether JPMC Violated Civ. Code §2923.6(c) by Foreclosing without Determining Whether Plaintiff Was Eligible for a Loan Modification ...........................................................................5

           1.        JPMC's Unreasonable Insistence on Cancelled Pay Checks Did Not Strip Plaintiff of HBOR Protections ...........................................................................6

           2.        Whether Plaintiff's Application Was Complete is a Triable Issue of Fact..9

           3.        JPMC Proceeded to Foreclosure Without Ever Determining Whether Plaintiff Was Eligible for Modification ...........................................................................10

           4.        Plaintiff Should Be Permitted Under Rule 56(d) to Conduct Further Discovery About Her 2014 Application ...........................................................................11

           5. Plaintiff Has Raised A Triable Issue of Fact on her ECOA Claim...................11

    B...........................................................................13

           1...........................................................................14

           2...........................................................................15

           3...........................................................................15

           4...........................................................................16

           5...........................................................................16

    C. Plaintiff Has Raised A Triable Issue of Fact on her ECOA Claim.......................16

    D. Plaintiff Amply Raises Triable Issues of Fact As To Whether JPMC Fraudulently Extended Her Modification Process For Its Own Gain.......................................16

        1 Plaintiff Has Evidence of Misrepresentation and Deceit.............................16

           a.    JPMC Repeatedly Invited Banks to Reapply and Engage In The

Modification Process, Demanding More and More Application Materials, When It Was Obvious She Would Never Qualify Because of Her Equity………………………………………………..……..16

b. Circumstantial Evidence Shows JPMC's Communications to Ms. Banks Were Intended to Mislead Her Into Believing She Might Qualify, Keeping Her In Default So That JPMC Could Profit……..…19

c.

2. Plaintiff Relied On JPMC's Various Promises and Representations That It Was Evaluating Her for Loan Modification In Good Faith…………………………21

E.   Questions Exists as to JPMC's negligence………………………………….……..22

1.   Plaintiff Raises Triable Issues Of Fact Whether Chase Breached Its Duty of Care…………………………………………………………………..…22

F.  Plaintiff Raises Triable Issues about Whether Chases Business Practices Were Fraudulent or Unfair under Bus. & Prof. Code 17200…………………………...…23

G. Plaintiff has Raised Triable Issues of Fact Exist as to Plaintiff's Real and Actual Damages………………………………………………………………………………24
       1. Loss of Equity ……………………………………………….……..24
       2. Banks Has Evidence of Credit Damage………………………………24
       3. Fees and Interest Were Permitted………………………………...…25
       4. JPMC Caused the Damages……………………………………………...25

H.  Plaintiff's Claims are not Barred by Judicial Estoppel………………………….26

I.       Plaintiff Has Not Abandoned Her Claims……………………………………27

## I.      Introduction and Factual Background

JPMC's motion for summary judgment argues Plaintiff Liz Banks received all the loan modification review to which she was entitled, and was treated lawfully and fairly, because she did not submit the unusual documents JPMC requested orally during the application process. What JPMC ignores is they were obligated to perform in a manner that unequivocally afforded borrowers with the opportunity to a fair and complete review of their modification application. Banks was not afforded a fair review of her application nor was she afforded an honest assessment of what was available to her in terms of modification options.

Throughout the entire process to modify her home, Banks was barraged with many different people who told her to submit many different documents. She continued to comply with the various requests, even when they seemed unnecessary or outlandish. Some of the requests were for items that did not belong to her and were sensitive in nature which caused her problems when she tried to comply. Throughout the entire process, JPMC continued to encourage her to re-apply. She would receive a letter saying she was being denied because she had not produced the necessary documents, and then, she would receive another application package telling her JPMC had programs available and she should re-apply again. All the while, Banks continued to try to comply with JPMC's never-ending requests in an effort to save her home.

Banks initially contacted JPMC in 2012 after she went into default to investigate the option of modification. JPMC sent Banks an application package for the HAMP modification program. Unbeknownst to Banks, she could not possibly qualify for a HAMP program, she filled out and submitted the application. The HAMP application does not ask whether a person is an employee or self-employed. Banks at this time was self-employed and submitted a letter from her client, Galaxy Gaming Ill, LLC, with whom she was working on a steady basis at the time in an attempt to verify her income. JPMC advised this was not an appropriate verification, she needed paystubs. Galaxy Gaming submitted to JPMC, through their attorney, paystubs demonstrating payment to Banks. (*See:* Grageda Decl. ¶ Ex. A, pp 96.) The paystub had an error in the address of Banks and Banks did not recognize this error prior to submitting it to JPMC.

In 2012, Banks and her husband Ernie Banks underwent a marital separation and due to Ernie Banks' declining health, his income and any income they derived through various businesses associated with him and his appearances became very unpredictable. While Ernie Banks was contributing to the household every month the amount varied and it was being provided as maintenance support since he was no longer paying the household bills. (*See:* Grageda Decl. ¶ Ex.) (JPMC-Banks_001226-001238) The HAMP application that JPMC sent to any and all income derived from the businesses Ernie Banks International and the 500 Home Run Club were directly and completely dependent on Mr. Banks himself regardless, of the amount of ownership. Banks held. Essentially, she could not earn any money through these businesses if Ernie Banks was unwilling to participate. Therefore, Banks' this was sole and separate income that was separate from Ernie Banks when applying for the modification with JPMC. The HAMP application specifically states on the second page, "You are not required to disclose child support, alimony or separation maintenance income unless you chose to have it considered by your servicer." (*See:* Grageda Decl. ¶ Ex. A, pp 8.) Banks viewed her income from Ernie Banks as separation maintenance and part of the impending divorce matter.

JPMC never notified Banks due to the errors on the paystubs and the fact that, as the sole borrower, her relying on her sole and separate income when applying, meant JPMC was going to have heightened standards for application. In fact, just now, in light of Banks complaint alleging JPMC continued to give her the run-around while amassing enormous default fees, does this allegation of suspicion (and thus heightened application requirements) during 2012 was even mentioned.

On **March 6, 2013,** JPMC sent another solicitation to Banks to reapply for modification. As advised by the JPMC employee during the February 18, 2013, phone call, Banks waited to until April to re-apply so the required documents would reflect the information JPMC was requesting. Their request surrounded how Banks' income was received. For more than a year, in an effort to avoid the standard 10-day hold on funds when depositing an out-of-state check, Banks sometimes used a check cashing service when receiving funds from Galaxy Gaming Ill, LLC, who is located in Chicago. (*See:* Quattocchi Decl. ¶ 3 Ex. A pp 113:7-9.) In an effort to

1   adequately respond to the February 18th instruction from JPMC, she asked her client, Galaxy

2   Gaming Ill, LLC, to wire transfer the funds in to her checking account for her March and

3   subsequent pay. This would allow her both immediate access to her funds and she could show

4   the funds deposited and thus prove receipt of income to JPMC as requested. She began

5   forwarding her modification documents on April 1, 2013.

6        The shortened briefing schedule prevents Plaintiff from identifying each flatly inaccurate

7   or misleading statement in JPMC's motion.[1] However, Plaintiff can readily show triable issues of

8   fact remain, or could be shown with the additional discovery specifically described in this

9   Opposition and in Plaintiff's Separate Statement.

10       **A.    Pursuant to Rule 56(d) of the Federal Rules of Procedure the Court Should
             Deny the Motion or Defer Decision, Allow Additional Discovery, and Extend
11           the Trial Deadlines Because Of JPMC's Delay and Bad Faith Efforts to Bar
             Plaintiff's Discovery before the Cutoff Date**

12       Despite arrangements to provide informal disclosures of servicing records agreed to early

13   on, JPMC intentionally delayed disclosing the most basic servicing records, withholding the vast

14   majority of the over 4,000 documents it disclosed, until a few days before its corporate

15   representative was deposed. (*See:* Sherron Decl. ¶.) It disclosed months' worth of records the

16   night before the deposition. (*Id* ¶ *. ) The late disclosures made impossible identifying, much

17   less deposing, critical witnesses; for instance, the document identifying Cheryl Ross as the

18   person who decided not to evaluate Ms. Banks for a modification in 2012 and reject her

19   application was not disclosed until July 28, 2014. (*See:* Sherron Decl. ¶) Even now, JPMC has

20   withheld critical information such as its "investigation" of Ms. Banks's income, and loss

21   mitigation notes after 2013, and customer service notes, written standards or policies about what

22   documents it requires to underwrite loans without so much as a privilege log. (*See:* Sherron

23   Decl.)

24       In the weeks leading up to the discovery cutoff, JPMC repeatedly scheduled, then

25   cancelled, depositions all over the country (not making any effort to actually serve the

26

27       [1] *See, e.g.,* UF 381 and 382, which claim that plaintiff admitted JPMC denied her

28   application because she did not submit documents, when in fact, she denied the Requests for
     Admission at issue.

1    subpoenas), playing musical chairs with the remaining deposition dates to delay deposition of the

2    30(b)(6) witness and the SPOC until the last possible moment. JPMC negotiated over the dates

3    for SPOC Lisa Martinez – the person who communicated directly with Ms. Banks from

4    November 2012 through August 23, 2013, and demanded that JPMC not consider her subsequent

5    applications (a current JPMC employee) – for 22 days, then refused to accept service for her

6    claiming they didn't have permission (after already accepting service); then later again accepted

7    service, but then objected that the notice was insufficient. (*See:* Sherron Decl. ¶)

8            As set out in the motion above and in UF 458 - 473, information sought in the 30(B)(6)

9    notice which Mr. Summerford was unable to provide, facts known to SPOC Lisa Martinez and

10   other JPMC employees identified only during the last days before the discovery cutoff, and

11   documents and discovery responses JPMC has refused to provide are critical to opposing

12   summary judgment and proving Plaintiff's case. Given these delays and obfuscations, additional

13   discovery is warranted: for example, a single interrogatory or request for admission would

14   suffice to counter JPMC's ridiculous argument that Civ. Code § 2923.7 does not apply because

15   Plaintiff hasn't shown JPMC foreclosed on more than 175 properties in the prior year.

16   (*See:* Declaration, Summerford Depo. pp.73-76.) The Court should defer decision and allow

17   additional discovery under Rule 56(d) based on this fact alone. Additionally, in their production

18   there is a conspicuous gap between February 25, 2013 and April 2, 2013. (*See:* Grageda Decl. ¶

19   Ex. B pp 214.) Since JPMC's omission of documents has deprived Plaintiff of loss mitigation

20   records crucial to proving whether JPMC received 2014 application showing a material change

21   in her position.

22   **II.    Argument**

23           **A.    There Are Triable Issues of Fact as to Whether JPMC Violated Civ. Code
                     §2923.6(c) by Foreclosing without Determining Whether Plaintiff Was
24                   Eligible for a Loan Modification**

25           JPMC argues Plaintiff's modification applications were not "complete," and that

26   therefore its denial letters were proper, and it was not required to genuinely evaluate her for a

27   modification or give her procedural protections under the Homeowner Bill of Rights JPMC is

28   wrong on all counts. First, Plaintiff provided all the documents that were legitimately, clearly,

1  and appropriately demanded of her, making her application "complete" within the spirit and

2  letter of the law. Although the record is unclear because JPMC has not produced a witness

3  sufficiently knowledgeable to interpret its records, (*See:* AF*[2] ) JPMC apparently

4  reopened. Banks's 2012 application in 2013, invited her to reapply, and then refused to review it

5  for much of 2013, ultimately providing the same specious denial on the grounds of incomplete

6  documents.

7          The record *is* clear that JPMC never actually considered evaluated Banks's eligibility for

8  a loan modification. Further discovery will show that had JPMC genuinely reviewed her

9  application any time in 2012 or 2013, she would have been denied a modification, and could

10  have taken other measures to save her home. Instead, she suffered foreclosure, losing at least

11  $1,000,000 in equity because of the delay and her home. Alternately, she might have reapplied

12  with "changed circumstances" by including the income from her separated husband that was

13  optional to include or exclude from her application. Plaintiff raises triable issues of fact as to

14  whether JPMC violated Civ. Code § 2923.6, causing her enormous harm.

15

16          **1.     JPMC's Unreasonable Insistence on *Cancelled Pay Checks* Did Not
        Strip Plaintiff of HBOR Protections**

17          JPMC argues Plaintiff's applications were incomplete because she did not provide

18  "verifiable" proof of income. (*See:* Mot. at 6-9.) An application does not require "verifiable

19  proof of income," defined by the servicer's whim, to be "complete" under the Civ. Code

20  §2923.6. Demands for documents the servicer identifies during review must be *in writing*. (*See:*

21  Civ. Code § 2924.10(a)(4).) An application is "complete" when "a borrower has supplied the

22  mortgage servicer with all documents required by the mortgage servicer within the reasonable

23  timeframes specified by the mortgage servicer." (*See:* Civ. Code §§ 2923.6(h); 2924.10(b).)

24          Moreover, the court should find, to effectuate the remedial intent of the statute, the

25  demands for documents must be reasonably necessary to determine the borrower's ability to

26

27          [2] [JPMC's corporate witness was insufficiently knowledgeable to testify about whether
the 2012 application was reopened. Summerford. 175:7-12; 175:15 UF 458-473 JPMC's

28  corporate witness had insufficient knowledge on TOPIC NO. 1 (citations, with parentheticals)…
No 2 (citations with parentheticals) ]

qualify for some foreclosure alternative. (*See* Civ. Code §2923.4 (purpose of HBOR)). Servicers should not be permitted to circumvent the HBOR's protections for homeowners by imposing arbitrary or unnecessary requirements. Accordingly, courts have genuinely scrutinized whether demands for documents are legitimate. (*See, e.g., Gilmore v. Wells Fargo Bank, N.A.* 2014 WL3749984 *5 (N.D. Cal. July 29, 2014)("serious questions" exist as to whether application was complete where documents demanded were unnecessary for the application, were not clearly communicated, and were demanded by telephone rather than in writing); (AG settlement servicing standards require JPMC to make its documentation demands publicly available.)

Here, JPMC made changing and often contradictory income verification demands of Banks that bore no relation to its written requests for documentation. More than six application forms were sent to Banks between 2011 and 2014 which sought only pay stubs or a profit and loss statement.[3] . The letters to Banks describing what her application was "missing" mentioned only IRS forms, completed application forms, UF31, 34, 41; "pay stubs" showing year to date earnings, UF41, and/or a profit and loss statement, UF45. Some demands or missing items were specious; for instance, JPMC repeatedly demanded Banks provide utility and cable bills to prove she occupied the property, when it had already completed an interior inspection of the home in October, 2012 to confirm she lived there. UF 487.[4]

In fact, JPMC rejected Plaintiff's application as "incomplete" for one reason alone: Banks failed to submit copies of the *cancelled pay checks* her employer sent to her and which she had cashed. JPMC's "Loan Integrity Operations" department apparently[5] demanded the cancelled checks corresponding to the pay stubs Banks had submitted for June through

---

[3] [JPMC781 – Pay stubs or P&L;;Depo Ex. 87 (2/28/12) (same) Depo Ex. 44 (1/17/13), Ex. 111 (3/5/13) pay stubs or Profit and loss; Ex. 78 – 1/16/14,]

[4] UF 487 [JPMC repeatedly demanded unnecessary documents as part of the application process. For instance, JPMC demanded an interior inspection in October, 2010 to confirm that Banks lived there. Summerford Depo 108:8-109:3, Ex. 89 at 4304-5, but in May 15, 2013 demanded utility and cable bills as proof of occupancy. Summerford Depo 201:4-202:24, corresponding LMT notes Ex. 88. ]

[5] JPMC has not disclosed any documents relating the "LIO" investigation, standards applied, or report; JPMC's corporate representative Jeremy Summerford had no knowledge relating to the investigation or report; and JPMC has refused to provide a privilege log relating to this or any other documents withheld. CITE, Summerford Deposition 112:13-118:16.

September, 2012. (See: UF55; 56.) JPMC initially denied the 2012 application solely because the cancelled checks were not submitted. When JPMC reopened the application and JPMC invited her to apply again, (*See:* UF 480[6] UF 71, 72, 77, 80), JPMC secretly imposed the *exact same requirement*: that she provide cancelled checks before it would even consider her reapplication. (*See:* UF 484[7] UF 485[8]) JPMC's internal notes show JPMC would not consider any renewed application without the specific cancelled checks it identified by check number from 2012. (*See:* UF105, UF 481.[9])

JPMC's unique demands were *never* communicated to Banks in writing. Although JPMC's December, 2012 and July, 2013 denial letters both stated that "[w]e sent you one or more letters with a list of the documents we needed from you to finish reviewing your modification," (*See:* Banks Depo. Ex.41, 58), no missing document letter ever mentioned cancelled checks (See: UF 483[10]). Although JPMC representatives mentioned the canceled checks to Banks on the phone, there is a triable dispute as to whether the JPMC's continuing demands for specific checks were conveyed effectively or honestly to Banks. JPMC notes about what Banks was told after she initially refused to seek additional documents from her employer are ambiguous; representatives told her to provide "canceled check (paystub)," or gave her the alternative of submitting bank statements showing the deposits (which she did) UF 486 [11] JPMC

---

[6]UF 480[JPMC invited Banks to reapply on January 17, 2013. Depo Ex. 44. Add more , see below]

[7]UF 484[[JPMC either reopened and denied the 2012 application or refused to consider her renewed application; Summerford Depo. 176-176ish. The LOI requirements of cancelled checks from 2012 barred review of her application. 175-76, 2381-81, Summerford Depo.188-89, 2142, Summerford Depo. pp. 206-207],]

[8]UF 485 For instance, JPMC internal notes state that "PER LOI FINDINGS UNABLE TO PROCEED WITH ANY MODIFICATION WITHOUT PROVIDING ALL DOCUMENTS REQUIRED FROM THE PREVIOUS MIL [missing items letter]. PER CIC and LOI GUIDELINES AND IF BORROWER DOES NOT COMPLY WITH PRIOR MIL NO REVIEW IS POSSIBLE. AF * (Ex. 88 2389, SUMMERFORD DEPO. Depo 162:5- 168:13 )

[9] UF 481 [JPMC required specific checks from 2012, identified by check number, even for Banks's attempts to apply in 2013. SUMMERFORD DEPO. 205:2-13 and related Ex.]. Ex. 85, started loss mit, started in error;]

[10]UF 483[… JPMC never demanded cancelled pay checks in writing. SUMMERFORD DEPO. Depo. 212:4-11; 89:2-16].

[11]UF 486 [**SUMMERFORD DEPO. 188-89; January 25, 2013 at 15:44:06** - "docs needed are: 2 most recent bnkstmts [bank statements] with paycheck deposits **or** 3 months canceled checks, 4506T cannot be altered, has brw [borrower] filed 2011 taxes?" *See:* Grageda Decl. ¶ Ex. B pp 221

recorded its calls with Banks, UF 487 but they have not been produced any of those audio recordings. UF 488 JPMC has not produced, and Mr. Summerford could not testify to, any written or standardized guidelines for requesting additional documents. UF 489 JPMC did not tell Banks why it was demanding the canceled paychecks or ask her about the inconsistencies it had identified. UF 490

### 2. Whether Plaintiff's Application Was Complete is a Triable Issue of Fact

Banks's application documents were not flawless, but she submitted all the documents needed to evaluate her request. JPMC's records show her 2012 application was initially denied, but reopened in early 2013. (*See:* UF 192). Even if the 2013 application was separate, there is a triable issue of fact as to whether she was "afforded a fair opportunity to be evaluated" in 2012. (*See* Civ. Code 2923.6(g). (servicers are not obliged to evaluate repeated applications from borrowers who have been). A representative instructed her to submit her documents in May of 2013, so she could submit two bank statements with "support of the income deposited." (*See:* UF 493[12].)In April, 2013, Plaintiff submitted an RMA form, 4506-T-EZ, pay stubs for December, 2013, (*See:* UF 72), January and February, 2013, UF 77, records of a wire transfer from Galaxy Gaming directly to her account for March, 2013, *id.*, a Dodd-Frank certification, (*See:* UF85),

---

**January 28, 2013 at 11:21:49** – "Employer to provide recent 3 months canceled check (Paystubs), Brwr [borrower] to provide 2 most recent bank statements to support receipt of this income." *See:* Grageda Decl. ¶ Ex. B pp 220

**February 6, 2013 at 14:54:39** – "Inbound call from Borrower… Advsd the file has just opened 02/01/2013 but not yet reviewed… sent email to CAS. She did not want me to go through the accnt she just want a call back." *See:* Grageda Decl. ¶ Ex. B pp 221

**February 9, 2013 at 15:19:48** – "Employer to provide recent 3 months canceled check (Paystubs) Brwr to provide 2 most recent bank statement to support receipt of this income." *See:* Grageda Decl. ¶ Ex. B pp 219

**Febraury 15, 2013** – "Lvm [left message] for Brw to call – we cannot review for loan mod until we get employer to provide recent 3 months canceled checks (Paystubs), Brw to provide 2 most recent bnkstmts [bank statements] to support receipt of the income with all other critical docs"

**February 18, 2013** – "Adv [advised] we cannot start the loan mod review process unless we have 3 months canceled checks from the employer along with 2 months bnkstmts with support of the income deposited suggested she reapply in May so she can have the bnkstmts of March and April she had my info adv [advised] FCL [foreclosure] suspended.]

[12] UF 193 [Ex. 88/2388 Feb 18, 2013;; isee also*:* Grageda Decl. ¶ Ex. B pp 221 (1/25/13)].

1    and complete March, 2013 Wells Fargo bank statement for March, 2013, (*See:* UF 80). In May,

2    2013, she submitted a complete Wells Fargo checking account statement for April, 2013.

3    (*See:* UF 89). In May and June, in response to JPMC's requests, she submitted water and cable

4    bills to prove her occupancy. (*See:* UF90-91.) Plaintiff had already provided her 2010 tax return,

5    ((*See:* UF15), along with that of Ernie Banks International, Inc., for 2010. ((*See:* UF 15, 46.) She

6    submitted her request for an extension of time to file her 2011 taxes, along with an explanation

7    letter. (*See:* UF293.)

8        These documents formed a "complete" application. JPMC document reviewers said that

9    all documents had been "perfected" by June, 2013. (*See:*  UF 494[13].)

10       **3.     JPMC Proceeded to Foreclosure Without Ever Determining Whether
               Plaintiff Was Eligible for Modification**

11       Despite having all the documents it needed to tell whether Banks could possibly qualify,

12   JPMC failed to genuinely review her for a modification. It chose, twice, not to complete its

13   review by using its software to determine the "Net Present Value" of a possible modification.

14   (*See:* UF 495.[14]) Plaintiff believes further discovery would show that, with nearly a million

15   dollars in equity in 2012-2014, she never could have qualified for a modification. (*See:* AF*-*.[15])

16   (*See, e.g.*, *Karapetyan v. JPMorgan JPMC Bank, N.A.*, 2012 WL 3308883 *1 (E.D. Tex. June 6,

17

18   _____

     [13] UF 494 [JPMC determined multiple times that documents had been "perfected" and
19   were ready to be sent to the underwriter Summerford Depo. 92:14-24 (defining "perfected"; Ex.
     88 2377, 2370 LIST EVERY TIME SAYS PERFECTED, Ex. 94, Summerford 96:19-23; 106 /
20   4306 "file is ready for the underwriter"] SUMMERFORD DEPO. 201, 204, 207, Ehx. 1112/2354
     On **June 19, 2013 at 04:56:33**, JPMC employee number N569205 enters the following notes
21   stating, "CA OPS Review: this review is based on full review: **\*All docs received and
     perfected."** Again, yet another employee has acknowledged the receipt of all necessary
22   documents and the perfection thereof. This employee performing the review does not state some
     of the documents are received and perfected or a few of the documents, but *all* documents have
23   been received and perfected. See*: Grageda Decl. ¶ Ex. B pp 196
         [14] UF 495 [JPMC decided not to run an NPV test in December 2012. SUMMERFORD
24   DEPO. 137-138, Ex. 102; JPMC declined to run an NPV test or evaluate Banks for a
     modification in July, 2013. JPMC 1583-1591 ]
25       [15] UF 496 [AF: The second component of modification review is a "net present value" or
     "NPV" test which determines whether it is in the investor's interest to modify. Summerford
26   Depo. 26-27. Mr. Summerford was unable to testify about JPMC's NPV test, or whether Banks
     could have ever qualified for a modification with significant equity. Summerford Depo. 58-
27   64:10; 140-141. Banks's unpaid balance from 2012-2014 ballooned from approximately
     $890,000 in June, 2012 (an unpaid principal balance of $852,236 (2223) plus $36, 948 (Ex.
28   125?)) to $ 982,542.50 at foreclosure Ex. 11. . JPMC's estimate of her home value varied from
     $1,285,750 TO $1,620,000 Ex. 97.

2012)(JPMC informed Plaintiffs they did not qualify for modification because they had too much equity). JPMC's failure to review the application once it was complete, keeping her instead on the proverbial modification treadmill with pointless demands for documents and bad faith "stays" of foreclosure for years, caused foreclosure of her home and loss of significant equity.

### 4. Plaintiff Should Be Permitted Under Rule 56(d) to Conduct Further Discovery About Her 2014 Application

JPMC's unexplained refusal to produce loss mitigation notes after July, 2013 has denied Plaintiff the opportunity to show that she submitted another application in May, 2014. (*See:* UF 496[16].) JPMC argues, under Civ. Code §2923.6(g), it would not have been required to review a 2014 application in any case because it had already given Plaintiff application a "full and fair" opportunity to be reviewed for a modification. As a trial court recently held in *Johnson v. Aurora Bank, FSB*, 2015 WL 1306466 (N.D. Cal. Mar. 23, 2015), a servicer's denial based on an erroneous finding that the borrower had not submitted all documents was not based on the merits of her application and did not afford the borrower a "fair opportunity" to be evaluated at all. As set out above, Plaintiff has raised a triable issue about whether she was wrongfully denied review. She should be permitted to compel the documents JPMC has failed to disclose and conduct further discovery.

### 5. Plaintiff Has Raised A Triable Issue of Fact on her ECOA Claim

Plaintiff has raised a triable issue of fact as to whether JPMC violated ECOA, 15 U.S.C. § 1691(d)(1) and 12 C.F.R. § 1002.9, because it did not notify her within 30 days of its refusal to modify her application. As set out above, JPMC determined on the basis of its "LIO" reports that it would never even evaluate her application unless she produced cancelled checks from 2012. Nonetheless, JPMC repeatedly invited her to apply, demanded other documents, and then waited to decline her application until July, 2013. The delay caused her loss of equity and the loss of opportunities to use other means to save her home.

### B. Questions of Fact Exist Whether Plaintiff was Assigned a True SPOC:

---

[16] UF 497 JPMC has refused repeated requests to produce a full and un-redacted copy of the LMT Process Notes (LMTN), the servicing software where loss mitigation notes are recorded. Summerford Depo.35. JPMC produced the notes for the LMTN system for the dates May 29, 2012 through July 10, 2013 ending virtually one year before the property is sold.

### 1. Questions of Fact Exist Whether Plaintiff's SPOC Changed

Banks acknowledges the assigned SPOC in November of 2012 was Ms. Lisa Martinez. Ms. Martinez continued as Banks' SPOC until after the erroneous denial on July 11, 2013. However, JPMC seems to believe this is when the relationship between Banks and JPMC ended. In fact, JPMC continued the next 12 months until the property was sold on June 12, 2014. It was during this time Banks' SPOC repeatedly changed. On August 24, 2014, the SPOC changed to John Kilroy. (*See:* Quattrocchi Decl. 4 ¶ Ex. B, pp 148.) On November 27, 2012, it changed to Susan Conert. (*See:* Quattrocchi Decl. 4 ¶ Ex. B, pp 149.) On May 21, 2014, it changed again to Daniel Ramirez. (*See:* Quattrocchi Decl. 4 ¶ Ex. B, pp 164.) In total, between December 11, 2011, and June 12, 2014, Banks had some 6 SPOC's assigned to her during that period. A modification can easily take six months and often takes longer when a borrower must complete a three-month trial payment plan, this is a SPOC change at an extraordinary rate.

### 2. Questions of Fact Exist Whether the SPOC Performed (Discharge) Duties

Under Section CA Civ. Code §2923.7(b), a SPOC shall provide applicants with 1) information on the process; 2) facilitate that process; 3) inform applicants of the status; 4) ensure that applicants are considered for all prevention alternatives and 5) have access to individuals with the ability to stop foreclosure proceedings when necessary.

During 2013 and 2014 JPMC failed to provide Banks with a SPOC that fulfilled their responsibilities as stated under Cal. Civ. Code 2923.7(b). JPMC has failed to provide the requested discovery to correlate employees with their numbers, Banks is unable to identify the specific SPOC she spoke with in the LMT Process Notes.

*1) Information on the Process:* Lisa Martinez did not send Banks one letter during the 2013 application process informing her of what documents were missing from her application. Further, Martinez sent Banks the denial letter on July 11, 2013, she never mentioned anything at all about an appeal process or Banks' right to such appeal. (*See:* Quattrocchi Decl. 4 ¶ Ex. C, pp 494-495, Banks Depo. Ex. 59). Throughout 2013, the SPOC failed to notify in writing of the missing documents and to notify of the option of appeal.

*2) Facilitate that process:* On January 25, 2013, at 15:44:06, either Ms. Martinez or a

1  member of the SPOC stated, "docs needed are: 2 most recent bnkstmts [bank statements] with

2  paycheck deposits **or** 3 months canceled checks, 4506T cannot be altered, has brw [borrower]

3  filed 2011 taxes?" (*See:* Grageda Decl. ¶ Ex. B pp 221)

4         This would inform anyone accessing this account, that Banks could either produce bank

5  statements with paycheck deposits **or** three months cancelled checks. Yet the same SPOC

6  throughout the entire period of time continued to notate in the system, "borrower has not

7  complied." This is true even though Banks delivered these statements on April 2, 2013, and May

8  7, 2013. Furthermore, as stated, *supr, a* several other people on at least three separate occasions

9  marked Banks file in the LMT Processing Notes as having received and perfected *all documents.*

10        On February 18, 2013, at 14:51:03, employee 0279883 advised Banks to wait until May

11  to reapply so she can change the way she receives her regular income and have proof of the

12  deposit on her bank statements. (*See:* Grageda Decl. ¶ Ex. B pp 218.) Banks follows this

13  instruction, and is still told it is not enough and she has not produced the necessary documents,

14  when in fact, she completely showed proof of receipt of income.

15        Ms. Martinez did not work to resolve these issues or facilitate the modification process.

16        *3) Inform Applicant:* Banks was not informed as to what she really needed to produce.

17        *4) Considered for All Modification Options:* JPMC wrongly claims Banks' application

18  was not considered due to the fact that it was incomplete. Thus JPMC cannot also claim Banks

19  was considered for all modification options as she was never considered for even one.

20        *5) Access to individuals who can stop the foreclosure:* Banks cannot tell from the

21  discovery produced whether or not Ms. Martinez had access to someone who could stop the

22  foreclosure. JPMC has neglected, despite several requests to produce LMT Process notes past

23  July 13, 2013.

24        Therefore, for these reasons, JPMC clearly did not provide a SPOC who was able to

25  discharge the statutorily required duties under Cal. Civ. Code 2923.7(g) and is thus liable under

26  same.

27        **3. Questions of Fact Exist Whether Cal. Civ. Code § 2923.7 Applies to JPMC**

28        JPMC challenges for the first time in their Motion for Summary Judgment whether or not

they are actually a large servicer under the meaning of Cal. Civ. Code § 2923.7 which is a servicer that forecloses on 175 or more properties in California. Considering JPMC is ranked as the largest bank in the world, this is a laughable idea.

### 4.   § 2923.7(g) Applies to JPMC

The public record search shows clearly that JPMC foreclosed on well over 175 qualifying homes and if they did not properly report such to their primary regulator they are clearly in violation of the code. Thus, § 2923.7(g) applies to JPMC *See:* Sherron Decl. Ex C)

### C. Plaintiff Has Raised A Triable Issue of Fact on her ECOA Claim

Plaintiff has raised a triable issue of fact as to whether JPMC violated ECOA, 15 U.S.C. § 1691(d)(1) and 12 C.F.R. § 1002.9, because it did not notify her within 30 days of its refusal to modify her application. As set out above, JPMC determined on the basis of its "LIO" reports that it would never even evaluate her application unless she produced cancelled checks from 2012. (*See:* AF *.) Nonetheless, JPMC repeatedly invited her to apply, demanded other documents, and then waited to decline her application until July, 2013: (*See:* AF* The delay caused her loss of equity and the loss of opportunities to use other means to save her home. AF* something else.

### D.   Plaintiff Amply Raises Triable Issues of Fact As To Whether JPMC Fraudulently Extended Her Modification Process For Its Own Gain

### 1. Plaintiff Has Evidence of Misrepresentation and Deceit

Plaintiff can satisfy the first element her fraud claim by showing JPMC knowingly made a false representation, made a representation without reasonable ground for believing it was true, states misleading facts, or makes a promise without intention to perform. Civ. Code § 1710; California Civil Jury Instructions ("CACI") 1900 (representation made "recklessly and without regard to the truth"); 1901 (intentional failure to disclose), 1902 (promise without intent to perform); 1903 (negligent misrepresentation).

### a.   JPMC Repeatedly Invited Banks to Reapply and Engage In The Modification Process, Demanding More and More Application Materials, When It Was Obvious She Would Never Qualify Because of Her Equity.

JPMC contends it "never stated that Plaintiff was eligible for a loan modification under any program." However, JPMC continually suggested it had options that could help Banks keep

her home (Denial Letter 12-18 and 7-11) JPMC evades the fundamental premise of Plaintiff's fraud claim: JPMC kept Ms. Banks in the workout process, suggesting to her in multiple ways that she might qualify if she just got the paperwork right, and finally supplied some magic document, when, in fact, she would not have qualified whatever document was provided.

When it had all the information it needed to know she would never qualify. In so doing, JPMC profited at Ms. Bank's expense.

Banks never could have qualified for a modification. She submitted her first application on May 24, 2012. (*See:* UF1.[17]) On June 6, 2012, JPMC obtained a Broker Price Opinion estimating the value of Banks' home at $1,825,750.00. FF2. At that point, Banks owed approximately $890,000. (*See:* FF3.) Even relying JPMC's *own* information, she had nearly a million dollars in equity.

JPMC has tried to deny Plaintiff a straight answer about whether she could have qualified with such equity: JPMC's person most knowledgeable claimed ignorance, (*See:* UF 502, [Summerford Depo 57:7- 63:24]), and JPMC refused to produce its standards for modifying loans. (*See:* Sherron Decl.) Ordinarily, NPV runs on Agent Desktop would show whether a loan could qualify for modification by showing whether a modification "makes business sense" for the investor. (*See:* FF 4-5.) However, JPMC only disclosed the fact that a NPV had never been run on Ms. Banks's loan until a week before the discovery cutoff. (*See:* FF7 (Summerford "not aware of an NPV being run on this loan at all, ever."); (*See:* UF 501.)

---

[17] JPMC invited Banks to apply for the flagship federal modification program HAMP no fewer than nine times between 2011 and May 2012, FF1, even though it knew she never could have qualified for HAMP because her unpaid balance was over the program limits. UF147. JPMC suggests "none of the application documents that Plaintiff ever submitted at any time between May 2012 and June 2104 was specific to HAMP." Mot. at 14, citing UF188 and a HAMP application. The application clearly states on its face it is for HAMP (Making Home Affordable). While the Acknowledgement and Agreement section does indicate the information will be used to evaluate for short sale (not applicable to Ms. Banks) or deed-in-lieu of foreclosure, it does not indicate it will be used for other modification programs. JPMC did not begin sending a more appropriate application until January 2013. UF63. Moreover, JPMC's letter acknowledging her HAMP application stated "You may qualify for monetary incentives that will pay down the principal balances of your loan if you make your modified payments on time." UF191. The solicitations to apply and this letter are intended to convey that Ms. Banks *might* qualify for HAMP, when in fact she could not.

Nonetheless, Plaintiff will be able to show, with even limited further discovery, that her equity unquestionably rendered her ineligible for a modification. The SPOC, the underwriters who declined to run the NPVs, Cheryl Ross (2012) and Ehtasham Ahman (2013), or even a knowledgeable 30(B)(6) witness could provide the answer. JPMC's response to a request for admission that Ms. Banks could not have qualified with the income she listed in her applications, her unpaid loan balance, and JPMC's home valuation would resolve any uncertainty.[18]

Despite Plaintiff's painfully obvious inability to qualify, JPMC led Ms. Banks on a two-year saga of demands for documents. JPMC took seven months to deny her first application. (*See:* UF1, 68.) It solicited her to reapply within days of the first denial. (*See:* UF163.) JPMC reopened her application and kept telling her not only to submit documents but how and when to submit in early 2013. UF 500 (Summerford Depo. pp. 175-77); FF8. JPMC solicited her again two months later, and accepted her application submitted in April, 2013. UF 72. JPMC continued to demand more documents to "verify" income when her equity was all that mattered; each time she submitted documents, JPMC requested more. UF76 (demand for new RMA, "pay stubs"), UF77 (provided), UF80 (updated documents), UF87 (request for tax letter of explanation), UF88 (provided) FF9 (demanding proof of occupancy) UF90, 91 (provided),. It kept demanding more and conflicting documents until her other documents expired.; *see* LMTN2367 ("6/18/13… NEEDED DOCUMENT NOT INCLUDED IN MIL [missing items letter]: CANCELLED CHCKS FROM EMPLOYER (PER STUBS RECD HAS NO DEDUCTIONS NEED TO KNW IF AT THE END OF THE YEAR WILL BE RCVING A 1099 IF SO NEED A 3 MONTH P&L"); FF10-11.

Finally, as set out in section * above, JPMC's invitations to apply and demands throughout 2013 for documents constituted a promise to genuinely review Ms. Banks for a modification without any intent to do so; JPMC had already determined she would *not* be evaluated because she refused to submit cancelled checks from 2012. UF 498 (citing Summford Depo. pp.166 – review is "not possible). JPMC's corporate witness admitted that JPMC was

---

[18] As set out in section *, Plaintiff still needs further depositions to support other claims and prove other facts.

simultaneously "demanding cancelled checks from October [2012] and refused to modify her until she produced those. And at the same time JPMC was continuing to ask her for other support documents for her applications and to solicit her for applications throughout 2013."

(*See:* Summerford Depo. 206:15-207:2.) JPMC was still demanding "that information from 2012. The Loan Integrity Operations investigation was still in place and in order to protect the borrower and the bank, that information, what could be considered inconsistencies needed to be cleared up." *Id.*

        **b.**     **Circumstantial Evidence Shows JPMC's Communications to Ms. Banks Were Intended to Mislead Her Into Believing She Might Qualify, Keeping Her In Default So That JPMC Could Profit**

JPMC's handling of Plaintiff's loan modification and its subsequent postponement of foreclosure on the basis of obviously fraudulent bankruptcy documents raise triable issues of fact about JPMC's knowledge, intent, and malice.

JPMC did not consider any other means of verifying Ms. Banks's income once she said she couldn't provide cancelled checks that were not in her control. (*See:* FF16.) JPMC intentionally kept Ms. Banks in the dark about its real handling of the modification. (*See:* UF 499) [never told her why it needed the documents]. JPMC never informed Banks her application was under heightened scrutiny for irregularities, so she could address that issue directly; it actually refused to allow her to speak to the underwriters. (*See:* FF13.) JPMC continued to tell her the loan was "in underwriting" or the "workout" was "in progress," (*See:* FFF12, 14), but took steps to ensure it remained on the brink of foreclosure, with serial postponements pushing the date out. (*See:* FF15.)

When asked whether "there was any way in which this loan modification application was handled differently because of the amount of equity that [Ms.] Banks had in her home," JPMC's witness responded, "From what I could tell, there were multiple attempts spanning almost a two-year time frame to allow her to modify. I don't know of any — I haven't seen any rush to judgment, I guess, on a modification decision." (*See:* Summerford Depo. 143:15-21.) On the contrary, JPMC delayed in every way possible. Although the loan went to the underwriting department multiple times, and it would have taken only minutes to check the obvious red flag of

a million dollars' equity by running an NPV test, (*See:* FF6.) JPMC never ran an NPV. (*See:* FF7.)

While JPMC relentlessly pursued unique documents to "verify" Ms. Bank's income, it took the opposite approach when it received obviously fraudulent bankruptcy documents in 2013 and 2014, immediately putting foreclosure on hold when it received each filing. On August 21, 2013, the Trustee sent JPMC documents faxed to it that purported to show a loan from Ms. Banks to a Vincent Riley, and a bankruptcy filing by Mr. Riley. (*See:* FF17.) JPMC put the foreclosure on hold until the bankruptcy was dismissed in November, 2013. (*See:* FF18.) On January 9, 2014, JPMC received similar notice of an alleged loan from Ms. Banks to a Ralph Zunker, and a bankruptcy filing by Mr. Zunker. (*See:* FF19.) JPMC put the pending foreclosure on hold from January, 2014 until the Zunker bankruptcy was dismissed in May, 2014. (*See:* FF20.)

The bankruptcy documents were obviously fraudulent. The deeds were not recorded. (*See:* FF21.) The notaries' signatures were forged. (*See:* FF24 (*See:* Humerto Navarro Decl.) Both faxes attached archetypically *pro se* style legal argument about bankruptcy stays. (*See:* FF2.) The Zunker fax attached a clearly falsified Notice of Trustee Sale, in which the forged barcode predated the document itself by four months. (*See:* FF23.) Ms. Banks's signatures were forged, and she had no knowledge of the bankruptcies or the documents sent to the foreclosure trustee. (*See:* FF25.)

JPMC did not suspect Ms. Banks herself of foul play; (*See:* FF27.) JPMC had an entire department devoted to protecting both the bank and its borrowers from fraud. (*See:* FF28.) JPMC was or should have been on notice that sending a "partial interest" bankruptcy notice was a common form of foreclosure rescue scam. (*See:* FF29.) JPMC did absolutely nothing to investigate whether the bankruptcies were real. (FF26.[19]) It failed to even consider whether a potential heir of Mr. Banks could have filed the documents to "preserve" what he or she viewed

---

[19] In any event, it disclosed no documents evincing an investigation, and its corporate witness designated to testify about its investigations related to the loan had no knowledge of any. *Id.*

as part of the estate, or whether a fan of Ms. Bank's husband, the baseball hero Ernie Banks, could have been filing fraudulent documents in a misguided attempt to help Mr. or Ms. Banks. (*See:* FF29.) In fact, When Ms. Banks insisted to both a housing counselor, who agreed the credit report she had just pulled did not show a bankruptcy noted, *and* a JPMC representative that she was not, in fact, in bankruptcy in 2014, JPMC did absolutely nothing, and made no substantive record of the conversation. (*See:* FF 30.)

JPMC stood to benefit from the delay in foreclosure. Under the pooling and servicing agreement that governs the relationship between the investor and JPMC, JPMC stands to benefit from delay in foreclosure through monthly servicing fees, default-related fees it charges homeowners, such as inspection and late fees, particularly where there is equity. FF31-37.

## 2. Plaintiff Relied On JPMC's Various Promises and Representations That It Was Evaluating Her for Loan Modification In Good Faith

Plaintiff relied on the modification process to resolve her delinquency. JPMC argues she cannot claim she changed positions in reliance on the ongoing modification process. However, she did. Had JPMC rejected her because she had too much equity, she would have explored other options. In 2012, her husband Ernie Banks could have helped her reinstate the loan had she asked him to, because at the time, his dementia was not as severe and he still had income. (*See:* FF *.) She could have sought a private loan from one of her many wealthy contacts. During 2012 and 2013, she also could have Mr. Banks back on title and refinancing with a reverse mortgage. (*See:* FF38-39.) She would have also seriously considered other options. Because she had nearly a million dollars in equity, she realistically had other options open to her. She has raised a triable issue of fact as to reliance.

JPMC's arguments to the contrary fail. Plaintiff does not contend that she was insisting on a HAMP modification only. (*See:* Mot at 15:18-16:5.) JPMC argues her deposition testimony establishes she "repudiated all alternatives other than modification." She did not consider those that were, by definition, inapplicable; she could not short sell or enter HAFA, the Making Home Affordable short sale program, because her home was worth more than she owed. It was not reasonable for her to consider a "deed in lieu" – that is, handing over a house worth more than

$2,000,000 to pay off a debt of less than a million. Moreover, she never repudiated other viable options which JPMC simply refused to offer, such as a recapitalization plan. Instead, JPMC kept her on the modification merry-go-round, soliciting modification applications and demanding more documents. Banks reasonably relied on these solicitations that JPMC was sincerely trying to help her and there was a possibility she could qualify for a modification.

### E.  Questions Exists as to JPMC's negligence

### 1.    Plaintiff Raises Triable Issues Of Fact Whether Chase Breached Its Duty of Care

This Court has already held that Plaintiff states a cause of action for negligence. Docket No. 25, November 19, 2014 Order at 12-13.  Chase disingenuously argues Plaintiff has no support for her claim. MSJ at 17:15-18, UF216.[20]  But Plaintiff's evidence already raises triable issue of fact about whether Chase breached its duty of care.   With the opportunity to compel further responses and conduct limited further discovery, she can prove Chase acted with in reckless disregard of her rights.

Chase enticed Ms. Banks into a two-year cycle of application, implying she might qualify for a modification with its repeated invitations to provide more documents and reapply. *See*, *supra.*  Chase acknowledges the value of having homeowners understand the modification process.  UF 503 During those two years, Chase representatives at every level – from her many SPOCs, to customer service representatives to the Chase Private Client office from which she faxed her applications – failed to recognize that her equity would doom her application from the start.  Chase systematically failed to train its front line staff on the actual mechanics of modification. UF 504 (Chase collections employees were only trained to suggest options and pass the customer on to loss mitigation);  28:12-29:5 (customer service representatives were trained only to describe the loan status), 45:20-46.15 (Chase branch employees could only direct borrowers to Chase Homeownership Centers or help fax documents)].  In fact, it trained its employees to tell homeowners that there were "so many variables" that they had to "go through the process" to know if they could qualify.  UF 505 For instance, those with no income, or a

---

[20] Plaintiff's counsel accidentally admitted to a double-negative request for admission – one of *204* requests for admission served by Chase.   Sherron Decl. ¶ *.

million dollars in equity.[21]   For those clients with equity, Chase's insistence on a long process of document collection and review would do no more than create default and servicing fees for Chase and consume the homeowner's equity.

Chase failed in multiple other ways.   As set out above, it refused or failed to recognize that Ms. Banks's application was sufficiently complete to evaluate her for loss mitigation, even though its records show documents were "perfected" on June 18, 2013, May 23, 2012 and April 16, 2013.  *See:* Grageda Decl. ¶ B pp. 198, 200 and 206 dates seem wrong .  It refused to find alternate means of "verifying" her income, putting its own (secret) rules above her interests. It failed to send her even one letter describing the income documentation it was demanding.  It protracted its review with internecine battles between the SPOC, Ms. Martinez, and other departments over whether Ms. Banks was properly could be denied for refusing to produce paystubs, UF 507 From January 24 to April 4, 2013, Chase's QC department repeatedly refused to approve the denials, while the loss mitigation department (Ms. Martinez) insisted no review was possible.   Ex. 88 2380-84;  Summerford Depo 168:2- 176:23; 181:4-17;  Depo Ex. 108-110.   Although it recognized its duty to protect borrowers from fraud, it ignored her protests that she had not filed bankruptcy, and utterly failed to recognize or investigate the bankruptcy scams that consumed nearly another year of her equity.

Finally, Chase's incomplete production casts doubt on whether it actually received but lost her May 2014 application, since so many records are missing.

**F.    Plaintiff Raises Triable Issues about Whether Chases Business Practices Were Fraudulent or Unfair under Bus. & Prof. Code 17200**

Chase's conduct described above is unlawful, both fraudulent and unfair.

A business practice is unfair if the harm to the consumer outweighs the utility of the conduct. *Rubio v.  Capital One Bank*, 613 F.3d 1195, 1204-05 (9th Cir. 2010).   Here, whatever fraud-

---

[21]   Chase's discovery stonewalling (specifically, its failure to produce its loan modification policies and procedures and to disclose the identity of knowledgeable underwriters who handled the loan) has kept Plaintiff from learning whether Ms. Bank's income would have been insufficient as well).   AF * [Sherron Decl:  we served XYZ, they didn't respond]

prevention purposes Chase's *ad hoc* demands for documents[22] served, their utility was far outweighed by the harm to Ms. Banks.   A practice is also unfair if it violates public policy as declared by specific constitutional, statutory, or regulatory provisions.  *Id.*  Chase's failures to communicate accurately with Ms. Banks, secret standards and undisclosed heightened scrutiny of Ms. Banks, and pointless delay violate the public policies of promoting of transparency in loss mitigation, avoiding dual tracking, and avoiding foreclosure embodied it the HBOR, ECOA, the CFPB's new loss mitigation regulations, 12 C.F.R. 1024.41 *et seq,* and the National Mortgage Settlement consent decree servicing standards imposed on Chase.

### G. Plaintiff has Raised Triable Issues of Fact Exist as to Plaintiff's Real and Actual Damages.

#### 1. Loss of Equity

JPMC claims the admission of the real estate expert are not admissible, but fails to state any reason why. JPMC asked Banks why she thought the property was worth what she suggest and she gave the basis for the formulation of her answer. She gave the facts provided as what formed the basis for her opinion. That does not disqualify her answer, nor is it hearsay. It is an accurate reflection of her opinion.

Moreover, June 5, 2013, mere days after Banks' initial application JPMC generated a Broker Price Opinion (hereinafter "BPO") to monitor the equity in the Property. JPMC continued to monitor the equity in the Property throughout their servicing of the loan. BPO from JPMC stated the house was worth $1,825,750 on June 5, 2012. (*See:* Sherron Decl. ¶ Ex. D) Thus, Banks had, based on JPMC's own estimate at the time of the first application, approximately $1 million in equity. Furthermore, JPMC knew immediately Banks had far too much equity to qualify for a modification because her loan too value was not negative.

Therefore, a valid question exists as to loss of equity.

#### 2. Banks Has Evidence of Credit Damage.

*First*, that Banks credit scores rose does not preclude damage. The time frame indicated

---

22  Mr. Summerford knew of no written standards for document demands, and Chase produced none in discovery.  UF * [Summerford 116:3-6, 131:20-132:4;

by JPMC is before the foreclosure took place in July 2014. Banks credit would have risen more if not for the reporting of JPMC.

*Second*, JPMC continues to ignore the central issue of this case, the problem is not that JPMC failed to provide Banks with a modification, but that it for approximately 30 months unreasonably delayed the process. Had JPMC made clear the impossibility of a modification, rather than provide false hope, Banks would not have had *years* of delinquencies, but only a few months. The credit score damage from years of delinquencies is undeniably worse than the damage from only a few months, let alone having a foreclosure on her credit which has particular implications.

### 3. Fees and Interest Were Permitted

*First*, of course JPMC is permitted to charge fees and interest. The initial charges were caused by the default, Banks fails to remit thirty monthly payments because JPMC continually and falsely told her she failed to obtain a modification because she had not submitted all necessary documents, when, in fact, she did; she was never going to be approved for a modification whatever documents she submitted. Had JPMC properly processed her request, JPMC would have told her at the initial interview or, at worst, with days when they received the BPO, she would not qualify she would not have incurred the extensive damage.

*Third*, the factors suggest by JPMC as to Banks still occupying the property or started paying rent to the new owner after the foreclosure is simply irrelevant to the issues at hand.

Therefore, the question is not if JPMC is entitled to fees and interest, but if they are entitled to 30 months' worth of such fees and interest when they create the situation that drags out the process from a reasonable week or one month to thirty? This is the central question and JPMC does not submitted any evidence on this issue. Deciding if JPMC's actions were reasonable or unreasonable remains a very large issue of fact for the jury to decide.

### 4. JPMC Caused the Damages.

Once again JPMC fails to understand the issue in the case. Whether or not Banks did or did not file all the requested documents is irrelevant. JPMC knew all the necessary and relevant information to determine Banks' suitability for a modification the moment it knew she had

1   equity, something that occurred nearly immediately. There does not exist any document Banks

2   could have submitted to JPMC that would have changed this fact. Had JPMC spoke honestly and

3   plainly as they have a duty to do, it would have turned Banks down telling her she was not

4   eligible based on the value of her home and the amount of the loan.

5       Therefore, JPMC caused the vast majority of the damage and Banks is entitled to

6   recovery.

7   **H.   Plaintiff's Claims are not Barred by Judicial Estoppel**

8       As defendant asserts, the doctrine of judicial estoppel, sometimes referred to as the

9   doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its

10   position over the course of judicial proceedings when such positional changes have an adverse

11   impact on the judicial process.

12      In *Hamilton*, the plaintiff-appellant failed in a bankruptcy proceeding to list his

13   outstanding insurance claim against State Farm as an asset of his estate, whereupon the

14   bankruptcy court discharged his debt based partly upon this claim; at the same time the plaintiff-

15   appellant persisted in state court to recover on the claims against State Farm. The inconsistent

16   statements were made directly to the courts and involved the very matter for which he was

17   requesting relief.  However, in *Rockwell* the Ninth Circuit ruled judicial estoppel did not apply

18   because consideration of the inconsistency of the statements involved an inquiry beyond the

19   purview of the lower court. As well, in *Ryan*, the Ninth Circuit also rejected the application of

20   judicial estoppel where Ryan claimed attorneys' fees throughout the litigation but had admitted

21   that she could not recover statutory damages or fees under the Copyright Act.

22      Here, the allegedly inconsistent statements were not made "in the same proceeding or a

23   prior one." Banks statement to JPMC was made on an application for a loan modification. It was

24   not filed in any court proceeding here or elsewhere. Moreover, the statements aren't germane to

25   this proceeding. While JPMC is fixated on Banks' income, her income is not the main issue.

26   Banks may or may not have qualified to receive a loan modification, regardless of her income,

27   because she had equity in the property. JPMC owed her that honest explanation. Instead, JPMC

28   continued to dangle a loan modification, soliciting time and time again to apply, pretending her

previous application did not contain the necessary documents for a signature for approximately 30 months.

Additionally, as the attached declaration of Berry H. Greenburg makes clear, the court in Illinois was aware of Banks work as a consultant, but that was not viewed as consistent, regular employment where she was common law employee. Her statements there conformed to the standard practice of that court concerning people without regular jobs. The Illinois court was aware of Banks position as a self-employed, contractor as it was notified in the divorce petition. Lastly, judicial estoppel applies when a party files contradictory opinion with a court. Banks has never filed anything with the *court* to indicate her income at the time, except as to provide exhibits of what was provided to JPMC. Thus, she has not taken inconsistent positions with the court and asks the court to use the power of its discretion.

## I.   Plaintiff Has Not Abandoned Her Claims

The filing of the Admission was late, by two days and due entirely to the error of Strategic Legal Group (hereinafter, "SLG"), not due any action by Banks. The due date had been miss calendared as due on Aug. 3rd, not July 28th, and SLG provided it to Morgan Lewis and Bockius, LLP (hereinafter, "MLB") on July 30th. SLG produced all other documents on time and according to meet and confer agreements. MLB never raised the issue of the lateness in any meet and confers, as required by the local order, and, therefore, SLG alleges MLB has waived the issue. As the error is harmless and could not have prejudiced JPMC in anyway, Banks asks this court to hold off ruling until SLG can file a proper motion to waive. As to defendant's assertion that it was prejudiced by plaintiff's failure by two days to file response to its Requests for Admission, plaintiff intends to file under F.R.C.P. 36(b) a Motion to Withdraw Admissions, whereas any such admission would subserve the presentation of the merits of the action, and defendant's failure to establish any harm caused by the alleged deadline failure. *See: Hadley v. United States*, 45 F.3d 134 (1995).

August 12, 2015                    Respectfully Submitted,


                                   _____/s/ Claudine Sherron_____
                                   Claudine Sherron, Attorney
                                   Strategic Legal Group, PC
                                   Attorney for Plaintiff Liz Banks