# EXHIBIT "F"

SLG-Banks000207

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LIZ BANKS,          ) |  |
|                    ) |  |
|   Plaintiff,      ) |  |
|                    ) |  No. 2:14-CV-06429-JAK-FFM |
|      vs.          ) |  |
|                    ) |  |
| JPMORGAN JPMC BANK, N.A.; DOES ) |  |
| 1 to 100, inclusive,   ) |  |
|                    ) |  |
|   Defendants.     ) |  |
| _____) |  |

VIDEOTAPED 30 (b)(6) DEPOSITION OF

JEREMY SUMMERFORD

DATE AND TIME:      Tuesday, July 28, 2015
                    9:30 a.m. - 6:38 p.m.


LOCATION:           300 South Grand Avenue, Suite 2200
                    Los Angeles, California


REPORTER:           Barbara Brosnan, RMR, CRR, RPR
                    CSR No. 2202



Job No. 6276

1

SLG-Banks000208

**Page 2**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

LIZ BANKS

Plaintiff,

vs.     No. 2:14-CV-06429-JAK-FFM

JPMORGAN JPMC BANK, N.A.; DOES
1 to 100, inclusive,

Defendants.

Videotaped deposition of JEREMY SUMMERFORD, 30(b)(6) designated witness, taken before Barbara Brosnan, RMR, CRR, CSR No. 2202, with principal office in the County of Orange, commencing on Tuesday, July 28, 2015, at 9:30 a.m., at 300 South Grand Avenue, Suite 2200, Los Angeles, California, pursuant to Notice.

**Page 3**

APPEARANCES OF COUNSEL:

For the Plaintiff:

STRATEGIC LEGAL GROUP, PC.
BY:  ALAN EIGHMEY, ESQ.
CLAUDINE SHERRON, ESQ.
121 West Main Street, Suite F
Turlock, California  95380
(209) 683-1616
alan@NorCal-Law.com
claudine@NorCal-Law.com

- and -

LAW OFFICES OF ELIZABETH S. LETCHER
BY: ELIZABETH S. LETCHER
60 29th Street, Suite 201
San Francisco, California  94110
(415) 643-4755
elizabeth@elizabethletcher.com

For the Defendant:

MORGAN, LEWIS & BOCKIUS LLP
BY:  JOSEPH DUFFY, ESQ.
JOSEPH BIAS, ESQ.
300 South Grand Avenue, Suite 2200
Los Angeles, California  90071-3132
jduffy@morganlewis.com
jbias@morganlewis.com

ALSO PRESENT:

JULIAN ABALOS, Videographer

**Page 4**

INDEX

WITNESS:

JEREMY SUMMERFORD

                                           Page
Examination by Ms. Letcher          11
(Afternoon Session.)               120

UNANSWERED QUESTIONS:

(None.)

**Page 5**

EXHIBITS:

| Plaintiff's | Description | Marked |
|---|---|---|
| No. 84 | Amended notice of subpena of deposition of JPMorgan Chase's person most knowledgeable (14 pages) | 12 |
| No. 85 | CPI online letter writer, letter log history file Bates JPMC-BANKS-001737-1741 | 53 |
| No. 86 | Binder of delinquency notes Bates JPMC-BANKS-002440-2634 | 55 |
| No. 87 | JPMC separation page, loan info Bates JPMC-BANKS-000855-869 | 67 |
| No. 88 | 3270 Explorer: LMT process notes (LMTN) Bates JPMC-BANKS-002364-2409 | 72 |
| No. 89 | Loss mitigation notes 5-27-2012 through 10-27-2012 Bates JPMC-BANKS-004302-4326 | 73 |
| No. 90 | Binder: Foreclosure process notes JPMC-BANKS-002186-2318 | 77 |
| No. 91 | CCW customer service comments Bates JPMC-BANKS-002132-2165 | 82 |
| No. 92 | Compilation of documents, Top page handwritten note 5/24/2012 Bates JPMC-BANKS-000952-959 | 87 |
| No. 93 | Chase documents re modification program Bates JPMC-BANKS-001103-1107 | 90 |
| No. 94 | LMT tracking form Bates JPMC-BANKS-001735-1736 | 91 |
| No. 95 | Request for modification and affidavit form of Making Home Affordable Program, request for modification and affidavit (RMA) Bates JPMC-BANKS-001117-1119 | 93 |

2  (Pages 2 to 5)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000209

E X H I B I T S (Continued):

| Plaintiff's | Description | Marked |
|---|---|---|
| No. 96 | Compilation of application materials | 96 |
| | Bates JPMC-BANKS_001122-1129; 2012.08.12 app materials, 1130-1137, Bates number JPMC-BANKS_001130-1157; Bates-BANKS_001145-1159; 001170-1193 | |
| No. 97 | Chase residential broker price opinion letters | 109 |
| | Bates JPMC-BANKS_004202-4222; 004267-4269; 004247-4249; 004257-4259; 004267-4269 | |
| No. 98 | Modification Underwriting Interview Worksheet | 125 |
| | Bates JPMC-BANKS_001221-0012223 | |
| No. 99 | NDeX 7/8/2014, Foreclosure Core Milestone Events | 126 |
| | Bates JPMC-Banks_004190-004191 | |
| No. 100 | Proof of Publication of Trustee Sale | 127 |
| | Bates JPMC-Banks_003723-003723 | |
| No. 101 | Modifications data sheet | 135 |
| | Bates JPMC-Banks_00978-00980 | |
| No. 102 | Chase Agent Desktop printout | 137 |
| | Bates JPMC-Banks_001268-001277 | |
| No. 103 | Corporate Assignment of Deed of Trust signed 5/3/2012 (1 page) | 145 |
| No. 104 | Email chain 9/11/2012 | 147 |
| | Bates JPMC-Banks_001169 | |
| No. 105 | Substitution of Trustee signed 09/12/2012 | 147 |
| | Bates JPMC-Banks_003274-003277 | |

6

E X H I B I T S (Continued):

| Plaintiff's | Description | Marked |
|---|---|---|
| No. 117 | WaMu 2003-AR3 Pooling and Servicing Agreement (14 pages) | 220 |
| No. 118 | Certified receipt; Pacer search | 224 |
| | Bates JPMC-Banks_003754-003756 | |
| No. 119 | U.S. Bankruptcy Court docket | 225 |
| | Bates JPMC-Banks_003759-003761 | |
| No. 120 | Collection of documents, top page of which is Fax to Barrett Daffin, et al | 229 |
| | Bates JPMC-Banks_003915-003922 | |
| No. 121 | Article re bankruptcy foreclosure scams (5 pages) | 230 |
| No. 122 | Plea Agreement for Defendant Darwin Bowman (19 pages) | 230 |
| No. 123 | 3270 Explorer: Bankruptcy Notes (BNKN) | 232 |
| | Bates JPMC-Banks_002171-002184 | |
| No. 124 | LexisNexis search | 235 |
| | Bates JPMC-Banks_004012 | |
| No. 125 | Letter 6/5/2012 to John G. Yedinak from Barrett Daffin, et al | 236 |
| | Bates JPMC-Banks_003086-003087 | |
| No. 126 | Letter 8/27/2014 to Claudine Sherron from Chase; enclosures | 237 |
| | Bates JPMC-Banks_000223-000258 | |
| No. 127 | WMMSC Calculation of Realized Loss | 238 |
| | Bates JPMC-Banks_001940-001952 | |
| No. 128 | Delinquency data | 239 |
| | Bates JPMC-Banks_001732 | |
| No. 129 | Notice of Default; Notice of Rescission (4 pages) | 241 |

8

E X H I B I T S (Continued):

| Plaintiff's | Description | Marked |
|---|---|---|
| No. 106 | Notice of Trustee's Sale | 148 |
| | Bates JPMorgan Chase Bank, N.A. Informal Production 00514-00516 | |
| No. 107 | Chase Quality Review System Report | 169 |
| | Bates JPMC-Banks_001162-001164 | |
| No. 108 | Chase Quality Review System Report | 171 |
| | Bates JPMC-Banks_001264-001267 | |
| No. 109 | Collection of documents, top page which is QC Checklist - Final Output | 173 |
| | Bates JPMC-Banks_001391-001409 | |
| No. 110 | Collection of documents, top page which is QC Checklist - Final Output | 177 |
| | Bates JPMC-Banks_001412-001416 | |
| No. 111 | Collection of documents, top page which is UPS Next Day Air Saver shipment label to Chase | 179 |
| | Bates JPMC-Banks_001417-001454 | |
| No. 112 | 3270 Explorer: Customer Service Notes (CERN) | 183 |
| | Bates JPMC-Banks_002319-002363 | |
| No. 113 | Collection of documents, top page of which is Wells Fargo PMA Package | 186 |
| | Bates JPMC-Banks_001487-001508 | |
| No. 114 | Collection of documents, top page of which is Fax Cover Sheet 4/1/2013 | 194 |
| | Bates JPMC-Banks_001459-001570 | |
| No. 115 | Collection of documents, top page of which is Fax Cover Sheet 4/17/2013 | 203 |
| | Bates JPMC-Banks_001549-001552 | |
| No. 116 | Pacer Bankruptcy Search information | 213 |
| | Bates JPMC-Banks_003732-003740 | |

7

E X H I B I T S (Continued):

| Plaintiff's | Description | Marked |
|---|---|---|
| No. 130 | Chase Account Statement 8/2/2014 (2 pages) | 244 |

PREVIOUSLY MARKED EXHIBITS:

| | | |
|---|---|---|
| No. 10 | Recording of Notice of Default and Election to Sell Under Deed of Trust (5 pages) | |
| No. 1 | Recording of Trustee's Deed Upon Sale (3 pages) | |
| No. 25 | Letter 5/28/2012 To Whom It May Concern re Elizabeth Banks (1 page) | |
| No. 29 | Letter 6/13/2012 to Liz Banks (1 page) | |
| No. 31 | Letter 7/17/2012 to Liz Banks (1 page) | |
| No. 41 | Letter 12/18/2012 to Liz Banks (4 pages) | |
| No. 44 | Letter 01/17/2013 to Liz Banks; attachments (19 pages) | |
| No. 58 | Letter 7/11/2013 to Liz Banks (3 pages) | |

(CONFIDENTIAL EXHIBITS BOUND SEPARATELY)

9

3  (Pages 6 to 9)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000210

```
 1        LOS ANGELES, CALIFORNIA; TUESDAY, JULY 28, 2015
 2                        9:30 A.M.
 3                         -o0o-
 4
 5        THE VIDEOGRAPHER:  Good morning.  Today's
 6   videotaped deposition of Jeremy Summerford is taken on July
 7   28, 2015, at 300 South Grand Avenue, Suite 2200, Los Angeles,
 8   California, in the matter of Banks versus JPMorgan, JPMC Bank,
 9   Case Number 2:14-CV-06429-JAK-FFM, in the United States
10   District Court, Central District of California.
11        My name is Julian Abalos with Elite Court Reporting
12   located in Mission Viejo California.  We are now commencing at
13   9:30 a.m.  Will all present please identify themselves,
14   beginning with the witness.
15        THE WITNESS:  Jeremy Summerford, JPMorgan Chase.
16        MR. DUFFY:  Joe Duffy for JPMorgan Chase.
17        MR. BIAS:  Joe Bias for JPMorgan Chase.
18        MR. EIGHMEY:  Alan Eighmey for Liz Banks.
19        MS. SHERRON:  Claudine Sherron for Liz Banks.
20        MS. LETCHER:  Elizabeth Letcher for Liz Banks.
21        THE VIDEOGRAPHER:  Would the court reporter please
22   swear in the witness.
23   ///
24   ///
25   ///

                                                            10
```

```
 1              JEREMY SUMMERFORD,
 2         having been duly sworn,
 3      was examined and testified as follows:
 4
 5                EXAMINATION
 6   BY MS. LETCHER:
 7     Q.   Good morning.
 8     A.   Good morning.
 9     Q.   My name is Elizabeth Letcher.  I'm an attorney
10   appearing for plaintiff Liz Banks in this action.  Have you
11   had your deposition taken before?
12     A.   I have.
13     Q.   How many times?
14     A.   I don't keep a running total, but I would say more
15   than 30 over the last four years or so.
16     Q.   Okay.  And what percentage of those were you
17   testifying on behalf of Chase?
18     A.   All of them.
19     Q.   Okay.  So you are pretty familiar with the ground
20   rules of a deposition?
21     A.   I am.
22     Q.   Okay.  Is there any reason you can't give your best
23   testimony today?
24     A.   Not that I can think of.
25     Q.   Okay.  And you understand that I'm entitled to your

                                                            11
```

```
 1   best estimate or your best answer to any question?
 2     A.   Yes.
 3     Q.   And I'm going to assume that you understand my
 4   questions and that if anything is unclear that you will ask
 5   me.
 6     A.   I will.
 7     Q.   Okay, great.
 8        MR. DUFFY:  I will just add, given the nature of
 9   the deposition notice, Chase would reserve all of its rights
10   with respect to privilege, including the bank examiner's
11   privilege and trade secrets and attorney-client privilege.
12        MS. LETCHER:  Okay.  Have objections been served?
13        MR. DUFFY:  No, I've made them now based on
14   Rule 30(b)(3).
15   BY MS. LETCHER:
16     Q.   Did you bring a copy of the notice of deposition
17   with you today?
18     A.   I did not.
19        MS. LETCHER:  Okay.  Can we mark this one as
20   Exhibit 84.
21        (Plaintiff's Exhibit 84 marked for
22        identification and attached hereto.)
23     Q.   The court reporter is going to hand you what's been
24   marked as Exhibit 84.  Do you recognize it?
25     A.   Yes.

                                                            12
```

```
 1     Q.   What topics are you here to testify on?
 2     A.   I've reviewed all the topics, and I'm here to
 3   testify on those.
 4     Q.   Okay, great.  What was the date of your first
 5   involvement in Ms. Banks' case?
 6     A.   I learned of this case, it was approximately two
 7   weeks ago, I believe, or within the last two weeks.
 8     Q.   And did you bring any documents with you in
 9   response to the notice of deposition or subpoena?
10     A.   I did not bring any documents with me personally
11   this morning.
12     Q.   Okay.  So I'd like to review your relevant personal
13   history.  Can you start by telling me a little bit about
14   your -- well, tell me about your work experience at Chase.
15     A.   I began technically my time with Chase in February
16   of 2008.  I was employed by Washington Mutual.  I was employed
17   there originally as a loan originator.
18        Shortly thereafter, mid-2008, I -- my position
19   changed to a loss mitigation role.  Basically assisting
20   customers that were less than 60 days past due for loan
21   modifications.
22        In September of 2008 Chase acquired the assets of
23   Washington Mutual via the FDIC.  I then became an employee of
24   Chase, basically the same role.  I maintained the same role
25   with loss mitigation in various forms, but dealing with

                                                            13
```

4 (Pages 10 to 13)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000211

1  modifications, until September of 2011 when I began my current
2  position as a mortgage banking research officer. And I have
3  held that position to this day.
4      **Q.   Are you an officer of Chase?**
5      A.   I am.
6      **Q.   And what's your title?**
7      A.   It is mortgage banking research officer.
8      **Q.   Okay. But it is not like a vice-president level**
9  **or --**
10     A.   No. I do have levels of signing authority and that
11 type of thing, but as far as vice-president is not in my
12 title.
13     **Q.   And what's the label for your level of signing**
14 **authority by Chase?**
15     A.   I believe assistant secretary. I haven't had to
16 utilize that in sometime.
17     **Q.   And where do you work?**
18     A.   Jacksonville, Florida.
19     **Q.   And have you always worked in Jacksonville when you**
20 **worked for Chase?**
21     A.   I have.
22     **Q.   Do you have any other mortgage servicing or loan**
23 **origination experience prior to working for WaMu?**
24     A.   I have.
25     **Q.   What can you tell me about that?**

14

1      A.   Beginning in 1999 I was employed as a mortgage loan
2  processor with Homeside Lending for approximately two years.
3          In 2001 I was a mortgage underwriter with Bank of
4  America; did approximately two, 2-1/2 years or so there.
5          In 2000 and I believe '03 I was employed as a loan
6  originator with DHI Mortgage, and was employed there through
7  really the beginning of 2007, when I opened a joint venture
8  with Wells Fargo Home Mortgage and a local real estate office
9  in Jacksonville.
10         My primary duties were manage that joint venture
11 and originate mortgage loans. The latter half of that year I
12 was employed as a mortgage broker with Vertical Mortgage.
13     **Q.   So on the joint venture, were you wholesaling loans**
14 **and selling them for sale to -- sale to be packaged and**
15 **securitized?**
16     A.   That was through Wells Fargo Home Mortgage, so it
17 was a correspondent-lending scenario there.
18     **Q.   And then I cut you off. After the joint venture?**
19     A.   Yes, Vertical Mortgage, the end of 2007. It was a
20 mortgage broker that opened up a shop in Jacksonville. I did
21 not originate any mortgages with that particular company.
22         And that brings us to the beginning of 2008, my
23 employment with Washington Mutual.
24     **Q.   Okay. So over the last 15-plus years you have**
25 **developed a pretty deep understanding of what it is to**

15

1  **underwrite a loan and the loss mitigation process, and**
2  **particularly Chase's loss mitigation processes; is that right?**
3          MR. DUFFY: Objection. Vague and ambiguous.
4          THE WITNESS: I feel like I have a good
5  understanding of the mortgage servicing process and the loan
6  origination process, and also with loss mitigation with Chase.
7  I have had several years of experience.
8  BY MS. LETCHER:
9      **Q.   Have you had any special training to allow you to**
10 **testify as Chase's corporate representative?**
11         MR. DUFFY: Objection. Vague and ambiguous.
12         THE WITNESS: Not necessarily any special training.
13 I meet with Chase attorneys. But outside of that, no special
14 training on performing my job duties. We have ongoing
15 training within the bank that I continue to take on an ongoing
16 basis.
17 BY MS. LETCHER:
18     **Q.   Are there any of the topics in the notice of**
19 **deposition today that are outside of your ordinary course of**
20 **work and the basis of knowledge that you gained doing your job**
21 **on a regular basis?**
22         MR. DUFFY: Objection. Vague and ambiguous.
23         THE WITNESS: You'd have to be more specific on
24 that. I don't --
25 BY MS. LETCHER:

16

1      **Q.   Are you able from your personal experience working**
2  **with Chase to testify on each of the topics set out?**
3          MR. DUFFY: Objection. Vague and ambiguous.
4          THE WITNESS: You will have to repeat that. I'm
5  sorry. You can just repeat the question. I just didn't hear
6  it with the objection. I'm sorry.
7          MS. LETCHER: Okay. Can you read the question
8  back, please.
9          (The record was read as follows:
10         "Q. Are you able from your personal
11         experience working with Chase to
12         testify on each of the topics set
13         out?")
14         THE WITNESS: I would say the majority I have had
15 some personal experience with, yes.
16 BY MS. LETCHER:
17     **Q.   Okay. How many cases that involve loan**
18 **modifications have you been involved in over the course of**
19 **your employment with Chase and Washington Mutual?**
20         MR. DUFFY: Objection. Beyond the scope of the
21 deposition notice.
22         THE WITNESS: As far as my entire tenure with the
23 bank it would be several hundred, I guess, and including my
24 time in loss mitigation.
25 BY MS. LETCHER:

17

5 (Pages 14 to 17)

SLG-Banks000212

1    Q.   Okay.  How many cases -- can you give me an
2  estimate of how many cases you handled while you were doing
3  loss mitigation?
4    A.   I would say several hundred, I guess.
5    Q.   Okay.  So you have a basic understanding of the
6  loan modification process, right?
7    A.   I do.
8        MR. DUFFY:  Objection.  Vague and ambiguous.  Just
9  slow down a little bit.
10       THE WITNESS:  Sure.
11  BY MS. LETCHER:
12   Q.   And do you have an understanding of the nonjudicial
13  foreclosure process and how it works?
14   A.   I do.  I have had some experience with that.  I'm
15  not from California, so I wouldn't say I'm, you know, an
16  expert in such things, but I am familiar with the process,
17  yes.
18   Q.   Okay.  Are you familiar with Chase's electronic
19  systems for handling mortgage loans?
20       MR. DUFFY:  Objection.  Vague and ambiguous.
21  Overbroad.
22       THE WITNESS:  I am.
23  BY MS. LETCHER:
24   Q.   And can you generally read and understand them?
25   A.   Yes.

18

1    Q.   Okay.  What systems were used to record information
2  about Ms. Banks' loan?
3    A.   The basic system would be MSP.  That is our main
4  system of record that contains loan information, loan notes,
5  that type of thing.
6    Q.   Okay.  Unless I say otherwise, the period of time
7  that I am going to be talking about with you is 2012 to 2014.
8        So during that period were there systems that came
9  in that stopped being used, that had been used before that
10  stopped being used?
11       MR. DUFFY:  Objection.  Overbroad.
12       THE WITNESS:  Again, the main system that's always
13  been utilized since my tenure and then up until the current
14  day is MSP for all loan information.
15  BY MS. LETCHER:
16   Q.   Okay.  Where are contacts with the borrower
17  recorded?
18   A.   Within MSP.
19   Q.   Okay.  Does the section of MSP where they record it
20  depend on the status of the loan at the time that the contact
21  is made?
22   A.   It can.  If there's loss mitigation activity there
23  are subscreens within MSP where loss mitigation activity is
24  input.
25   Q.   Okay.  What determines whether records are put in

19

1  that subscreen?
2    A.   If the employee in the loss mitigation department
3  is handling a loss mitigation application, then those notes
4  would be input into that subscreen.
5    Q.   And where else are records of contacts with the
6  borrower recorded?
7    A.   They are recorded -- there are other notes within
8  MSP.  There's just the general notes section where customer
9  contact by a customer service agent may be input.
10   Q.   And what's the label for that?
11   A.   I believe that's subsection SERN section.
12   Q.   And calls to collections are recorded where?
13   A.   There are several locations they could be.  They
14  could be located in the SERN.  The majority of those would be
15  in the, I believe the DLQ7 subscreen.
16   Q.   When Chase receives documents are they imaged?
17   A.   They are.
18   Q.   Where are they stored?
19   A.   Chase has a system that stores image documents.  It
20  is called iVault.  The letter I, V-A-U-L-T.
21   Q.   Does Chase use LenderLive?
22   A.   Yes.
23   Q.   Were Miss Banks' documents stored in iVault,
24  LenderLive, or both?
25   A.   Both.

20

1    Q.   What determines whether a document is stored in one
2  or the other?
3    A.   When an owner submits a document either by mail or
4  fax they are immediately input into LenderLive.  They are
5  imaged there.  And then after a couple of months those images
6  are then transferred over to iVault, which is Chase's
7  recordkeeping system.
8    Q.   Does Chase subcontract its imaging?
9    A.   I don't know the current status of LenderLive.  I
10  believe Chase's iVault system is a Chase proprietary system.
11  And I really can't say with 100 percent assurance on
12  LenderLive status.  I want to say it is owned by Chase now,
13  but I'm not sure.
14   Q.   When borrowers send in loss mitigation documents,
15  do they go to -- where are they sent?  Where does Chase have
16  them sent?
17   A.   There are addresses on the loss mitigation
18  paperwork where they are to be sent.
19   Q.   Is that Chase Fulfillment Services in Glendale,
20  Colorado for Miss Banks?
21   A.   I don't recall the address on the document.  I'd
22  have to look at it.
23   Q.   Is Chase Fulfillment Services a subsidiary of
24  Chase?
25       (To the reporter) I will spell that for you later.

21

6 (Pages 18 to 21)

SLG-Banks000213

**Page 22**

1    A.   I'm not sure of the exact relationship of that

2  entity within Chase.

3    Q.   Aside from imaging documents that Chase receives,

4  is there another record of them having been received?

5    A.   No, that would be the record.  It would be the

6  imaged and the stamp, the date stamp on when it was received.

7    Q.   So if somebody is looking to see if a document is

8  received -- let's choose a customer assistance specialist

9  wants to see if a document has been received.  How would they

10  search for that?  Would they have to look at the image or

11  would they look at a name somewhere?

12    A.   They would look up the borrower's loan number.  And

13  if it is a recent document, look that up in LenderLive.  And

14  it has documents listed under headings, titles and the dates

15  in which they were received.

16    Q.   And who puts the titles on the documents?

17    A.   I believe that's done by an intake employee at the

18  document imaging system center.

19    Q.   Is there a standardized title for each kind of

20  document?

21    A.   Yes.

22    Q.   Okay.  And are they arranged by date?

23    A.   Yes.

24    Q.   And is there a way to get a list of every document

25  that was received in the way that a customer assistance

**Page 23**

1  specialist would see it?

2    A.   I'm not sure.

3    Q.   Could you print screens of what a customer

4  assistance specialist would see?

5    A.   I don't know if there's a way to print a screen

6  from LenderLive.  I'm not sure.

7    Q.   Is there a way to print screens from other MSP

8  pages?

9    A.   Yes.

10    Q.   Where does Chase record its receipt of payments,

11  what system?

12    A.   MSP.

13    Q.   And what field -- what term do you use, field or

14  page subscreen?

15    A.   For?

16    Q.   You have referred to customer service notes as SERN

17  or delinquency notes as being different subpages.

18    A.   Right.

19    Q.   Okay.  We will use that term.  Under what subpage

20  would receipt of payments be recorded?

21    A.   There's a main screen.  I believe it is SER1 is the

22  main screen and there's a subscreen where you can -- there are

23  actually several where you can look up a payment history and

24  where I believe payments can be input.

25    Q.   And where are payments to and from third parties,

**Page 24**

1  including the investor on the loan, recorded?

2    A.   I'm not sure if those are recorded in MSP or not.

3  I don't have any knowledge of that.

4    Q.   Well, let's take payments for escrow items, for

5  example.  Where are those recorded?

6    A.   There are certain escrow subscreens within MSP.

7    Q.   And payments for default-related services by the

8  trustee, where would those be recorded?

9    A.   There are certain fees and things that are

10  recorded, I believe it is the DDCH subscreen.

11    MS. LETCHER:  Have those been disclosed?

12    MR. DUFFY:  I believe they have, yes, if they

13  existed.

14  BY MS. LETCHER:

15    Q.   So any payments to the foreclosure trustee would be

16  recorded in DDCH?

17    A.   I believe any, and what I refer to as fees, that

18  would be located in that subscreen.

19    Q.   And where are transfer of moneys between the

20  investor custodial account and Chase's custodial account

21  recorded?

22    A.   I'm not sure.

23    Q.   Where are communications with the trustee recorded?

24    A.   There are some that are recorded in the subscreen

25  FOR2.

**Page 25**

1    Q.   Are there other records that don't -- are there

2  entries or records about communications with the trustee,

3  whether written, oral or instant messaging, that would be

4  recorded in LPS Desktop records that are not captured in the

5  Foreclosure 2 subscreen?

6    MR. DUFFY:  Objection.  Vague and ambiguous.

7    THE WITNESS:  It is my understanding that

8  LPS Desktop subscreen -- or, I'm sorry, the notes are

9  captured, all captured within MSP at this time.

10  BY MS. LETCHER:

11    Q.   And when you say "at this time," was there a time

12  when they weren't captured?

13    A.   I believe back in, when I first started in 2008,

14  2009 --

15    Q.   Okay.  So for this period what's in the foreclosure

16  2 subscreen would be identical to the LPS records?

17    A.   It is my understanding that those communications

18  are transferred over to MSP, all of them would be.

19    Q.   What systems did Chase use to underwrite

20  modifications like Miss Banks, for loans like Miss Banks'?

21    A.   Chase would use underwriting software referred to

22  as Agent Desktop.

23    Q.   Any other software platforms?

24    A.   Not that I'm aware of.

25    Q.   Okay.  So just to start out, I want to confirm my

7  (Pages 22 to 25)

SLG-Banks000214

**Page 26**

1 understanding of the basic modification process, that there
2 are two components. One is basically to try to adjust the
3 interest rate and term of the loan according to either the
4 guidelines of a specific modification program or the
5 guidelines of a particular investor to create an affordable
6 payment based on the income of the borrower; is that correct?
7     A. I would say generally, yes, that would be the
8 general idea of a modification.
9     Q. And then there's generally a second component which
10 is referred to as a net present value calculation in which the
11 underwriting determines whether it is in the investor's
12 financial interests to modify or not?
13     MR. DUFFY: Objection. Vague, ambiguous and
14 overbroad.
15     THE WITNESS: I'm aware of such a calculation but I
16 haven't dealt with NPV's in sometime.
17 BY MS. LETCHER:
18     Q. Okay. But you understand what a net present value
19 analysis is?
20     A. I have a general understanding, yes.
21     Q. Okay. And it is a comparison of the projected
22 income stream from a modified loan to a projection of the
23 likely outcome if the servicer does nothing with the loan and
24 pursues the ordinary course of business; is that correct?
25     MR. DUFFY: Objection. Vague and ambiguous.

26

**Page 27**

1     THE WITNESS: You would have to repeat that. I'm
2 sorry.
3     MS. LETCHER: Can you read it.
4     (The record was read as follows:
5     "Q. And it is a comparison of the
6     projected income stream from a modified
7     loan to a projection of the likely
8     outcome if the servicer does nothing
9     with the loan and pursues the ordinary
10     course of business; is that correct?")
11     THE WITNESS: It is my general understanding, I
12 mean whether it makes business sense or not, to do a
13 modification. That's what the NPV is for.
14 BY MS. LETCHER:
15     Q. That's a good way of putting it. Who is the first
16 person at Chase who generally discusses a modification with
17 somebody who is in default?
18     A. That can be -- well, initially a customer service
19 representative.
20     Q. And is that -- when you say customer service
21 representative, is that someone in collections?
22     A. It could be somebody calling about a default on a
23 mortgage loan, they could give them that information.
24     Q. So if somebody's loan is in default and they call
25 the general Chase number, is their call routed to the

27

**Page 28**

1 collections department?
2     MR. DUFFY: Objection. Vague and ambiguous.
3     THE WITNESS: I think it would first speak with a
4 customer service representative who might then transfer them
5 to an appropriate department.
6 BY MS. LETCHER:
7     Q. So there's no prior routing based on the default
8 status of the loan?
9     A. If a customer calls the main customer service
10 number they are going to reach the customer service
11 representative.
12     Q. Okay. And what kind of training do the customer
13 service representatives have about loan modifications?
14     A. It is my general understanding they have -- they
15 look at MSP and have certain screens that they can look at to
16 see, or notes to see if it is under a loss mitigation review
17 or really any other status that the loan might be in at the
18 time, and then route it to the appropriate department.
19     Q. So their training has to do only with determining
20 the status of the loan and appropriately routing it?
21     MR. DUFFY: Objection. Vague and ambiguous.
22     THE WITNESS: If it is something outside of their
23 normal duties, you know, perhaps collecting payments or
24 answering general questions about the mortgage loan.
25 BY MS. LETCHER:

28

**Page 29**

1     Q. Okay. So they are not -- they don't have any
2 modification-specific training?
3     MR. DUFFY: Objection. Vague and ambiguous.
4     THE WITNESS: They do not handle loan
5 modifications, no.
6 BY MS. LETCHER:
7     Q. And they are not given any training about what a
8 loan modification is or when it might be appropriate?
9     MR. DUFFY: Objection. Vague and ambiguous.
10 Overbroad.
11     THE WITNESS: I'm not sure about any specific
12 training regarding what specifically a loan modification is
13 for a customer service representative.
14 BY MS. LETCHER:
15     Q. Okay. Did Miss Banks have contact with any
16 customer service representatives?
17     A. There are many contacts within the notes that I
18 reviewed. I don't know the specific individuals on all of
19 them. I'm not sure.
20     Q. But you are here to testify on all topics,
21 including topic 9, Chase's training and instruction for any
22 person who had direct contact with the plaintiff, including
23 but not limited to single point of contact representatives,
24 managers, employees at branches, relating to eligibility for a
25 loan modification?

29

8 (Pages 26 to 29)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000215

1    MR. DUFFY:  Objection.  Asked and answered.
2  Argumentative.  Vague and ambiguous.
3    THE WITNESS:  Yes.
4  BY MS. LETCHER:
5    **Q.    Okay.  Do collections employees have any training**
6  **about the loan modification process?**
7    MR. DUFFY:  Objection.  Overbroad.  Vague and
8  ambiguous.
9    THE WITNESS:  Again, the responsibility of a
10  collection employee with relation to loan modification is to
11  let the loan modification department or loss mitigation
12  department handle that aspect of the loan.
13  BY MS. LETCHER:
14    **Q.    So they are not trained to suggest any options for**
15  **borrowers who call in who are in default?**
16    A.    I've seen instances where they do recommend loss
17  mitigation options such as loan modification, short sale, deed
18  in lieu of foreclosure, that type of thing.
19    **Q.    Are they trained to do that?**
20    MR. DUFFY:  Objection.  Vague and ambiguous.
21    THE WITNESS:  Well, they can recommend that to the
22  borrower and then they transfer them to the loss mitigation
23  department for further information.
24  BY MS. LETCHER:
25    **Q.    But I'm asking specifically about their training.**

30

1  **Have they been trained to -- how to respond to borrowers who**
2  **are in default who have questions about what their options**
3  **are?**
4    MR. DUFFY:  Objection.  Vague and ambiguous.
5    THE WITNESS:  Yes, that's my understanding.  They
6  can give them those general options and transfer them to the
7  appropriate department for further information.
8  BY MS. LETCHER:
9    **Q.    So you are saying that it is appropriate for them**
10  **to do so.  I'm asking about their training.  What training**
11  **have they received?**
12    MR. DUFFY:  Objection.  Argumentative.  Asked and
13  answered.  Vague and ambiguous.
14    THE WITNESS:  Again, they give the borrower the
15  options and then transfer them to the loss mitigation
16  department if they want to pursue those options.
17  BY MS. LETCHER:
18    **Q.    Maybe we are talking past each other.  Are you**
19  **saying that they are trained simply to describe options and**
20  **pass the customer on to loss mitigation department?**
21    A.    Yes, that's what I have been saying.  They offer
22  those options and if the borrower would like more information
23  they transfer them to the appropriate department in order to
24  give them that additional information.
25    **Q.    But they are not trained about what those options**

31

1  **are and how they work?**
2    MR. DUFFY:  Objection.  Vague and ambiguous.
3  Overbroad.
4    THE WITNESS:  I don't believe they are trained in
5  depth like a loan modification or loss mitigation employee
6  would be trained on those types of options.
7  BY MS. LETCHER:
8    **Q.    Are they given even any basic understanding of the**
9  **difference between, for example, a repayment agreement or**
10  **modification or a forbearance?**
11    MR. DUFFY:  Objection.  Vague and ambiguous.
12    THE WITNESS:  That's pretty general knowledge of
13  what the difference between those would be, so I would say
14  those representatives would have an understanding of those
15  differences.
16  BY MS. LETCHER:
17    **Q.    As a result of training by Chase?**
18    MR. DUFFY:  Objection.  Vague and ambiguous.  Calls
19  for speculation.
20    THE WITNESS:  I'm not sure of the specific training
21  along those lines.
22  BY MS. LETCHER:
23    **Q.    What starts the loan modification application**
24  **process for someone who is in default?**
25    A.    Either a solicitation by Chase or a borrower

32

1  calling in and requesting assistance.
2    **Q.    But -- so the application process hasn't started**
3  **just when a solicitation is mailed out, right?**
4    MR. DUFFY:  Objection.  Vague and ambiguous.
5    THE WITNESS:  I'm sorry, I don't understand.
6  BY MS. LETCHER:
7    **Q.    If Chase mails a solicitation to somebody and they**
8  **don't respond, has their modification application process**
9  **started?**
10    MR. DUFFY:  Objection.  Vague and ambiguous.
11    THE WITNESS:  No.
12  BY MS. LETCHER:
13    **Q.    Okay.  So would an oral request start the process?**
14    MR. DUFFY:  Objection.  Vague and ambiguous.
15    THE WITNESS:  I think we may be talking about two
16  different things as far as a solicitation and the actual
17  application process.
18  BY MS. LETCHER:
19    **Q.    What would you consider the start of an**
20  **application?  What triggers Chase treating it as an**
21  **application?**
22    MR. DUFFY:  Objection.  Vague and ambiguous.
23    THE WITNESS:  When the borrower sends in a package,
24  a loss mitigation package.
25  BY MS. LETCHER:

33

9  (Pages 30 to 33)

SLG-Banks000216

1    Q.   So not an oral request but an actual document?
2    A.   Yes.
3    Q.   What's a "critical document"?
4         MR. DUFFY:  Objection.  Vague and ambiguous.
5         THE WITNESS:  What do you mean by "critical
6    document"?
7    BY MS. LETCHER:
8    Q.   Chase's records referred to a receipt of critical
9    documents.  Are you familiar with that term?
10   A.   If you could point that out to me I would like to
11   look at the context of that.
12   Q.   Okay.  We will look at that.
13   A.   Okay.
14   Q.   When is a customer service specialist assigned to a
15   borrower?
16   A.   Generally when an application is received, then one
17   would be assigned.
18   Q.   And is that also, that person also known as a SPOC?
19   A.   Single point of contact, I believe.
20   Q.   Yes.
21   A.   I don't think -- I don't know if internally in
22   Chase it is referred to as that, but I can refer to it as that
23   as well.
24   Q.   Okay.  And is a relationship manager the same as a,
25   I will call it a CAS?

34

1    A.   Yes, I believe the "CAS" term did not really go
2    into effect until 2012, so that's the previous term that might
3    have been used as well.
4    Q.   What is the role of the customer assistance
5    specialist?
6    A.   Basically they would have contact with the
7    borrower, receive the documents for a loan modification.  And
8    this is going to be just in respect to a loan modification
9    that I'm talking about.
10        They would receive any documents that are required
11   by the document checklist on the application, and they would
12   submit that application to underwriting and they would also
13   follow up for any missing documents, that type of thing.
14   Q.   And what department are customer assistance
15   specialists in?
16   A.   Loss mitigation department.
17   Q.   So if somebody is talking to a customer assistance
18   specialist, that's in loss mitigation?
19   A.   Yes.
20   Q.   Okay.  And the notes would be recorded in the
21   subscreen called LMT of MSP?
22   A.   I believe that's LMTN, yes.
23   Q.   LMTN.  Does the CAS receive documents directly?
24   A.   They receive it through LenderLive and then that's
25   the general form of receiving documents.

35

1    Q.   Do they generally receive them the same day that
2    Chase receives them?
3    A.   They are generally uploaded, from what I recall,
4    either the same day or maybe the day afterwards.
5    Q.   So you have talked about a process of contacting
6    the borrower, receiving documents, checking a documentation
7    checklist and following up for missing documents.  Are there
8    any other roles for the customer assistance specialist?
9    A.   Any other roles?  I don't --
10   Q.   Is it their job to be Chase's liaison with the
11   customer about loss mitigation?
12   A.   They are the point of contact for the customer,
13   yes.
14   Q.   So are they supposed to give information about the
15   status of loans to the borrower?
16   A.   That is one of their duties that they do.
17   Q.   And keep them informed about the progress of the
18   modification?
19   A.   Yes.
20   Q.   Is it important to keep the borrower informed about
21   the process and status of the loan?
22        MR. DUFFY:  Objection.  Vague and ambiguous.
23        THE WITNESS:  I would say it is one of the duties
24   of the CAS so it's -- it would be something that they would be
25   responsible for.

36

1    BY MS. LETCHER:
2    Q.   Is it important for the borrower to understand
3    what's going on with their loss mitigation?
4         MR. DUFFY:  Objection.  Vague and ambiguous.
5         THE WITNESS:  As far as importance, I guess every
6    borrower is different.  Some may require more or expect more
7    updates than others, but that is something that the CAS
8    regularly do.
9    BY MS. LETCHER:
10   Q.   Okay.  Is it important for borrowers to understand
11   what their options are at any juncture and what the
12   consequences of any event in the modification process are?
13        MR. DUFFY:  Objection.  Vague and ambiguous.
14        THE WITNESS:  If you could use a different word
15   than "important."  I mean that's kind of confusing to me.  I
16   don't know what you really mean by that.
17   BY MS. LETCHER:
18   Q.   Does Chase place any value on the borrower
19   understanding the process?
20        MR. DUFFY:  Objection.  Vague and ambiguous.
21        THE WITNESS:  Yes.
22   BY MS. LETCHER:
23   Q.   Why?
24   A.   So they can understand what is going on with their
25   loss mitigation.  It is a serious matter for a customer to

37

10  (Pages 34 to 37)

ELITE COURT REPORTING (949) 829-9222

1 lose their home and Chase does not want a customer to lose
2 their home unnecessarily.
3    **Q.  So at every point they have to have some**
4 **understanding of what's going on with their loss mitigation**
5 **application, right?**
6       MR. DUFFY: Objection. Vague and ambiguous.
7 Overbroad.
8       THE WITNESS: Again, the Chase's responsibility, or
9 the CAS's responsibility within Chase is to keep the borrower
10 informed about their loss mitigation process and always be
11 available for the borrower to call as well.
12 BY MS. LETCHER:
13    **Q.  And is it the customer assistance specialist who**
14 **helps them understand exactly what documents they need to send**
15 **in to support their modification application?**
16    A.  The CAS is the person that relays that information
17 which typically comes -- if there is any additional
18 information, it typically comes from an underwriter and it is
19 the CAS's responsibility to make the borrower aware of those
20 needed documents.
21    Q.  Are calls with borrowers recorded?
22    A.  Calls may be recorded. I'm not sure of the
23 retention policy for that.
24    Q.  Do you know if any calls with Miss Banks were
25 recorded?

38

1    A.  I'm not aware of any calls.
2    **Q.  Where would phone calls be kept if they were**
3 **recorded?**
4    A.  I'm not sure.
5    **Q.  But you are here to testify on Chase's computer**
6 **systems used to service loans, including loss mitigation**
7 **systems, right?**
8       MR. DUFFY: Objection. Asked and answered.
9 Argumentative. Vague and ambiguous.
10       THE WITNESS: I don't recall anything about phone
11 calls in the notice, so I apologize.
12 BY MS. LETCHER:
13    **Q.  So do you think recording phone calls of**
14 **communications with borrowers would fall under computer**
15 **systems for servicing home mortgage loans?**
16       MR. DUFFY: Objection. Vague and ambiguous.
17       THE WITNESS: I'm not sure.
18 BY MS. LETCHER:
19    **Q.  Does Chase consider communications with the**
20 **borrower part of the process of servicing a mortgage loan?**
21       MR. DUFFY: Objection. Vague and ambiguous.
22       THE WITNESS: Communications with the borrower is
23 the general duty of a servicer, yes.
24 BY MS. LETCHER:
25    **Q.  And it is a core part of loss mitigation process,**

39

1 **right?**
2       MR. DUFFY: Objection. Vague and ambiguous.
3       THE WITNESS: That is part of the process of loss
4 mitigation, is to communicate with the borrower.
5 BY MS. LETCHER:
6    **Q.  So the Chase employee primarily tasked with making**
7 **sure that the borrower sends in the right documents is a CAS,**
8 **right?**
9    A.  Yes.
10    **Q.  Okay. You said that the requirements for what the**
11 **borrowers are supposed to send in are communicated from the**
12 **underwriter. Did I understand that correctly?**
13    A.  I believe I said if any additional documents are
14 needed, that comes from the underwriter.
15    Q.  How do those communications come?
16    A.  Come from what?
17    Q.  How does the underwriter tell the customer
18 assistance specialist that more documents are needed?
19    A.  Typically that would be done through MSP.
20    Q.  Is there a checklist that changes, or are there
21 direct communications? Can you describe that process for me.
22    A.  There can be basically notes within MSP, is how it
23 is generally done.
24    Q.  So how does the CAS find out that there are new
25 documents needed? They just check MSP?

40

1    A.  Well, they typically have a timeline or a service
2 level agreement that would outline how long it is supposed to
3 take with underwriting, and they would continually check for
4 the results of that underwriting review.
5       MS. LETCHER: Could you read that back to me.
6       (The record was read as follows:
7       "A. Well, they typically have a
8       timeline or a service level agreement
9       that would outline how long it is
10       supposed to take with underwriting, and
11       they would continually check for the
12       results of that underwriting review.")
13    **Q.  What's an MIL?**
14    A.  That stands for missing items letter.
15    **Q.  Okay. Is there ever any direct contact over the**
16 **phone or by e-mail, or any other way, between the customer**
17 **assistance specialist and the underwriter?**
18    A.  There may be e-mail communications between the
19 underwriter and -- it is typically the customer service
20 specialist manager.
21    **Q.  So customer service specialists can't communicate**
22 **directly with the underwriter?**
23    A.  I wouldn't say that's typical, other than through,
24 you know, receiving communications through MSP.
25    **Q.  If a customer service specialist doesn't understand**

41

11 (Pages 38 to 41)

SLG-Banks000218

1 what borrower documents are required or why, can they
2 communicate directly with the underwriter?
3    A.   I believe those communications are done through
4 their manager at this time.
5    Q.   And where are communications done through a manager
6 with the underwriter recorded?
7    A.   That would be done through e-mail communications
8 and any pertinent information would be input into MSP.
9    Q.   So they might be talking to each through e-mail but
10 they would just make a record of what they talked about in
11 MSP, or are the e-mails actually stored in MSP?
12    A.   I've seen instances where basic summaries are put
13 into MSP and also I've seen instances where e-mails are copied
14 and pasted in MSP.
15    Q.   Okay.  And where are e-mails stored?
16    A.   Chase uses Outlook for their e-mail system.  And I
17 believe there are servers where e-mails are stored on the
18 company network.
19    Q.   Are they purged?
20    A.   From an individual employee's perspective they are
21 purged, deleted.  After certain storage limits are reached on
22 their employee Outlook they are deleted from the employee's
23 Outlook.
24    Q.   But they are backed up somewhere in Chase's
25 systems?

42

1    A.   I'm not sure as far as where exactly those would be
2 held, if they are held.
3    Q.   Is there -- are the contents of employees' Outlook
4 files uploaded to Info-1 in a back-up process on a daily or
5 monthly basis?
6    A.   I haven't heard the term "Info-1" in a long time so
7 I'm not sure what that is.  I don't recall.
8    Q.   Do you know if Chase does an overall back-up to a
9 single server on a regular basis of its loss mitigation
10 documents?
11    MR. DUFFY:  Objection.  Vague and ambiguous.
12 Overbroad.
13    THE WITNESS:  The documents are held in iVault
14 indefinitely, those documents.
15 BY MS. LETCHER:
16    Q.   But I am just trying to figure out if Outlook files
17 would be included in that kind of regular back-up of Chase
18 files.
19    A.   Outlook files are not part of the iVault system.
20    Q.   Okay.  But do you know if there's a back-up process
21 for Outlook files that may have been purged?
22    A.   I'm not sure.
23    Q.   Okay.  Does Chase subcontract with anybody else to
24 help borrowers figure out what kind of documents they should
25 be submitting or learn anything about the modification

43

1 process?
2    MR. DUFFY:  Objection.  Vague and ambiguous.
3 Overbroad and compound.
4    THE WITNESS:  As far as submitting documents, I'm
5 not really sure if Chase -- I'm not aware of any third party
6 that would help a borrower submit documents to Chase.
7 BY MS. LETCHER:
8    Q.   Have you heard of the HOPE hotline?
9    A.   Yes.
10    Q.   What is that?
11    A.   That is a third party that a customer can contact
12 with any questions outside of Chase.  The information is
13 listed I believe on the modification applications.
14    Q.   Okay.  So the housing counseling agencies that a
15 borrower would contact through Chase are those which Chase
16 feels are legitimate?
17    MR. DUFFY:  Objection.  Vague and ambiguous.
18 Overbroad.
19    THE WITNESS:  I have limited understanding of the
20 HOPE program.  It is my understanding that several servicers
21 are a part of that.  And it is a third party that a borrower
22 can contact that is offered.  But as far as any other types of
23 third parties that can assist borrowers, I'm not aware of any
24 other special functions that they can serve other than what
25 the borrower can do themselves.

44

1 BY MS. LETCHER:
2    Q.   Okay.  What's a Chase Home Ownership Center?
3    A.   That is -- there are local centers within certain
4 cities that Chase established where a borrower can come in and
5 sit down with an individual face to face to apply for loss
6 mitigation options.
7    Q.   Okay.  Are people ever referred to a Chase Home
8 Ownership Center if they are having special trouble with
9 fulfilling documentation requirements, so they can sit down
10 with a live person?
11    A.   I'm not sure if I've seen that in the past or not.
12    Q.   Okay.  What about just Chase branches?
13    MR. DUFFY:  Objection.  Vague and ambiguous.
14 Incomplete question.
15    MS. LETCHER:  You are right.
16    Q.   Is there anybody --
17    MR. DUFFY:  I have got one right so far for the
18 record.
19 BY MS. LETCHER:
20    Q.   Is there any training for people in Chase branches
21 that would allow them to help people who are seeking loss
22 mitigation in the loss mitigation process?
23    A.   I've seen in the past where if there is a city --
24 or if there is within that city a Chase Home Ownership Center
25 the branch generally refers customers to that location where

45

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000219

1  they can be helped more readily.
2        And also I have seen circumstances where the branch
3  employees will help facilitate any type of loss mitigation as
4  far as getting, faxing in documents to loss mitigation
5  department and that type of thing.
6    Q.  Okay.  But do they, given the foreclosure crisis
7  that's gripped the country for the last five years, have they
8  been given any training about what a loan modification is and
9  how it works?
10       MR. DUFFY:  Objection.  Vague and ambiguous.
11  Overbroad.
12       THE WITNESS:  Yes, it is my understanding that they
13  have general knowledge of loss mitigation options for a
14  borrower and they end up referring them to the experts which
15  would be in the loss mitigation department within Chase.
16  BY MS. LETCHER:
17    Q.  Okay.  So who is the first person at Chase who
18  actually handles an application?  And I mean the job title.
19    A.  That would be, who basically handles the processing
20  would be the customer assistance specialist.
21    Q.  Is there another department that plays a support
22  role in evaluating documents that have been received for
23  completeness?
24    A.  It is the CAS's responsibility to review those,
25  that's my understanding.

46

1  that were unclear or if, say for instance, a bank statement
2  was submitted without all of the pages, that would be
3  something that an underwriter would send back to the CAS and
4  say we need either further clarification or we need all pages
5  of a bank statement, for example.
6  BY MS. LETCHER:
7    Q.  Okay.  Well, aside from technical deficiencies in
8  documents -- you know, obviously faxes fail, people forget to
9  sign things, people sign things in the wrong place.  I am not
10  talking about that kind of information.
11       Where there are substantive deficiencies and the
12  underwriter decides to ask for a different type of document to
13  make the application, to complete the application, how do they
14  determine what to ask for?
15       MR. DUFFY:  Objection.  Vague and ambiguous.
16  Overbroad.
17       THE WITNESS:  Well, in this case there were some
18  instances where the pay stubs had an incorrect address on them
19  for I believe the employer, so that is something that the
20  underwriter would notice as a red flag or something to get
21  more clarification on and require some additional
22  documentation to verify that information.
23  BY MS. LETCHER:
24    Q.  I'm asking if there are any written guidelines
25  about what they need to ask for.

48

1    Q.  I've seen references throughout the documents that
2  were disclosed to, it is spelled C-A and a separate word
3  O-P-S.  What is that?
4    A.  I'm not sure.
5    Q.  When the underwriter is looking to see if the
6  documents that have been received are sufficient, what are
7  they looking at to make that determination?
8    A.  The documents themselves.  Whether or not they are,
9  the documents themselves are complete and according to the
10  documentation checklist.
11    Q.  Okay.  So they are looking at a documentation
12  checklist that sets out the requirements?
13    A.  Yeah, basically the one that is included in the
14  application package are the documents that are required in the
15  initial application.
16    Q.  Are there any written criteria that would determine
17  when additional documents need to be submitted?
18    A.  I'm not sure on the underwriter perspective as far
19  as documentation requirements, what type of written criteria
20  they would look at other than the documentation checklist
21  itself.
22    Q.  So would other demands for documents be made ad hoc
23  by the individual underwriter?
24       MR. DUFFY:  Objection.  Vague and ambiguous.
25       THE WITNESS:  If they were items on the documents

47

1       MR. DUFFY:  Objection.  Vague and ambiguous.
2  Overbroad.
3       THE WITNESS:  In my analysis of this one I did not
4  see any written guidelines on this case.
5  BY MS. LETCHER:
6    Q.  So there are no investor specific guidelines about
7  what documents are required for loss mitigation?
8       MR. DUFFY:  Objection.  Vague and ambiguous.
9  Overbroad.
10       THE WITNESS:  I'm not sure.  I haven't seen any on
11  this case in my review.
12  BY MS. LETCHER:
13    Q.  Okay.  So did you review only documents -- only
14  documents relating to this case in preparation for this
15  deposition?
16       MR. DUFFY:  Objection.  Vague and ambiguous.
17       THE WITNESS:  My research was based on documents
18  and facts surrounding this case.
19  BY MS. LETCHER:
20    Q.  Have you reviewed any documents that have not been
21  previously disclosed to plaintiff's counsel in this case?
22    A.  Not that I can think of, no.
23    Q.  Did you review any policies and procedures for
24  Chase's loss mitigation operations?
25       MR. DUFFY:  Objection.  Vague and ambiguous.

49

13  (Pages 46 to 49)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000220

1      THE WITNESS: I have not reviewed any current
2 policies and procedures, any written ones within Chase.
3 BY MS. LETCHER:
4     **Q. Okay. And have you reviewed any written standards**
5 **that would apply to the handling of this loan?**
6     A. Again --
7     MR. DUFFY: Objection. Vague and ambiguous.
8     THE WITNESS: I have had experience within the loss
9 mitigation area for approximately three years and then I have
10 had several cases where I've reviewed loss mitigation efforts
11 within the past three years, so I'm familiar with the
12 practices of the loss mitigation area.
13 BY MS. LETCHER:
14     **Q. So do you feel qualified to testify to Chase's**
15 **policies and procedures about the documentation that Chase**
16 **required?**
17     MR. DUFFY: Objection. Vague and ambiguous.
18     THE WITNESS: Regarding the practice of Chase in
19 this case, what they required, yes, it seems pretty standard
20 to me.
21 BY MS. LETCHER:
22     **Q. Okay. But do you feel prepared to testify about**
23 **whether those, the demands were based on written criteria or**
24 **made ad hoc by an individual?**
25     MR. DUFFY: Objection. Vague and ambiguous.

50

1     **Q. So do you feel prepared to testify fully about**
2 **Chase's review, investigation and analysis of this loan?**
3     A. Again, we -- Chase has not released the results of
4 that investigation. I have not analyzed that information, so
5 as far as the specific results of what was found, other than
6 the documentation requested to clarify the documentation that
7 was already sent, I have no other knowledge of that.
8     **Q. So your knowledge as a corporate witness is limited**
9 **to the documents that have been disclosed so far?**
10     MR. DUFFY: Objection. Vague and ambiguous.
11     THE WITNESS: Yes, and my, again, knowledge and
12 experience as well. But yes.
13 BY MS. LETCHER:
14     **Q. So you are able to help us interpret the documents**
15 **that have been sent but you are not able actually to testify**
16 **about the policies and procedures on the subjects that we've**
17 **just discussed?**
18     MR. DUFFY: Objection. Vague and ambiguous.
19     THE WITNESS: Again, I've answered I haven't
20 reviewed written policies and procedures currently. I am
21 aware and have kept up-to-date on the business practices of
22 Chase as far as processing loan modifications and I have had
23 several years experience doing so.
24 BY MS. LETCHER:
25     **Q. So does that mean that you are able to testify**

52

1     THE WITNESS: Again, I have not seen any written
2 documentation criteria in this time frame for documents other
3 than the documentation checklist and needing more
4 clarification on that, that information that was provided.
5 BY MS. LETCHER:
6     **Q. Okay. You didn't see any references to written**
7 **guidelines that require additional documentation?**
8     A. I don't believe I saw any reference to written
9 guidelines in any of the notes I reviewed regarding the
10 additional documentation.
11     **Q. Did you review any documents relating to any**
12 **investigation performed by Chase in relation to this loan?**
13     MR. DUFFY: Objection. Vague and ambiguous.
14     THE WITNESS: I did not review any results of
15 further investigation on the documents on this loan.
16 BY MS. LETCHER:
17     **Q. Did you review any documents relating to any**
18 **investigation of this loan?**
19     MR. DUFFY: Objection. Vague and ambiguous.
20     THE WITNESS: Other than the notes outlining what
21 was required and looking at the documents themselves and
22 specifically the pay stubs and possibly the bank statements,
23 those are the documents that I reviewed that I believe were
24 the subject of investigation.
25 BY MS. LETCHER:

51

1 about policies and procedures or not?
2     MR. DUFFY: Objection. Vague and ambiguous.
3 Overbroad.
4     THE WITNESS: I can testify about the practices of
5 Chase. But again, as far as the general policies and
6 procedures written, if there's something that was written I
7 wouldn't have any knowledge of that.
8 BY MS. LETCHER:
9     **Q. But you can't say whether there are objective**
10 **criteria for what documents would be demanded or not?**
11     MR. DUFFY: Objection. Vague and ambiguous.
12 Overbroad.
13     THE WITNESS: My research was done on this case.
14 It seems to me in my analysis and my experience that the
15 additional information was not something out of the ordinary
16 that was requested to verify the unclear pay stubs.
17     MS. LETCHER: I'd like to have the court reporter
18 hand you what she is going to mark as Exhibit 85.
19     (Plaintiff's Exhibit 85 marked for
20     identification and attached hereto.)
21     **Q. What is this?**
22     A. This is a subscreen within MSP. It is a letter
23 log.
24     **Q. What kind of letters does it record the summing up?**
25     A. Letters that are generated out of MSP.

53

14 (Pages 50 to 53)

SLG-Banks000221

1    **Q.**   So is every letter that Chase ever sent reflected
2  in these?
3        MR. DUFFY:  Objection.  Vague and ambiguous.
4  Overbroad.
5        THE WITNESS:  No, there may be instances where
6  other letters are sent that are not included in this letter
7  log.
8  BY MS. LETCHER:
9    **Q.**   Okay.  Is there a specific kind of letter that's
10  included in this letter log?
11    **A.**   There are many types of letters that are included
12  in this letter log.
13    **Q.**   Is it just loss mitigation and foreclosure related
14  letters?
15    **A.**   On a general loan, no, it would be -- there would
16  be many types of letters.
17    **Q.**   Okay.  Looking at the header column, what does the
18  heading "Letter" mean?
19    **A.**   That is a code that would be on, it is typically on
20  the letter itself.  Just the type of letter.
21    **Q.**   So that is a code for a form letter?
22    **A.**   Yes, or a template, yes.
23    **Q.**   Okay.  And what does the "REQ" header mean?
24    **A.**   That would be -- I refer to it as requestor, but
25  I'm not sure if that's the exact term or not.

                                                                54

1    **Q.**   And do the identifiers in that column refer to a
2  person or a department?
3    **A.**   It could refer to either a person, department,
4  system-generated letter.
5    **Q.**   Okay.  How can you tell?
6    **A.**   Based on the codes.  You could tell if an
7  individual sent it or if it was sent by the system.
8    **Q.**   Okay.  On page 1740, can you tell me which of these
9  were sent by the system?  You can refer to them by date and
10  name.
11    **A.**   On this one I can't determine if, if any of these
12  were sent by the system with the exception of the 4-29 letter
13  has "VEN" and that's typically a system-generated type letter.
14    **Q.**   Okay.  And which of these would be sent by an
15  individual?
16    **A.**   I'm not sure unless I have the codes, the code log,
17  to see if they were individuals or system generated.
18    **Q.**   But you could look it up if you had to?
19    **A.**   Yes.
20    **Q.**   Okay.  I'm going to hand you one of the, the first
21  of many behemoth exhibits that the court reporter will mark as
22  Exhibit 86.
23        (Plaintiff's Exhibit 86 marked for
24        identification and attached hereto.)
25    **A.**   I'd like to take a short break in a few minutes if

                                                                55

1  you don't mind.
2    **Q.**   If you want to do it now we can do it now.
3    **A.**   Sure.  Just five minutes or so.
4        MS. LETCHER:  Let's go off the record.
5        THE VIDEOGRAPHER:  Going off the record at
6  10:31 a.m.
7        (Discussion off the record.)
8        (Recess taken.)
9        THE VIDEOGRAPHER:  And we are back on the record at
10  10:42 a.m.
11  BY MS. LETCHER:
12    **Q.**   Okay.  So I wanted to circle back a little bit.  Do
13  the customer assistance specialists handle anything other than
14  loan modifications?
15    **A.**   I don't know if any other job function would have
16  the same title as customer service specialist or not.  I'm not
17  sure.
18    **Q.**   Do they handle anything other than loan mods?
19    **A.**   A customer assistance specialist in the loss
20  mitigation would handle -- their only duties would be loan
21  modification.  There would be another department that might
22  handle a short sale, and that person may also be called a
23  customer assistance specialist.  So just to be clear, that's
24  what I'm referring to.
25    **Q.**   Okay.  Are loss mitigation customer assistance

                                                                56

1  specialists handling any other non-liquidation modification
2  options, like repayment plans or forbearance plans?
3    **A.**   They generally do not.
4    **Q.**   Who handles those?
5    **A.**   I believe their repayment payment plan can be
6  handled by a collections department representative.
7    **Q.**   Okay.  In fact, general questions about the
8  modification process.  Is an NPV test generally performed as
9  part of --
10        THE REPORTER:  I'm sorry, NPV?
11        MS. LETCHER:  NPV.
12    **Q.**   -- net present value calculation generally
13  performed as part of a loan modification application analysis?
14        MR. DUFFY:  Objection.  Vague and ambiguous.
15        THE WITNESS:  Once all the documents are in and an
16  underwriter can run it for a decision, then that NPV is part
17  of that result.
18  BY MS. LETCHER:
19    **Q.**   In what percentage of applications would you say an
20  NPV is run?
21    **A.**   I would say on all complete applications that are
22  underwritten by an underwriter the NPV calculation is
23  typically a part of that.  I would say to my knowledge all of
24  them.  I'm not aware of ones that would not be run.
25    **Q.**   So of all applications, a percentage?

                                                                57

                                          15  (Pages 54 to 57)

SLG-Banks000222

1      MR. DUFFY: Objection. Vague and ambiguous.
2          THE WITNESS: Again, all complete applications that
3  an underwriter can submit for a decision, the NPV it is my
4  understanding is part of that decision-making process.
5  BY MS. LETCHER:
6      Q.   In your understanding what proportion of
7  applications end up having an NPV analysis?
8          MR. DUFFY: Objection.
9  Beyond the scope of the deposition notice.
10         THE WITNESS: As far as all applications submitted
11  and run in NPV, I have no idea. I don't know.
12  BY MS. LETCHER:
13     Q.   Okay. Of the ones that you have handled in your
14  three years of loss mitigation experience and the ones that
15  you have handled as testifying for Chase as a corporate
16  representative, what percentage involved an NPV?
17         MR. DUFFY: Objection. Vague and ambiguous.
18  Beyond the scope of the deposition notice.
19         THE WITNESS: Again, just to be clear, those that
20  I've seen run for a decision where all documents are received
21  and everything is in there in order to run the underwriting
22  for a decision, I believe I've seen an NPV in all of those.
23  BY MS. LETCHER:
24     Q.   So what you are saying is circular because you are
25  saying of all of those that got to the NPV stage, all of those

58

1  had an NPV done. But I am asking a different question, which
2  is, of all of those you've seen what proportion have the NPV
3  run? Half? More than half? Almost all?
4          MR. DUFFY: Objection; compound. Vague and
5  ambiguous. Beyond the scope of the deposition notice.
6          THE WITNESS: Well, again it depends on if the
7  application is complete or not. If you're asking me the
8  percentage of complete applications versus non-complete, I
9  have no idea.
10  BY MS. LETCHER:
11     Q.   You have no experience with that at all?
12         MR. DUFFY: Objection. Vague and ambiguous.
13         THE WITNESS: I don't keep a running tally on
14  complete application versus non-complete applications. I'm
15  sorry.
16  BY MS. LETCHER:
17     Q.   Okay. In your experience what has -- what's the
18  most common denial reason for a loss mitigation application?
19         MR. DUFFY: Objection. Beyond the scope of the
20  deposition notice.
21         THE WITNESS: I don't really remember. I don't
22  know.
23  BY MS. LETCHER:
24     Q.   You have handled hundreds of cases and you can't
25  say what the most common reason for denial is?

59

1      MR. DUFFY: Objection. Argumentative. Vague and
2  ambiguous. Asked and answered. Beyond the scope of the
3  deposition notice.
4          THE WITNESS: It would be a guess as far as what
5  the most common would be. I don't really recall.
6  BY MS. LETCHER:
7      Q.   Do you think you are qualified to testify as to
8  Chase's loss mitigation policies and practices on loss
9  mitigation given that you can't remember even what the most
10  common denial reason is?
11         MR. DUFFY: Objection. Vague and ambiguous.
12  Beyond the scope of the deposition notice.
13         THE WITNESS: That is something that I've never
14  looked at or had the opportunity to research and review, so
15  again, I don't keep a running tally on any denials so I
16  really, I really can't say what I've seen most often. I don't
17  remember.
18  BY MS. LETCHER:
19     Q.   Does Chase use an NPV algorithm that's
20  significantly different from the Treasury's Check My NPV
21  Calculator for HAMP modifications?
22         MR. DUFFY: Objection. Vague and ambiguous.
23         THE WITNESS: This loan didn't get that far so --
24  and I don't really have any -- I haven't dealt with NPV
25  calculations in a very long time so I didn't research that as

60

1  part of this case.
2  BY MS. LETCHER:
3      Q.   Okay. So does your research in other cases ever
4  inform your testimony here?
5          MR. DUFFY: Objection. Vague and ambiguous.
6          THE WITNESS: I would consider that part of my
7  experience, so any past research that I can recall, yes, I
8  would definitely utilize that knowledge.
9  BY MS. LETCHER:
10     Q.   And in your employment for Chase have you ever
11  learned anything about the NPV calculator and how similar it
12  is to the Check My NPV Calculator online?
13     A.   I have had research in the past on NPV and I have
14  had personal experience with the NPV calculations. But as far
15  as it relates to that, I don't recall specifically as far as
16  the Check My NPV. I am aware of that but I don't know how
17  that relates to that.
18     Q.   Does Chase ever tell, instruct borrowers that they
19  can use the Treasury's Check My NPV Calculator to help
20  determine whether they are going to be eligible for a
21  modification or not?
22     A.   I'm not aware of that.
23     Q.   How long does it take to check an NPV using Agent
24  Desktop?
25     A.   If all the information is input it is basically run

61

16  (Pages 58 to 61)

SLG-Banks000223

1 and the calculations are done by the engine, so a matter of
2 less than a minute I would believe.
3    Q.   And so a positive NPV result means that a
4 modification is better for the investor than a foreclosure,
5 and it gives a dollar amount of the estimate by -- of the
6 amount by which it is better for the investor, right?
7        MR. DUFFY:  Objection.  Vague and ambiguous.
8        THE WITNESS:  Again, I have not dealt with NPV's in
9 a long time and I didn't research NPV's for this just because
10 it did not, this loan didn't get that far in the process.  So
11 I really don't remember on that.
12 BY MS. LETCHER:
13    Q.   When was the last time that you dealt with a loan
14 that had an NPV issue?
15    A.   It was probably about nine months ago to possibly a
16 year.  I don't remember specifically.
17    Q.   Does Chase ever run an NPV on an application before
18 all documents are received?
19    A.   I don't believe so.  I believe they need the
20 information because the -- I do recall the primary driver of
21 the NPV is a borrower's income.  So that would represent the
22 amount of payment that would be allowable under a
23 modification.
24    Q.   Does Chase ever run an NPV on the borrower's stated
25 income?

62

1    A.   Back in 2000, I believe, '11 or prior to that,
2 maybe 2010, the modification application process was a little
3 bit different than it is during the time period that we're
4 discussing, 2012 to '14, so it would be based off of stated
5 income, and a trial payment plan would be sent to the borrower
6 based on that stated income.
7        And then during that trial period the borrower
8 would send in documentation to verify the income that they
9 stated over the phone.
10    Q.   So it is completely possible to run an NPV just to
11 get an eyeball idea of whether somebody is going to be
12 eligible for a modification based on stated income, right?
13        MR. DUFFY:  Objection.  Vague and ambiguous.
14 Overbroad.
15        THE WITNESS:  Again, I think the last time that was
16 done was 2010.  So in this case, no.  All documentation would
17 be received prior to any type of underwriting.
18 BY MS. LETCHER:
19    Q.   I am not asking about Chase's practice.  I am
20 asking whether it is possible.
21        MR. DUFFY:  Objection.  Vague and ambiguous.
22        THE WITNESS:  I'm not sure if that's possible or
23 not, to enter in arbitrary information into the Agent Desktop
24 and try to get results from that.
25 BY MS. LETCHER:

63

1    Q.   Not arbitrary.  The information that the borrower
2 provides, just using the figures that the borrower provides.
3        MR. DUFFY:  Just for the court reporter's sake, if
4 we can make sure you guys finish speaking before the next one
5 starts.
6        THE WITNESS:  I'm not aware of any way the
7 underwriter would get stated income information in order to
8 run an Agent Desktop review, so I don't believe that would be
9 possible.
10 BY MS. LETCHER:
11    Q.   So turning to Exhibit 85 that's sitting in front of
12 you.  What is this?
13        MR. DUFFY:  The binder is 86.
14        MS. LETCHER:  Sorry, you are right.
15    Q.   Do you recognize these?
16    A.   Yes.
17    Q.   What are they?
18    A.   They are screenshots from MSP DLQ7 subscreen.
19    Q.   And do they record calls made by the borrower?
20    A.   I believe they can include incoming calls.
21    Q.   And does it include outgoing calls?
22    A.   It does.
23    Q.   And is this a record of all incoming and outgoing
24 calls on this loan?
25    A.   I believe there may be some additional, the SERN

64

1 screens that may have some customer service information on
2 that, but I'm not certain.
3    Q.   Do these records include the fact of every call,
4 whether there are other records that include more information
5 about each call, or are there calls that would appear in SERN
6 that don't appear here?
7    A.   These would basically include calls that are
8 handled by individuals trying to reach out to a borrower
9 regarding a late payment.  That's what the DLQ7 subscreen is
10 generally for, those types of calls for that activity.
11    Q.   So are these calls only for a specific department?
12    A.   Basically the collection department would enter
13 phone calls or also automated calls would be logged in this
14 particular subsection.
15    Q.   Okay.  What else is recorded other than automated
16 calls and actual calls in DLQ7 notes?
17    A.   That is the general concept of the DLQ7 screens, is
18 to just do those things.
19    Q.   Okay.  Let's just take a random page to start.  I
20 am looking at 2609.  We're going to start in the back with all
21 of these records because they are in reverse chronological
22 order and try to go chronologically.
23    A.   Okay.
24    Q.   So I'm looking at the first entry that says 2-6-12.
25 Is that February 6 of 2012?

65

17  (Pages 62 to 65)

SLG-Banks000224

1    A.   Yes.
2    Q.   How can you tell who made this record?
3    A.   The user I.D.
4    Q.   And that's under the column "USR"?
5    A.   Yes.
6    Q.   Okay.  On the third entry, what does this entry
7  "Contact Established" mean?
8    A.   Specifically on that one I don't know.  It looked
9  like there was an inbound call there from that note you just
10  referenced, and that's on page 608 or 2608, the bottom line,
11  "Inbound customer requesting assistance."
12    Q.   How can you tell what's an inbound call and what's
13  an outbound call?
14    A.   Well, this note says inbound on the note itself.
15    Q.   Okay.  On the previous page 2608?
16    A.   Yes.
17    Q.   Which of those entries are calls?
18    A.   Basically multiple entries can be made on a single
19  call.  So from my analysis this looks like it is the same
20  user, the same timestamp, so that was done at the same time of
21  that note on page 609.
22    Q.   So under the column "Contact/Response/Reason," are
23  all of those entries notes made by a human or some of them
24  automatic entries?
25    A.   They can be made by a human or the automated

66

1  system.
2    Q.   And how can you tell if they are made by an
3  automated system?
4    A.   Some of these have under the user name "AVA" which
5  is basically the automated phone system.  Everything else
6  would generally be an individual.
7    Q.   Turn to page 2603.  There are two entries.  There
8  are a couple entries that say, for example the one for 1624,
9  "DLN DLR no contact."  What does that mean?
10    A.   The DLN I'm not certain.  The DLR I believe is for
11  the dialer, is what the automated system is called.
12    Q.   And "no contact"?
13    A.   It appears so.
14    Q.   Okay.  So we will be returning to this.  You might
15  just want to keep it handy.
16    A.   Okay.
17    MS. LETCHER:  I'm going to hand you, the court
18  reporter will mark as Exhibit 87.
19    (Plaintiff's Exhibit 87 marked for
20    identification and attached hereto.)
21    Q.   Do you recognize this?
22    A.   Yes.
23    Q.   What is it?
24    A.   It is a blank modification package.
25    Q.   For what kind of modification?

67

1    A.   These packages can be used for any type of
2  modification that Chase offers.
3    Q.   Okay.  Turning to page 861.  What is this?
4    A.   This is a, what's commonly referred to as an RMA
5  form.  It is a request for modification and affidavit.  It is
6  what the borrower completes for -- to give the servicer her
7  information in requesting a loan modification.
8    Q.   Okay.  And what's the fourth page of this RMA?
9    A.   It is the homeowner's hotline information for the
10  homeowner's HOPE that we previously talked about.
11    Q.   At the top it says "Complete all four pages of this
12  form."  How does a borrower complete this page?
13    A.   I'm not sure.
14    Q.   There's no signature line or any information that
15  the borrower has to add, is there?
16    A.   No.
17    Q.   Okay.  On page 860, which is the page before that,
18  what's this?
19    A.   This is a what I refer to as a documentation
20  checklist.
21    Q.   Okay.  And so if a person submits the appropriate
22  information on this checklist is their application complete?
23    MR. DUFFY:  Objection.  Vague and ambiguous.
24    THE WITNESS:  If they submit all information on
25  this package -- I mean on this checklist, rather, the CAS

68

1  would then submit the package to an underwriter for review.
2  BY MS. LETCHER:
3    Q.   Okay.  I'd like you to look at page 857.  It says:
4    "You recently requested a mortgage
5    modification through the Making Home
6    Affordable Program."
7    Would Miss Banks ever have qualified for a Making a
8  Home Affordable loan?
9    A.   I'm not sure.  I didn't run any speculative
10  scenarios.  I don't know.
11    Q.   So are you familiar with the HAMP program?
12    A.   I am.
13    Q.   Is it the flagship federal modification program
14  that Chase was one of the initial signatories to?
15    A.   I am not sure as far as Chase's history in regards
16  to that, but it was referred to the Making Home Affordable
17  Program at that time and Chase was a participant in that.
18    Q.   Chase started doing the basic kind of modification
19  under that program called a HAMP modification in 2009, right?
20    MR. DUFFY:  Objection.  Vague and ambiguous.
21    THE WITNESS:  I believe from my experience, yeah,
22  it was 2009.
23  BY MS. LETCHER:
24    Q.   And you testified to some of the changes in
25  requirements for documentation that took place in 2010 under

69

18  (Pages 66 to 69)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000225

1  the HAMP program, right?
2  A.  Yes.
3  Q.  So are you familiar with any of the requirements of
4  the HAMP program?
5  A.  I'm familiar with the general requirements, yes.
6  Q.  What's the upper limit for the unpaid balance of a
7  single unit residence under HAMP?
8  A.  I believe there were several changes to that, and
9  from what I recall in --
10 Q.  In 2012.
11 A.  At that time I believe it was in the $700,000
12 range, but I'm not sure.
13 Q.  And what was Miss Banks' unpaid balance?
14 A.  I think hers was around 850 or so at that time.
15 Q.  So because of her balance she never would have
16 qualified for HAMP modification, right?
17 MR. DUFFY:  Objection.  Vague and ambiguous.
18 THE WITNESS:  Again, the guidelines changed, as you
19 said, often, so she may have qualified for that if the
20 guidelines had changed.  But I'm not sure at that time.  The
21 balance was 850 and I believe the guideline was in the
22 $700,000 range somewhere.
23 BY MS. LETCHER:
24 Q.  Was it 729?
25 A.  That sounds familiar.

70

1  Q.  Was it the limit for a jumbo loan?
2  A.  Well, I know jumbo loans, they do vary by area as
3  well.  I believe they did at that time too, so I don't know if
4  that would be an accurate description.
5  Q.  Okay.  I'd like you to return to Exhibit 85.  How
6  many HAMP application packages did Chase send Ms. Banks
7  between June of 2011 and May of 2012?
8  MR. DUFFY:  Objection.  Vague and ambiguous.
9  THE WITNESS:  (Reviewing document.)
10 BY MS. LETCHER:
11 Q.  Did you understand the question?
12 A.  Through what date?  Yes, I'm trying to get the
13 total.  But through what date?
14 Q.  Through June -- through May 29th, let's put that.
15 A.  And I'm sorry, what were the -- that was 2012?
16 Q.  Of 2012.
17 A.  Okay.  Can you just repeat just to make sure of the
18 date ranges you are looking for.
19 Q.  During the first year reflected on this letter
20 log --
21 A.  Okay.
22 Q.  -- up until May 12, 2012?
23 A.  Okay.
24 Q.  -- how many HAMP or Making Home Affordable
25 applications did Chase send Miss Banks?

71

1  A.  Okay.
2  (Reviewing document.)
3  There appears to be nine.  I may be off one or two
4  but it appears to be about nine.
5  Q.  Should Chase have checked the balance of
6  Miss Banks' loan against the HAMP program requirements before
7  sending the solicitations?
8  MR. DUFFY:  Objection.  Vague and ambiguous.
9  THE WITNESS:  Again, as I stated earlier, this
10 package is valid for all modification programs.  And from what
11 I recall -- I mean I know there are a lot of call notes --
12 that that was, that was communicated to the borrower.  It is
13 not just for HAMP modification.
14 BY MS. LETCHER:
15 Q.  Where are the call notes about communications with
16 the borrower about loss mitigation before May 29th?
17 MR. DUFFY:  Objection.  Vague and ambiguous.
18 BY MS. LETCHER:
19 Q.  Where would those be recorded?
20 A.  I saw some in the LMTN notes.
21 Q.  Okay.  The court reporter is going to hand you what
22 she will mark as Exhibit 88.
23 (Plaintiff's Exhibit 88 marked for
24 identification and attached hereto.)
25 A.  I believe we provided some additional notes from a

72

1  date range that was not included in these.  Just for a
2  complete record can we include those as well?
3  Q.  I'm going to hand you what the court reporter will
4  mark as Exhibit 89.
5  (Plaintiff's Exhibit 89 marked for
6  identification and attached hereto.)
7  A.  Thanks.
8  Q.  Is this what you're referring to?
9  A.  Yes, Ma'am.  Thank you.
10 Q.  So are these the same notes but in a different
11 format?
12 A.  It is.  Well, they are -- they do include some
13 duplicate dates but it would be additional information,
14 additional entries that are not included in Exhibit 88.
15 Q.  And why were the -- why were these notes omitted
16 from the initial disclosure and not disclosed until around
17 5:00 p.m. yesterday?
18 MR. DUFFY:  Objection.  Vague and ambiguous.
19 Beyond the scope of the deposition notice.  And to the extent
20 it calls for disclosure of attorney-client communications, I
21 would remind you not to respond to those questions.
22 THE WITNESS:  Sure.  Just in my review yesterday I
23 noticed some -- this date range missing, so I wanted to make
24 sure that those were included so we had the full scope of the
25 notes.

73

19  (Pages 70 to 73)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000226

**Page 74**

1  BY MS. LETCHER:
2      Q.  So if you wanted to print LMT notes, how would you
3  do that to prepare these documents for printing?
4      A.  That's done through MSP.
5      Q.  Okay.  So would you just say print all -- print all
6  LMTN notes and push a button, or would you enter a date range?
7      A.  There would be a date range you would need to
8  enter.  There's a standard date range that's already included.
9  But if you want a specific date range you would enter that
10 information then yourself.
11     Q.  So if somebody produced just notes from May 12th to
12 June 12th and then from October 11th to July 13th, they would
13 have entered two date ranges?
14     A.  On this particular exhibit, Exhibit 88, I don't
15 know how this was produced.  I can just tell you how I
16 personally did this one.  I just noticed that those date
17 ranges were missing.  I don't know why.  As you can see, each
18 page on Exhibit 88 says 1 of 1.  So I don't know if they
19 were -- I don't know how those dates were missing from this
20 exhibit.  I just noticed that.
21         So I just wanted to have a complete note record.
22 So I actually provided these yesterday, Exhibit 89.
23     Q.  Okay.  So you said that there were conversations
24 with Ms. Banks before May of 2012 in which she was advised
25 about her eligibility for a HAMP modification.  These notes

**Page 75**

1  start in May of 2012.  So where would those, the notes you
2  were referring to, be recorded?
3      MR. DUFFY:  Objection.  Misstates testimony.
4  BY MS. LETCHER:
5      Q.  Please correct me if I misunderstood.
6      A.  And I apologize if I was not specific on your days
7  prior to May 2012.  There is an entry on, or, Bates number 4326
8  that was June 6, 2012.  I guess the representative spoke to a
9  John Yedinak, which was a financial adviser I guess for the
10 borrower, and it says:
11         "Check status as borrower 1 received
12         letter stating because of her balance
13         she was not qualified for HAMP."
14 And it says:
15         "Advised we still have Chase
16         modification that we can try to qualify
17         buyer for."
18         That was the note that I was referencing.
19     Q.  But that was after the nine HAMP solicitations over
20 a year that you mentioned before, right?
21     MR. DUFFY:  Objection.  Vague and ambiguous.
22     THE WITNESS:  That particular note was June 6,
23 2012.
24 BY MS. LETCHER:
25     Q.  Okay.  While we are on these, these are loss

**Page 76**

1  mitigation notes, LMT?
2      A.  Yes.
3      Q.  Okay.
4      A.  LMTN.
5      Q.  Tell me, what are these notes?
6      A.  These are notes entered in by someone working on
7  the loss mitigation for the file, for the loan.
8      Q.  Okay.  So these are all notes of a customer
9  assistance specialist, or do they include notes from other
10 people?
11     A.  As far as I am aware, the primary input individual
12 would be the CAS for these notes.  I don't know of any other
13 person that would really have any reason to put in a note into
14 the loss mit subsection if they are not working on the
15 loss mit.
16     Q.  And why do they start on May 29th?
17     A.  On page 2404 it just says end of notes, so I don't
18 know why they would start at that other than that's the first
19 note that was input --
20     Q.  Okay.
21     A.  -- regarding the loss mitigation.
22     Q.  Going back to the letter log, Exhibit 85.  I'm
23 going to refer to it as the letter log.
24     A.  That's fine.
25     Q.  Page 1740.  There's an entry for May 29th that

**Page 77**

1  says:  "Started loss mit."
2      A.  Okay.
3      Q.  Is that -- is that an official status of the loan?
4  Does it make any difference to the handling of the loan?
5      A.  If loss mit is started there's a, what's referred
6  to as a template that's opened up within MSP.  It is a
7  subscreen.  It is actually the LMT-1 screen that would show
8  active loss mitigation.
9          And as I stated before, any customer service
10 representative or really anybody that's looking into the loan
11 would -- that would be a screen that they would check to
12 verify if any loss mit activity is occurring.
13     Q.  Okay.  Would there be any loss mitigation notes
14 before the template is opened?
15     A.  No, you cannot put any notes into the LMTN screen
16 without an open loss mitigation activity.
17     Q.  And why do the notes in Exhibit 89 end on July
18 10th, 2013?
19     A.  I'm not sure why those would end at that time.
20     Q.  Was Miss Banks in loss mitigation after 2013?
21     A.  I'm not sure if there was another application in
22 process after that time.  I don't recall seeing one.
23     MS. LETCHER:  So this is Exhibit 90.
24     (Plaintiff's Exhibit 90 marked for
25     identification and attached hereto.)

20   (Pages 74 to 77)

ELITE COURT REPORTING (949) 829-9222

**Page 78**

1    Q.   What are these?
2    A.   These are what's referred to as the FOR2 notes.
3    Basically a subsection within MSP where notes can be placed
4    regarding the foreclosure.
5    Q.   Turning to the back page.  Is that page the only
6    entries for 2012?
7    A.   It appears to be.
8    Q.   Why is that?
9    A.   I'm not sure.
10    Q.   So what's contained -- who makes notes in
11    foreclosure processing notes?
12    A.   These are generally notes between the foreclosure
13    department and the trustee handling the foreclosure.
14    Q.   And can the trustee make notes that get recorded in
15    the foreclosure processing notes?
16    A.   All of these notes that are indicated by the user
17    I.D., the @ symbol and VU are notes that are transferred from
18    LPS Desktop.
19    Q.   And does that mean that they were originally
20    entered by the trustee?
21    A.   They can be entered in by a representative with
22    Chase or an individual with the trustee.
23    Q.   Okay.  So let's turn to page 2575.
24    A.   Is that in another exhibit?
25    Q.   I am so sorry.  Yes, that's the DLQ's.

**Page 79**

1    A.   Okay.  Okay.
2    Q.   So this starts with a call on May 24, 2012, right?
3    A.   Yes, there are some additional notes on 2574 that I
4    believe are the same call.
5    Q.   Okay.  Actually, let's just start with 5-29.  Can
6    you interpret these for me and tell me what happened during
7    this call.
8    A.   Okay.  You mentioned 5-29.  What -- I don't see
9    anything on that page.  Oh, on 574?
10    Q.   Yes.
11    A.   Okay.  That, I'm not sure what that's referring to.
12    Q.   And how about the entry above it, "CPR CAP team
13    review," what does that mean?
14    A.   I'm not sure.
15    Q.   Okay.  So let's look at the 5-24 call which seems
16    to start on page 2581 and finish on 2575.
17    A.   Okay.
18    Q.   Can you interpret these notes for me, and just tell
19    me what these mean, the notes recorded on the call.
20        Actually, before that question, can you tell me
21    who -- can you tell who was making these notes?
22    A.   Other than the user I.D. there, I don't see a name
23    of this individual that may have entered these notes.
24    Q.   So is the user I.D. an individual or department?
25    A.   Based on the content of the notes, it appears to be

**Page 80**

1    an individual.
2    Q.   Okay.  So the call started at about 6:48, right?
3    A.   Yes.
4    Q.   And ended sometime around 7:35.
5    A.   It looks like that individual with the user I.D.
6    I&3, it looks like they transferred the call around 19:20.
7    Q.   Okay.  So tell me what happened during that call.
8    A.   Looks like a forbearance agreement and possible
9    repayment plan was discussed.
10    Q.   And what did they say about it?
11    A.   Looks like HAMP forbearance program, it says in
12    the notes it is not feasible.
13        "Based on the information you have
14        provided you are not eligible for the
15        forbearance program."
16    Q.   What is the HAMP forbearance program?  Is it
17    unemployment based?
18    A.   I'm not sure of the guidelines for the forbearance
19    program at that time.
20    Q.   Okay.  Did they discuss a modification?
21    A.   Looks like there's a note on page 576:
22        "Advised to website for loan mod.
23        Advised of CAS information of Chelsea
24        C."
25        And then a phone number and extension for her.  I'm

**Page 81**

1    going to look at the rest of these to see if there's anything
2    regarding a loan mod.
3        There's a note that says the customer was calling
4    about getting waiving -- it says:
5        "About getting waiving late charges and
6        also about loan mod."
7    Q.   And then the call was transferred after a request
8    to speak with manager?
9    A.   I'm sorry, I am still looking at the other notes to
10    see if there's anything regarding a loan modification.
11        (Reviewing document.)
12        It looks like the -- there is a note:
13        "Customer requested to speak with
14        manager about late charges.  Warm
15        transfer."
16        Basically it is the representative stays on the
17    line until someone does pick up, and that was done around
18    19:20, I guess.
19    Q.   Okay.  And what does that top line "NOP RP unable
20    to PTP" mean?
21    A.   The NOP RP -- the NOP, I am not certain what that
22    means.  RP I believe is repayment.  "Unable to" -- the PTP is
23    promise to pay.  So basically, you know, the borrower said
24    they couldn't pay anything at that time.
25    Q.   So do you feel like you can understand the notes

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000228

**Page 82**

1  that are entered by collections agents?
2  A.  Generally, yes.  There may be some acronyms that I
3  may not be familiar with, but I would say generally, yes.
4  Q.  Okay.  I am going to hand you another exhibit that
5  will be labeled 91.
6  (Plaintiff's Exhibit 91 marked for
7  identification and attached hereto.)
8  A.  I'm just going to refresh my coffee real quick over
9  there.
10  Q.  Sure.  What are these?
11  A.  These are what's referred to as CCW notes.
12  Q.  What do they record?
13  A.  These are basically used for interdepartmental
14  notes or tasking within Chase.
15  Q.  Okay.  I'd like you to look at page 2136.
16  A.  Okay.
17  Q.  And what's a CCW route?
18  A.  Again, that's going to be a task between
19  departments.
20  Q.  And is a single task identified by a single case
21  number in the left-hand column?
22  A.  Yes.
23  Q.  So when I refer to a route, I will just use the
24  last two numbers on a page.  So on page 2136 the route that
25  ends in 20 about halfway down the page, it says:

**Page 83**

1  "Special handling: Escalated assigned
2  Donna Perkins.  Please verify/update
3  property type."
4  And at the end of that route it says:
5  "Per imaged appraisal in iVault.  Prop
6  is a DET-PUD."
7  What does that mean?
8  A.  I believe that DET would be for "detached," so like
9  a single family home.  And PUD would be I believe planned --
10  is it "planned urban development"?  I haven't dealt with that
11  in sometime.
12  Q.  And why would they be checking that?
13  A.  I mean that's just something standard on really any
14  type of review.  You want to know what type of property you
15  are dealing with, whether it is a condominium or an attached
16  property.
17  Q.  So why does it say "special handling escalated"?
18  A.  I don't know.
19  Q.  Going back to the DLQ notes.  Since we're going to
20  be going back and forth chronologically, you might as well
21  just keep them open to the date.
22  A.  Okay.  What page are you looking at?
23  Q.  2574.
24  A.  Okay.
25  Q.  I'm sorry, 2573.  The May 31st entry says "BPO

**Page 84**

1  ordered."  What is a BPO?
2  A.  That's a broker's pricing opinion.
3  Q.  And is that ordered as part of the modification
4  process?
5  A.  It is.
6  Q.  Is it ordered for any other reason?
7  MR. DUFFY:  Objection.  Vague and ambiguous.
8  THE WITNESS:  BPO's can be ordered any time Chase
9  needs to get a value, an estimated value for the property.
10  BY MS. LETCHER:
11  Q.  But it wouldn't do that ordinarily just because a
12  loan is in default, would it?
13  A.  Based only on the fact that the loan is in default
14  a BPO is not automatically ordered at that time, no.
15  Q.  Okay.  Going back to the CCW notes, page 2138.  The
16  second entry says -- no, I'm sorry, never mind.  Let's just
17  skip that section.
18  And go back to the LMT notes.  LMT which is Exhibit
19  89.  Page 2404.
20  A.  Okay.
21  Q.  What does the entry for June 1st mean?
22  "Working LISA no mod reports.  Notes
23  added to MSP."
24  A.  I can't be certain about that, that note.  It would
25  be -- I think it would be more along the lines of a guess if I

**Page 85**

1  did.
2  Q.  Does LISA have to do with investor restrictions on
3  a loan?
4  A.  LISA is an acronym for Loan Information Servicing
5  Answers where investor guidelines are kept.  I don't know how
6  that particular note would apply to that.  It says: "Working
7  LISA.  No mod report."  I really have -- I don't know what
8  that would mean.
9  Q.  So what kind of information is stored in the LISA
10  system about a particular loan?
11  A.  Just in general it would contain information about
12  the pool of loans containing trustee or investor information,
13  I guess.
14  Q.  Can you explain what you mean by "pool of loans"?
15  A.  There are loans that are bought and bound into a
16  pool by investors and those pools have names.  The investor on
17  that is typically the trustee of those loans.
18  Within LISA that information is included, and also
19  certain documents regarding that pool.  And also in reference
20  to modifications, there are typically certain guidelines
21  regarding terms of modifications that are in LISA.
22  Q.  So a loan is included in a certain pool.  The pool
23  is governed by documents that describe how Chase can modify
24  the loan?
25  A.  There are usually subsections within that pool that

1  may deal with that.  I haven't looked at that in this
2  particular case.  Within the LISA system, though, there is
3  typically a section that would list the terms under which a
4  loan in that pool can be modified.  There may be certain
5  limits as far as interest rate, principal forgiveness, term
6  limits, that type of thing.
7      Q.   And are those terms pulled from the pooling and
8  servicing agreement for that particular pool of loans?
9      A.   I'm not certain where that information is derived
10  from.  I know we have a whole department of investor relations
11  that handles that type of thing.  But I'm not sure where that
12  information is incorporated in LISA, where that would
13  come from directly.
14      Q.   Other than the terms under which it can be
15  modified, are there any other investor restrictions or
16  guidelines that are included in LISA?
17      A.   No, not other than the terms.
18          MS. LETCHER:  We are out of tape so let's take a
19  break.
20          THE WITNESS:  Okay.
21          THE VIDEOGRAPHER:  This is the end of media number
22  1.  We are going off the record at 11:39 a.m.
23          (Recess taken.)
24          THE VIDEOGRAPHER:  And we are back on the record at
25  11:49 a.m.  This is the start of media number 2.

86

1  anywhere else in Chase's records where receipt of an
2  application would be recorded?
3      A.   I mean there may be notes in the loss mit notes
4  referencing documents received, but other than that I'm not
5  aware of any other type of notes.
6      Q.   Okay.  There's a bar code at the bottom of the RMA
7  in this.  Can Chase tell from that bar code when this document
8  was sent to her to fill out?
9      A.   Actually, I'm not sure of the particular functions
10  of that bar code at the bottom.
11      Q.   I'm going to hand you Exhibit 93.  No, I'm going to
12  hand you what was previously marked Exhibit 25.  Did Chase
13  receive this document?
14      A.   Yes.
15      Q.   Approximately when?
16      A.   I know there were some notes referencing this
17  particular document.
18      Q.   Okay.
19      A.   The stamp on the document itself says 5-31-12.
20      Q.   So turn to LMTN notes 2404.
21      A.   Okay.
22      Q.   Is the first entry the entry you were referring to?
23      "Advised A LOE is not valid proof of
24      income."
25      A.   This is the first note that appears to reference

88

1          MS. LETCHER:  Okay.  I'm handing you Exhibit 92.
2          (Plaintiff's Exhibit 92 marked for
3          identification and attached hereto.)
4      Q.   Is this the first application received by Chase for
5  modification from Miss Banks?
6      A.   (Reviewing document.)
7          As far as the dates, I'm having trouble remembering
8  the dates but I believe so.  I know there was one in mid-2012.
9  I don't remember if it was April or May, but I believe --
10      Q.   Okay.
11      A.   -- it was around that time frame.  And there were
12  multiple submissions of this form, and many of them with the
13  same date of signature but -- so I really can't say for sure.
14  But this would have been one of the first ones.
15      Q.   Okay.  How would you find out which of the
16  documents disclosed was received by Chase when?
17      A.   Many of the times if -- what I recall, I mean I've
18  seen many fax stamps so I'd look at that.  If I had to
19  correlate, I mean that's what I would basically use just to
20  look at the docs as we're sitting here today.
21      Q.   Okay.  So you would agree that the fax stamp at the
22  top is generally the date that Chase got it?
23      A.   Yeah, the date that it was faxed, yes.  I mean I
24  would generally rely on that to give me an idea.
25      Q.   And looking at the letter log -- no.  Is there

87

1  this particular document.
2      Q.   Okay.  So within a couple of weeks of submitting
3  this she's getting a letter saying that she has missing
4  documents, right?
5      A.   I don't remember the exact day but I have seen a
6  missing items letter.
7      Q.   Okay.  Here it is.  This is what's been previously
8  marked as Exhibit 29.  They are not -- this letter doesn't
9  request any further proof of income from her first
10  application, does it?
11      A.   This letter references a 4506-T form to be
12  completed and also a completed RMA form.
13      Q.   But it doesn't say anything about pay stubs or bank
14  statements or anything like that?
15      A.   I don't see anything on this particular document
16  referencing pay stubs.
17      Q.   Okay.  So at this point she's not required to
18  submit any, is she?
19          MR. DUFFY:  Objection.  Vague and ambiguous.
20          THE WITNESS:  It looks like she was notified by
21  phone that she would -- that the letter of employment, this
22  letter is not going to be sufficient.
23  BY MS. LETCHER:
24      Q.   Okay.  So are the missing documents letters that
25  she's getting in the mail not accurate?

89

23  (Pages 86 to 89)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000230

1    A.   I do not know why that information is not included
2  on this letter.
3    Q.   **But the letter requests a tax return, right?**
4    A.   No, it does not.
5         MS. LETCHER:  I'm going to hand you Exhibit 93.
6         (Plaintiff's Exhibit 93 marked for
7         identification and attached hereto.)
8         THE WITNESS:  Just to follow up on this letter, I
9  don't know if -- I don't recall when the pay stubs were sent
10  in, if it was between that phone call and this letter or not.
11  So I don't know if that may be a reason.  But that would just
12  be a reason why they may not be included on the letter.
13  BY MS. LETCHER:
14    Q.   **Okay.  Is Exhibit 93 application materials sent to**
15  **Chase on June 21st?**
16    A.   (Reviewing document.)
17         I appear to have two copies of the same -- well,
18  yes, they are all different.  Well, it is duplicate Bates
19  numbers.
20    Q.   **Okay.  Let's just take the one copy.**
21    A.   I will give that back to you.  The fax stamp at the
22  top is dated June 21st, 2012.  It appears to be basically the
23  same package that was submitted in May.  It is dated the same
24  on the signature line.
25         MS. LETCHER:  I'm going to hand you Exhibit 94.

90

1         (Plaintiff's Exhibit 94 marked for
2         identification and attached hereto.)
3         THE WITNESS:  Just continuing my answer, it appears
4  to be -- the documents appear to be the same.  I don't see any
5  real difference between the two exhibits.
6  BY MS. LETCHER:
7    Q.   **Yes, I'm not going to ask you the details about the**
8  **applications materials received, unless you want to stay here**
9  **for an extra couple of days.  I'm happy to do that.**
10         MR. DUFFY:  You can fully answer the questions.
11  BY MS. LETCHER:
12    Q.   **So Exhibit 94, what is this?**
13    A.   The LMT3 subscreen within MSP.
14    Q.   **Okay.  What is in LMT3 screen?**
15    A.   This screen basically tracks certain tasks that are
16  done on a loss mitigation review.
17    Q.   **What is a "step description"?**
18    A.   Where do you see that?
19    Q.   **It is the middle column.**
20    A.   Oh, that's basically just a general description of
21  the task.
22    Q.   **Okay.  And does the task change how the**
23  **modification application is handled or does it just record how**
24  **one was handled?**
25    A.   I believe it is just a recordation of what

91

1  occurred.
2    Q.   **Okay.  So why do these records only go back to 2013**
3  **when she's already in loss mitigation in mid-2012?**
4    A.   I'm not sure.
5    Q.   **So turning back to the loss mitigation notes, page**
6  **4320.**
7    A.   4320?  I'm sorry.
8    Q.   **Uh-huh.  There are step codes at the bottom of the**
9  **page, or codes at the bottom of the page.  Can you interpret**
10  **those?**
11    A.   From what it appears to me, it looks like those
12  documents, particular documents were received.  It mentions
13  pay stubs and tax return.
14    Q.   **And what does "perfected" mean?**
15    A.   That's a term that's used by the CAS we
16  actually -- basically that we actually just have them and
17  they're going to -- basically that that step needs to be
18  checked off in order to send it to underwriting.
19    Q.   **That it needs to be checked off or it has been**
20  **checked off?**
21    A.   Well, the purpose of the perfected step is that
22  according to the CAS we have enough documentation to submit to
23  the underwriter.  And those have to be basically checked off
24  on before the file is sent to the underwriter.
25    Q.   **Okay.  So at that point what remains before it is**

92

1  sent to the underwriter?
2    A.   There may be certain orders that have not come in
3  such as, I mean mentioned the BPO before.  The underwriter
4  would need the BPO in order to make a decision on the loan, on
5  a modification.
6    Q.   **On July 7th, the entry, it says:**
7         **"Need new RMA signed and dated with all**
8         **pages.  And two recent pay stubs."**
9         **Where did the person get that information?**
10    A.   (Reviewing document.)
11         It looks like if -- and again, I'm trying to
12  interpret these notes.  Beginning on page 4321, it looks like
13  some information was submitted and stated at the top that:
14         "Doc chasing review need new RMA fully
15         completed and signed and dated with all
16         with pages and recent pay stubs with
17         year-to-date earnings."
18         And it looks like there was an attempt on the 3rd
19  of July to reach the borrower for that information, and then
20  another attempt on the 7th of July for that information.
21    Q.   **And then they reached her.  And I'm going to hand**
22  **you Exhibit 95.**
23         (Plaintiff's Exhibit 95 marked for
24         identification and attached hereto.)
25    A.   Well, they didn't reach her on --

93

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000231

1    Q.   You can just strike my comment. Is Exhibit 95
2 application materials received by Chase on July 9th?
3    A.   Again, that appears to me a duplicate copy again
4 dated 5-25-2012.
5    Q.   Were they materials received on July 9th?
6    A.   There's a fax stamp at the top that says July 9th,
7 but again, it is the same signature and date 5-25-2012 by the
8 borrower.
9    Q.   I'm going to hand you what's been previously marked
10 as Exhibit 31. This is a missing documents letter sent after
11 those submissions. Do they make any mention of submitting pay
12 stubs?
13    A.   Yes.
14    Q.   Okay. Any other proof of income needed?
15    A.   Other than the tax form 4506, no.
16    Q.   Okay. Turning to the loss mitigation notes, 4318.
17 Is that what's referred to on the July 17th letter as a "hard
18 reject letter"?
19    A.   It states "Hard reject letter sent."
20    Q.   And is that, the hard reject letter, the previous
21 exhibit?
22    A.   (Reviewing documents.)
23       The dates are the same, but I mean I refer to this
24 letter Exhibit 31 as a missing items letter. I don't really
25 recall it being described as a hard reject letter, but --

94

1       THE REPORTER: 96.
2       MS. LETCHER: 96, thank you.
3       (Plaintiff's Exhibit 96 marked for
4       identification and attached hereto.)
5    Q.   Let's see. Rather than give you the wrong stack, I
6 am just going to, because I have combined a few here, I will
7 keep it all for now.
8       Does this exhibit reflect documents received by
9 Chase on the dates at the top of the fax banners as
10 application materials between July 23 and September 24th?
11    A.   (Reviewing documents.)
12       Yes, these documents are date stamped between July
13 23rd, 2012 and September 24th, 2012.
14    Q.   Okay.
15       MR. DUFFY: Should we remove your insert? I think
16 you created this.
17       MS. LETCHER: Sure. I think you may have also
18 gotten my version in one of these.
19    Q.   There you go. Returning to the loss mitigation
20 notes on page 4313. By August 30th, 2012 had Chase received
21 all the documents that it needed to receive at that point?
22    A.   The note states:
23       "All docs received and under review."
24    Q.   Okay. And then on page 4312, it was sent to the
25 underwriter on September 1st?

96

1    Q.   So what is a hard reject letter?
2    A.   I'm not sure. This letter does say:
3       "Return your documents within 30 days
4       so you don't risk being dropped from
5       the modification program."
6       And it is dated the same date.
7    Q.   Has the hard reject letter been disclosed?
8    A.   Again, I don't know -- this letter may be a hard
9 reject letter just because it does give a 30-day time frame.
10 Bear with me just a moment.
11    Q.   Okay. Is the code at the top of the letter under
12 the bar code-like thing an identifier for the letter number?
13    A.   I believe that is some sort of tracking mechanism.
14 I don't think it would indicate a letter number. I'm not
15 sure.
16    Q.   Okay. And -- okay. Bear with me while I combine a
17 couple of exhibits to make this go a little faster.
18       Can we go off the record for a second.
19       THE VIDEOGRAPHER: Going off the record at
20 12:12 p.m.
21       (Discussion off the record.)
22       THE VIDEOGRAPHER: And we are back on the record at
23 12:14 p.m.
24       MS. LETCHER: Okay. I'm going to hand you Exhibit
25 95.

95

1    A.   That's what the notes state.
2    Q.   Okay. Was it in fact sent to the underwriter on
3 September 12th?
4    A.   I have no other knowledge other than the notes.
5    Q.   Okay. So you don't have any actual knowledge of
6 what happened other than what's reflected in the notes?
7    A.   Well, the notes are what we rely on in relaying
8 what happened at the time. So if it says it was sent to the
9 underwriter, I would say it was sent to the underwriter.
10    Q.   Okay. So what's happening on September 7th,
11 starting on page 4311 and continuing from there?
12    A.   (Reviewing document.)
13       It looked like it was reviewed, and basically based
14 on the information that was submitted some additional
15 documents would be needed.
16    Q.   Who reviewed it?
17    A.   The note on the 7th states underwriting did not
18 receive complete core package, and in another note it lists
19 information that would be needed.
20    Q.   Okay. So on the note on page 4312, the first one,
21 it says:
22       "P&L statements without revenues."
23       What is a P&L statement?
24    A.   A profit and loss statement.
25    Q.   Had anybody to date requested her for a profit and

97

25 (Pages 94 to 97)

SLG-Banks000232

**Page 98**

1  loss statement?
2  A.  I don't believe so because the borrower sent in
3  some pay stubs and did not, I don't think -- I'd have to look
4  at the RMA forms, but did not provide a P&L statement with the
5  RMA form.
6  Q.  But there hadn't been a mention to her, mention of
7  a request for a profit and loss in either a letter or a call
8  before then, right?
9  A.  It was on the application package on the checklist.
10  If she is self-employed, that's one of the documents to
11  provide.  But without that knowledge that she is
12  self-employed, I don't see how the representative could have
13  advised her that she would need that.
14  Q.  Is this representative Anderson T -- when it says
15  "transferred to operator Anderson T," and then that code,
16  looks like maybe I485643 is on the subsequent entries.
17  A.  Those, the letter followed by that six digit number
18  is what we refer to as a standard I.D., and all employees
19  would have one.  As far as the purpose of that note, it looks
20  like a phone call was transferred, but I don't have any other
21  knowledge other than that.
22  Q.  Do these entries reflect a phone call?
23  A.  This was done it appears like at 13:27.  It doesn't
24  appear to be in the same time frame as those other notes on
25  the 7th.  I really can't tell other than it says "transferred

98

**Page 99**

1  to operator."  I would take that to mean a phone call but I
2  can't be certain.
3  Q.  So the next notes, in the next note someone
4  determines that she appears to be self-employed.
5  A.  On page 4311 at the bottom:
6       "Borrower appears to be self-employed
7       per 2011 tax extension form 2."
8  Q.  Okay.  And so it is in underwriting and they are
9  still not performing an NPV yet, right?
10  MR. DUFFY:  Objection.  Vague and ambiguous.
11  THE WITNESS:  An NPV I don't believe would have
12  been performed at this time.  It wasn't underwritten for a
13  decision.
14  BY MS. LETCHER:
15  Q.  Okay.  So they requested pay stubs.  And did she
16  send pay stubs in the previous exhibit that you'd seen, 95?
17  A.  It appears on August 27th a pay stub was -- or two
18  pay stubs were submitted.
19  Q.  So for three months they requested pay stubs.  She
20  sent in pay stubs and then they requested a profit and loss?
21  A.  Well, based on the information on the pay stub --
22  Q.  That is a yes-or-no question.
23  A.  -- general information --
24  MR. DUFFY:  Objection.  Vague and ambiguous.
25  THE WITNESS:  They did request a profit and loss

99

**Page 100**

1  statement based on -- again, this note, it appears that the
2  borrower is self-employed.  And again, based on these pay
3  stubs without the taxes taken out and that kind of
4  information, that would be reasonable to think that.
5  BY MS. LETCHER:
6  Q.  Okay.  Did they state that that was the -- is there
7  anything in this note that indicates that there was anything
8  about the pay stubs that caused them to request a profit and
9  loss?
10  A.  It doesn't indicate anything on that note.  It just
11  references the 2011 tax extension form.
12  Q.  Okay.  So the decision to request a profit and loss
13  was made on the basis of the tax extension form?
14  MR. DUFFY:  Objection.  Vague and ambiguous.
15  Overbroad.
16  THE WITNESS:  I can just tell you what the note
17  says:  "Per the 2011 tax extension form 2."
18  BY MS. LETCHER:
19  Q.  But do you know the actual reason why additional
20  documents were requested?
21  MR. DUFFY:  Objection.  Vague and ambiguous.
22  THE WITNESS:  Because it says the borrower 1
23  appears to be self-employed.
24  BY MS. LETCHER:
25  Q.  Okay.  The entry on 9-10:

100

**Page 101**

1       "RM supervisor approves 061."
2       What does that mean?
3  A.  I'm not sure.
4  Q.  And what does "Aged file, break requested per
5  manager" mean?
6  A.  I don't know.
7  Q.  What does the term "break" mean in loss mitigation?
8  A.  I'm not sure.
9  Q.  On 9-12, page 4310, there are notes about "CA OPS
10  review."  What does that mean?
11  A.  I think you asked me that before.  I don't recall.
12  Q.  What does "File is pending incomplete" mean?  And
13  I'm sorry.  "File is pending incomplete package."
14  A.  Other than what it says:
15       "File is pending incomplete package due
16       to borrower not submitting requested
17       docs.  No action taken."
18       I don't have any other analysis of that note.
19  Q.  What does the 9-14 entry mean?
20       "QC completed, disagree with denial.
21       New MIL should be sent out for
22       additional documents required after
23       underwriter's hard reject."
24  A.  All loan decisions go through a QC process which is
25  a separate department.  And in this note it looks like the QC

101

SLG-Banks000233

---

**Page 102**

1 reviewed it and said a new missing items letter should be sent
2 out for the additional documents that were required.
3    Q.   Okay. And was a profit and loss ever requested?
4    A.   (Reviewing documents.)
5    Q.   I am going to show you what's been previously
6 marked Exhibit 36.
7    A.   Okay.
8    Q.   So did they request a profit and loss on September
9 19th?
10    A.   It appears from this letter they did.
11    Q.   Okay. And turning back to the loss mitigation
12 notes. Did she call on September 24th?
13    A.   Yes.
14    Q.   Okay. And what did she say about her income during
15 that call?
16    A.   It says:
17       "Spoke with borrower 1."
18       Basically the borrower advised not earning an
19 income with self-employment income.
20       "Borrower is now a wage earner.  Gets
21       paid monthly.  Have June and July
22       stubs."
23    Q.   So they asked for profit and loss and she explained
24 that she's not self-employed; she's paid monthly.  And so the
25 only remaining thing that she needs is the 2010 tax returns,

---

**Page 103**

1 right?
2    A.   It says according to notes:  "Need 2010 tax
3 returns."  And it says:
4       "Advised to send in proof of occupancy
5       to clarify she lives at the property."
6    Q.   Okay. And the last entry of the large Exhibit 95,
7 the last pages, is that a tax return for 2010?
8    Q.   I have 96.  Is that what it is?
9    Q.   I'm sorry, 96.
10    A.   Okay.  There appears to be a 4506-T form and then a
11 tax return.
12    Q.   Okay. Going back to the loss mitigation notes,
13 4308.
14    A.   Okay.
15    Q.   So she is told on September 25th that the loan is
16 going back to underwriting, right?
17    A.   It says advised -- we received the document on
18 9-24-12.  "Advised next step is to send file back to" --
19    Q.   And that included a water bill?
20       THE REPORTER:  Wait.  You're talking at the same
21 time.
22 BY MS. LETCHER:
23    Q.   And that included a water bill?
24       MR. DUFFY:  Did you finish your answer to the last
25 question?

---

**Page 104**

1       THE WITNESS:  No, I did not.
2 BY MS. LETCHER:
3    Q.   Okay. Why don't you finish your answer.
4    A.   Well, I will just read the whole note.
5       "Inbound call.  Basically discussed
6       with borrower 1 to confirm we received
7       proof of occupancy with water bill and
8       tax form 7004.  Advised we received it
9       on 9-24-12, and advised next step is to
10       send file back to underwriting."
11    Q.   Okay. And then on October 10th, at the top of the
12 page, someone advised her that it was still in underwriting,
13 correct?
14    A.   That's not correct.
15    Q.   All right. Interpret it for me.
16    A.   On this date, October 3rd.
17    Q.   I'm sorry.  So October 3rd they said the file is
18 still in underwriting.
19    A.   Yes.
20    Q.   Okay. Who at this point is primarily responsible
21 for helping her submit all the documents that are requested?
22    A.   That would be the CAS.
23    Q.   And who is that?
24    A.   I don't know who that was at this time.  It appears
25 to be there's a standard I.D. notated on the comments section

---

**Page 105**

1 of that 10-3-2012 note, for example.
2    Q.   And who was handling it in underwriting?
3    A.   I don't know by these series of notes who would
4 handle it in the underwriting department.
5    Q.   But if she has questions about what she's supposed
6 to be submitting, the customer assistance specialist is
7 supposed to be helping her with those, right?
8    A.   That would be a duty of the CAS, yes.
9    Q.   Okay. On page 4306, on October 8th there's another
10 entry. She's calling back. Is she expressing some confusion
11 about what she should be sending in?
12    A.   I don't know which entry you are referring to.
13    Q.   The one that says:
14       "The borrower advised me the 1008
15       Harbor Crossing is the property
16       address.  She is re-faxing in the 2010
17       tax returns.  She'd like a return phone
18       call from the CAS in regards to the
19       LOE.  Will e-mail CAS."
20       MR. DUFFY:  Objection.  Vague and ambiguous.
21       THE WITNESS:  (Reviewing document.)
22       And what is your question regarding that note?
23 BY MS. LETCHER:
24    Q.   Is she expressing some confusion about what she is
25 supposed to send in?

---

27 (Pages 102 to 105)

SLG-Banks000234

1    MR. DUFFY:  Objection.  Vague and ambiguous.
2    THE WITNESS:  I don't know if it is confusion.  It
3  says she's re-faxing the 2010 tax returns and would like a
4  return call from the CAS in regards to the letter of
5  employment.
6  BY MS. LETCHER:
7    Q.   Okay.  It says "Will e-mail CAS."  Has that e-mail
8  been disclosed?
9    A.   I haven't seen one regarding that.
10    Q.   Okay.  So the entries at the top of the page for
11  October 10th, what do those mean?  It says:
12        "Private default.  Underwriter rejected
13        on 9-7 for profit and loss.  QCX on
14        9-14.  15 MIL sent on 9-19.  Borrower
15        docs uploaded.  Per new policy file is
16        ready for underwriter."
17        What does that mean?
18    A.   It looks like the missing item letter was sent.  We
19  got some documents, and it says sent to CAS to submit to
20  underwriting.
21    Q.   What's the new policy they are referring to?
22    A.   I'm not sure.
23    Q.   Who would you ask to find out?
24    A.   I don't know.
25    Q.   So do you know what policies applied to loss

106

1  mitigation during the pendency of Ms. Banks' application?
2    MR. DUFFY:  Objection.  Vague and ambiguous.
3    THE WITNESS:  In reference to this note, I don't
4  know what new policy they are referring to.
5  BY MS. LETCHER:
6    Q.   Okay.  And does the underwriter in the entry just
7  below that state that she's not earning self-employment
8  income, she's now a wage earner?
9    A.   I'm not sure if that's the underwriter's note there
10  on 10-10, that other one.
11    Q.   But does it reflect a determination by Chase that
12  they are going to treat her as a wage earner?
13    A.   It states:
14        "Borrower not earning self-employment
15        income.  Borrower is now a wage
16        earner."
17    Q.   And then they say it is ready to send to the
18  underwriter, correct?
19    A.   That's right.
20    Q.   And then the next entry on 4305 is:
21        "CAS file ready for underwriter."
22    A.   Yes.
23    Q.   And then it is sent to the underwriter again on
24  October 10th.
25    A.   From the notes it appears so, yes.

107

1    Q.   Okay.  And so was an NPV run at that point?
2    A.   I'm not aware of an NPV being run on this loan at
3  all, ever.
4    Q.   Okay.  And at this point she's been in loss
5  mitigation for five months, right?
6    A.   If we're going off that end of May submission, I
7  guess it would be four to five months, yes.
8    Q.   Okay.  And on the next page, the bottom entry says
9  in the middle:
10        "Interior BPO as the property appears
11        to be N/O/O."
12        What does that mean?
13    A.   What page are you looking at?  I'm sorry.
14    A.   4304.  Sorry, I misspoke.
15    A.   (Reviewing document.)
16        It states:
17        "Interior BPO as property appears to be
18        nonowner occupied."
19        I don't know if that information came from the BPO
20  or if there's information that led someone to believe that the
21  property might be nonowner occupied so an interior BPO was
22  needed.  I'm not sure.
23    Q.   Okay.  So the entry in the middle of the page says
24  request --
25        "Order outs requested.  Request

108

1        interior BPO."
2        Is that responding to the earlier note?
3    A.   It appears to be, yes.
4    Q.   Bear with me again while I combine exhibits for the
5  sake of brevity.
6        I'm handing you Exhibit 97 which is a copy of every
7  residential broker price opinion document of this format that
8  was disclosed to us by Chase.
9        (Plaintiff's Exhibit 97 marked for
10        identification and attached hereto.)
11        What are these forms?
12    A.   These are all copies of various BPO's.
13    Q.   Okay.  So looking at the first one which was
14  performed in June of 2012, the BPO gives a range of sales
15  prices in the neighborhood, right?
16    A.   Yes.
17    Q.   And it is used as an assessment of the value of the
18  property by Chase, right?
19    A.   It utilizes, just to be clear, sales price or list
20  prices, yes.
21    Q.   Okay.
22    A.   And that's utilized by the person performing the
23  BPO to give an approximate value of the property based on that
24  comparison.
25    Q.   Okay.  And it is using comparable homes that are in

109

28  (Pages 106 to 109)

SLG-Banks000235

1  Los Angeles and Venice, right?
2      A.   As far as the sale prices, yes, on the first page.
3  As far as the listings, it also includes West Hollywood and
4  Westchester it appears.
5      Q.   Okay.  And if you look on page 4204 it says:
6           "Inventory has no comps so search
7           expanded to two miles due to subject is
8           newly constructed.  My search results
9           were 20 with scattered with values and
10          cities.  In order to complete the
11          report I'm forced to use scattered
12          value comps to compare with the
13          subject.  However, my value approaches
14          is true as per market conditions."
15          So they are looking pretty broadly to find
16  comparable values, right?
17     MR. DUFFY:  Objection.  Vague and ambiguous.
18     THE WITNESS:  I can just tell you what the notes
19  say.  I mean I don't know if that's odd or not.
20 BY MS. LETCHER:
21     Q.   And the suggested list price at that time was
22  1.8 million, right?
23     A.   Yes.
24     Q.   Now looking, starting at page 4212, this is a BPO
25  performed on October 11th, right?

110

1      A.   Yes.
2      Q.   And it is the day after it was requested by the
3  underwriter, right?
4      A.   I believe so.  I believe that was the 10th.
5      Q.   And is this an interior BPO performed at least in
6  part to determine the owner occupancy of the property?
7      A.   It is an interior BPO.  As far as the reason for
8  that, I mean that was in the notes.
9      Q.   Okay.  Do borrowers ever dispute the value assigned
10 to Chase -- by Chase to homes during -- in the BPO
11 evaluations?
12     A.   I've seen that done, yes.
13     Q.   Okay.  Does Chase have a process for homeowners to
14 appeal a valuation if they feel that an actual appraisal would
15 be more accurate?
16     A.   From what I recall, there have been instances where
17 a borrower can get their own interior appraisal and submit it
18 for review.
19     Q.   Okay.  And was Ms. Banks' account charged for this
20 BPO?
21     A.   I believe a BPO is part of the normal charges on a
22 file, yes.
23     Q.   Okay.  Turning to page 2403 of the LMTN notes.
24     A.   Okay.
25     Q.   I am going to ask you some questions about the

111

1  entries for October 11th.  What does the first entry mean?
2  The entry says --
3      A.   I'm just looking if you don't mind.
4      Q.   Okay.  It is a one-line entry.
5      A.   Right.  I'm just referring to the other exhibit as
6  well that has entries on the 11th.  So with your question
7  meaning the first entry, I will note it is on that date or
8  whatnot.  I'm just trying to get some context.
9           It looks like, if I'm looking at page 4303, the
10 first note of the day was "File referred to supervisor to
11 escalate for review."  And then it appears that the next notes
12 would be duplicate on page 4302 and 2403.
13     Q.   Why was the file referred to the supervisor?
14     A.   It appears from the notes on the 11th, from what I
15 can tell, it appears that suspicious activity was identified
16 on the loan.
17     Q.   What suspicious activity?
18     A.   From what I can tell from the notes, it appears
19 that there were some inconsistencies on the pay stubs that
20 were submitted.
21     Q.   What inconsistencies?
22     A.   The pay stubs as far as the tax information located
23 on there and also the address was, the address of the borrower
24 was "Marina del Ray" and it is spelled R-A-Y, and then the
25 state is Illinois, but the zip code was 90292.

112

1           That's -- that would be in my opinion a pretty
2  obvious, I guess, red flag on the documents that something is
3  unclear or needs additional investigation.
4      Q.   Okay.  And where is that reflected in the notes, in
5  the loss mitigation notes?
6      A.   (Reviewing document.)
7      Q.   I see on October 10th where it says:
8           "Year-to-date and regular pay info
9           didn't match up.  Sent file back to
10          underwriter to be reviewed."
11          But I don't see anything relating to address.
12     A.   (Reviewing documents.)
13          I'm fairly certain I saw that information somewhere
14 in the notes.  I can't recall exactly where that was.  I may
15 have passed it.
16     Q.   Okay.  If it was referred to loan integrity,
17 submitted to loan integrity -- what is loan integrity?
18     A.   Loan integrity is a department within Chase that
19 will basically investigate suspicious activity, any type of
20 suspicious activity on a loan.  They just do further research.
21     Q.   And do they keep records of their research?
22     A.   Yes.
23     Q.   Did you review the records of their research?
24     MR. DUFFY:  At this point I'd just counsel you that
25 this may implicate the bank examiner privilege, and to the

113

29  (Pages 110 to 113)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000236

1 extent you'd have to reveal anything that would be covered by
2 that I'd instruct you not to answer.
3         Whether you reviewed something would not implicate
4 that, but beyond that yes or no, I would be cautious.
5     THE WITNESS: I have not reviewed a report from
6 Loan Integrity Operations.
7     MS. LETCHER: Okay. Have you guys disclosed a
8 privilege log?
9     MR. DUFFY: No.
10     MS. LETCHER: Why not? I am not getting embroiled
11 in discovery stuff, but a bank examiner privilege applies when
12 documents are submitted to a government entity in the course
13 of supervisory duties, so it is hard to see how an internal
14 record of a Chase fraud department would fall under that
15 privilege.
16     MR. DUFFY: One, there hasn't been any discussion
17 about the existence of that document. As for the privilege
18 log, I believe our production was due yesterday. And we can
19 prepare a privilege log that will include any of that kind of
20 information.
21     MS. LETCHER: I will leave that to you guys to hash
22 out.
23     Q.  I'm sorry, remind me. Does the loan integrity
24 department have its own loan note-taking system?
25     A.  I am not aware of any specific note-taking system

114

1 by the Loan Integrity Operations.
2     Q.  Do they keep records according to each loan that
3 they investigate?
4     A.  Again, there's typically some type of report
5 generated. But other than that, I haven't seen one for this
6 loan.
7     Q.  Is the loan integrity department an internal Chase
8 department?
9     A.  It is.
10     Q.  And is it staffed by attorneys?
11     A.  Not that I'm aware of.
12     Q.  Okay. Do you know what kind of investigation they
13 did?
14     MR. DUFFY: Objection. If it is going to call for
15 you to discuss anything that may be covered by the privilege
16 we discussed, I'd advise you not to discuss those results.
17     THE WITNESS: Other than the information that's
18 provided in the notes as far as what was requested to clear up
19 any inconsistencies on the paycheck stubs --
20 BY MS. LETCHER:
21     Q.  Okay.
22     A.  -- I don't know.
23     MS. LETCHER: Why don't I ask questions and you can
24 assert the privilege so we can establish a record.
25     MR. DUFFY: Sure. That's fine.

115

1     MS. LETCHER: Because I don't want to force you to
2 repeat other than what's here. I can't say over and over.
3     Q.  Are there written standards that set out what the
4 loan integrity department does to investigate a loan?
5     A.  I'm not aware of the written standards of the LIO
6 department.
7     Q.  LIO. What steps did the LIO department take to
8 investigate the problems with the pay stubs that you
9 identified?
10     MR. DUFFY: I would note that the this may be
11 privileged information. To the extent it would require you to
12 divulge that, I would ask you to not do so.
13     THE WITNESS: I am not aware of the methods used by
14 the LIO department. All I know is the documents that were
15 requested to clarify the inconsistencies apparently in the pay
16 stubs.
17 BY MS. LETCHER:
18     Q.  Was a report generated in this case?
19     A.  I have no knowledge of that one way or the other.
20 I have not reviewed one.
21     Q.  What happens to a report if it is generated?
22     MR. DUFFY: Objection. Vague and ambiguous.
23 BY MS. LETCHER:
24     Q.  How is a report used by Chase if it is generated?
25     MR. DUFFY: Objection. Vague and ambiguous.

116

1     THE WITNESS: I believe that's utilized by the Loan
2 Integrity Operations department themselves. And that can be
3 used for really any type of suspicious activity on a loan,
4 whether it is someone trying to do something in the borrower's
5 name, improperly so, for the protection of the borrower, as
6 well as any suspicious activity that is supposedly being
7 originated by a borrower.
8 BY MS. LETCHER:
9     Q.  So Chase has an entire department, part of whose
10 mission is to protect the borrower from fraudulent activity?
11     MR. DUFFY: Objection. Vague and ambiguous.
12     THE WITNESS: It is my understanding they serve
13 that dual function that I just described.
14 BY MS. LETCHER:
15     Q.  Okay. Are the results of any report communicated
16 to the CAS's in any way?
17     A.  I'm not sure if that actual report is transmitted
18 to the CAS. Only the result I believe or the -- not even the
19 results, but the documentation requested to clarify that
20 information is sent to the underwriter and I believe the
21 underwriter would then communicate those needed documents to
22 the CAS.
23     Q.  And how is it, how are those special document
24 requests communicated to the underwriter?
25     A.  I'm not certain from the LIO to the underwriter how

117

30 (Pages 114 to 117)

SLG-Banks000237

1 that's communicated.
2    **Q.   Is the reason for the demand for additional**
3 **documents ever conveyed to the borrower?**
4    MR. DUFFY: Objection. Overbroad. Vague and
5 ambiguous.
6    THE WITNESS: As far as the specifics, I'm not sure
7 other than you need to clarify information that was originally
8 submitted.
9 BY MS. LETCHER:
10    **Q.   Was the reason for the requests for canceled**
11 **paychecks ever conveyed to Ms. Banks?**
12    A.   I haven't seen the results of that review myself
13 and I don't recall seeing any notes regarding that, the
14 results of that review being relayed to the borrower, other
15 than documents being needed to clarify the original submitted
16 documentation.
17    **Q.   Going back to the original entry that we were**
18 **looking at, "Underwriter supervisor reviewed decision delay,"**
19 **does that mean that they're going to delay the modification**
20 **process while they investigate the credit risk?**
21    MR. DUFFY: Objection. Vague and ambiguous.
22    THE WITNESS: It just appears the underwriter
23 supervisor reviewed and then there was going to be a decision
24 delay. Other than that, I don't have any other information
25 about that note.

      118

---

1    MS. LETCHER: You know, it is one o'clock. Why
2 don't we take a break right now.
3    THE VIDEOGRAPHER: Going off the record at
4 1:02 p.m.
5    (Luncheon recess taken.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

      119

---

1    LOS ANGELES, CALIFORNIA; TUESDAY, JULY 28, 2015
2       1:53 P.M.
3       -o0o-
4
5    THE VIDEOGRAPHER: And we are back on the record at
6 1:53 p.m.
7       EXAMINATION (resumed)
8 BY MS. LETCHER:
9    **Q.   So to go back about where we left off, the loan**
10 **wasn't sent to the loan integrity department, but the loan was**
11 **sent to the loan integrity department because of discrepancies**
12 **on the pay stub, right?**
13    A.   I believe --
14    **Q.   I'm so sorry. Because of the pay stub year-to-date**
15 **information didn't match, right?**
16    A.   I'm not sure where we were in the notes, but from
17 what I recall, I believe that was a reason.
18    **Q.   Okay. It wasn't required by any particular**
19 **government rule to send it to the loan integrity department,**
20 **was it?**
21    A.   I'm not aware of any government rule about that.
22    **Q.   And was the loan integrity department required to**
23 **create a report to submit it to some government agency?**
24    MR. DUFFY: Objection. Vague and ambiguous. To
25 the extent it would require you to disclose any privileged

      120

---

1 information, I'd advise you not to do so. Also calls for a
2 legal conclusion.
3    THE WITNESS: As far as like any other specific
4 purpose of the report outside of Chase, I'm not aware of
5 anything else.
6 BY MS. LETCHER:
7    **Q.   Okay. But within Chase it was prepared to**
8 **investigate what it viewed as suspicious activity?**
9    A.   Again, the contents of the report, I haven't viewed
10 it so I don't know.
11    **Q.   But the reason it was prepared?**
12    MR. DUFFY: Objection. Vague and ambiguous.
13    THE WITNESS: Well, the reason it was sent to that
14 department and what I'm -- was that there was suspicious
15 activity on the account.
16 BY MS. LETCHER:
17    **Q.   Okay. You have some experience in loan**
18 **origination, right?**
19    A.   I do.
20    **Q.   People have to prove their income to qualify for a**
21 **-- to receive a loan, an actual payment on behalf of the**
22 **person from the bank, right?**
23    A.   Not in all cases.
24    **Q.   Under what circumstances do people not have to**
25 **prove their income?**

      121

31 (Pages 118 to 121)

ELITE COURT REPORTING (949) 829-9222

1      A.   There are certain stated income loan programs that
2  don't require documentation.
3      Q.   Okay.  And in your experience, when they are
4  required to document their income are they required to provide
5  canceled checks to prove their income?
6          MR. DUFFY:  Objection.  Vague and ambiguous.
7  Overbroad.  Incomplete hypothetical.
8          THE WITNESS:  Yeah, I mean I guess in general a
9  borrower applying for a regular mortgage loan would
10  provide typically pay stubs and W-2s.
11  BY MS. LETCHER:
12     Q.   Okay.
13     A.   Which is different than a loan modification
14  application.
15     Q.   Would you say that a bank is taking more risk when
16  it originally makes a loan or when it modifies a loan?
17         MR. DUFFY:  Objection.  Vague and ambiguous.
18  Beyond the scope of the deposition notice.
19         THE WITNESS:  I would say it is roughly the same.
20  BY MS. LETCHER:
21     Q.   Why would you say that?
22         MR. DUFFY:  Objection.  Beyond the scope of the
23  deposition notice.
24         THE WITNESS:  Well, in the purposes of -- or in the
25  example of a loan mod, I guess a borrower showing a propensity

122

1  to default on a loan so I guess that would be a risk factor to
2  take into account.
3  BY MS. LETCHER:
4      Q.   But the bank isn't extending credit at that point.
5  They have already extended credit, right?
6          MR. DUFFY:  Objection.  Vague and ambiguous.
7  Beyond the scope of the deposition notice.
8          THE WITNESS:  Well, I think it works two-fold.  I
9  mean the bank is not going to put a borrower in a loan
10  modification that they cannot afford.  So I mean it is
11  reviewed I would say along the same lines.
12  BY MS. LETCHER:
13     Q.   Okay.  And during a loan origination process is
14  there ever verification of employment?
15         MR. DUFFY:  Objection.  Vague and ambiguous.
16  Beyond the scope of the deposition notice.
17         THE WITNESS:  I don't -- I mean I haven't worked in
18  the loan originations from Chase but -- and I've been out of
19  originations for ten years probably.
20  BY MS. LETCHER:
21     Q.   To your knowledge, is verification of employment a
22  typical aspect of loan origination?
23         MR. DUFFY:  Objection.  Vague and ambiguous.
24  Overbroad.  Beyond the scope of the deposition notice.
25         THE WITNESS:  I guess it can be, from what I

123

1  recall.  But I'm not certain about the circumstances on which
2  one would be needed.
3  BY MS. LETCHER:
4      Q.   Did anybody ever call to confirm, call the employer
5  to confirm Miss Banks' employment here?
6      A.   I don't recall seeing any records of somebody
7  calling an employer.  I don't know -- I don't recall that
8  being a standard practice.
9      Q.   But it wasn't done here?
10     A.   No, I don't believe so.  I don't think I've seen
11  any notes regarding that.
12     Q.   Were the canceled checks -- ordinarily would the
13  canceled checks be her property?
14         MR. DUFFY:  Objection.  Vague and ambiguous.
15  BY MS. LETCHER:
16     Q.   Her canceled paychecks.
17         MR. DUFFY:  Objection.  Vague and ambiguous.
18         THE WITNESS:  I'm not sure.  I believe they were
19  requested from the company, so I don't know if that would be
20  her property or not.
21  BY MS. LETCHER:
22     Q.   How is it requested from the company?
23     A.   I believe -- I mean she would get copies of those
24  canceled checks.  I don't know --
25     Q.   I'm sorry, I misunderstood you.  Chase never

124

1  requested them from the company, did they?
2      A.   No, not directly, no.
3      Q.   Okay.  I'm handing you Exhibit 98.
4          (Plaintiff's Exhibit 98 marked for
5           identification and attached hereto.)
6          What is this?
7      A.   I don't recall seeing this document before.  I'm
8  not familiar with this document.
9      Q.   Have you ever seen a Modification Underwriting
10  Interview Worksheet before?
11     A.   I don't believe so, not in this type of format.
12  I'm not familiar with this type of document.
13     Q.   Okay.  This document indicates up at the top left
14  of the first page that CAS Chelsea Colmenero, whose I.D.
15  number is z260301, is filling out a worksheet.  And on the
16  second page of the exhibit, 1222, under "Customer income
17  documents needed" it says:  "Two most recent pay stubs for
18  each employer."  Correct?
19     A.   It looks like that is marked, yes.
20     Q.   So as of October 26th the customer service
21  representative is still requesting pay stubs?
22         MR. DUFFY:  Objection.  Vague and ambiguous.
23         THE WITNESS:  I don't know the purpose of this
24  form.  I don't recall seeing anything like this in my review.
25         MS. LETCHER:  I'd like to hand you Exhibit 99.

125

32  (Pages 122 to 125)

SLG-Banks000239

1       (Plaintiff's Exhibit 99 marked for
2       identification and attached hereto.)
3    Q.    Do you recognize this document?
4    A.    I do not.
5    Q.    Okay.  Does it -- on the second page, this appears
6  to be a list of changes in foreclosure status.
7    A.    It does have notations that say that, yes.
8    Q.    Okay.  And a list of postponement dates?
9    A.    Yes, down at the bottom it lists postponement
10  dates.
11   Q.    Is there any reason -- do you have any reason to
12  believe that this isn't an accurate summary of changes in
13  foreclosure status and the postponement dates for -- and the
14  milestone events listed on the first page for Ms. Banks' loan?
15   A.    I don't -- I don't know.  I mean I can't say for
16  sure.  I haven't -- I don't recall seeing this particular
17  document.  I did see letters that list changes to the
18  foreclosure date, postponements, but I don't recall, you know,
19  all those dates or anything.
20   Q.    Okay.  Let me ask you some questions about the
21  statuses listed here anyway.  On October 18th it says:
22       "Changed foreclosure status from
23       prepublication to publication."
24       What is publication status during the foreclosure
25  process?

126

1  continued to November 8th.  Why was the foreclosure date
2  postponed at that time?
3    A.    And where are you looking at?  You are going to
4  have to direct me on this document.
5    Q.    It is the top column on "postponement."
6    A.    Okay.
7    Q.    I don't think we need to fixate on the document.
8  Let's just say, why was the foreclosure date postponed the
9  first time for Miss Banks' loan?
10   A.    I believe the majority, if not all, were due to
11  some type of loss mit activity on the file in one way or
12  another, in some form or the other.
13   Q.    Okay.  So what loss mitigation activity was going
14  on on November 29th that caused the postponement?
15       MR. DUFFY:  Objection.  Vague and ambiguous.
16       THE WITNESS:  I'm sorry, where do you see November
17  29th?  I'm trying to look for that.
18  BY MS. LETCHER:
19   Q.    I'm sorry, October 29th.
20   A.    And where is October 29th on this form?  I don't
21  see that either.
22   Q.    Under postponements, that first postponement.
23   A.    Okay.
24   Q.    Postponement date is listed as October 29th.
25   A.    Right.

128

1    A.    My limited understanding is that it is basically
2  they -- the foreclosure trustee will put in a, can put in a
3  local paper the foreclosure of the property or the sale date.
4  Notice of foreclosure, basically.
5    Q.    So it is a statutorily required notice to the world
6  at large that there's going to be a trustee's sale of this
7  property on a given date, right?
8    A.    Yeah, I believe so.
9    Q.    Okay.  I am going to hand you Exhibit 100.
10       (Plaintiff's Exhibit 100 marked for
11       identification and attached hereto.)
12       Is this an example of publication of the trustee's
13  sale relating to Miss Banks' loan?
14   A.    Yes.
15   Q.    And I am not going to make you look through the
16  small print.  So, thank you.
17   A.    Thank you.
18   Q.    I brought extra reading glasses in case you need
19  them.
20       The next milestone on this, listed on Exhibit 99,
21  or soon thereafter, is November 1st the status is changed from
22  publication to sale.  What is sale foreclosure status?
23   A.    In this context of this document I'm not sure.
24   Q.    Okay.  And then later it lists a postponement on
25  November 8th -- sorry, a postponement on October 29th,

127

1    Q.    And it is postponed from November 8th to December
2  10th.
3    A.    I think that was the time frame we just were kind
4  of going over, the October 2012 time frame where loss
5  mitigation activity was occurring.
6    Q.    So what specific activity is going on that is
7  causing the postponement?
8       MR. DUFFY:  Objection.  Vague and ambiguous.
9       THE WITNESS:  I would say in all of these, from
10  what I could tell, basically just loss mitigation activity on
11  loan modification review.
12  BY MS. LETCHER:
13   Q.    So they are postponing foreclosure so long as
14  there's some kind of loss mitigation activity going on?
15   A.    From my review -- I mean I did not look at every
16  single date, I don't believe, but as an overview I believe all
17  the postponements were based on loss mitigation activity.
18   Q.    So is it Chase's policy to postpone whenever
19  there's any kind of loss mitigation activity, including
20  shifting requests for documentation?
21       MR. DUFFY:  Objection.  Overbroad.  Vague and
22  ambiguous.
23       THE WITNESS:  I really don't know what you mean by
24  "shifting requests for documentation."
25  BY MS. LETCHER:

129

33  (Pages 126 to 129)

SLG-Banks000240

1    Q.   So as we've gone through already, Chase demanded a
2  number of different things from Miss Banks.  First they
3  demanded updated RMA's.  Then they demanded pay stubs.  When
4  she got pay stubs they asked for a profit and loss.  She
5  explained she was no longer self-employed.  They asked for
6  four tax forms.  She sent them.  They asked for proof of
7  occupancy.  She got an interior BPO.
8         That's what I mean by rolling and shifting demands
9  for documents.  That took a period of four to five months, as
10  we discussed.
11        And so the question is, is it Chase's policy to
12  postpone a foreclosure whenever there's any kind of pending
13  demand for documents or loss mitigation activity?
14        MR. DUFFY:  Objection.  Vague and ambiguous.
15  Overbroad.
16        THE WITNESS:  I would say while -- I mean the loss
17  mitigation activity, I mean the modification was still in
18  process so I would say yes, it would still be on hold while
19  the loss mitigation effort is underway.
20  BY MS. LETCHER:
21    Q.   And what did that effort consist of at that point
22  in November of 2012?
23    A.   I think during that time period trying to get a
24  true indication of the borrower's income appears to be the
25  predominant focus of the multiple requests during that time

130

1    THE WITNESS:  I'm not aware of the written
2  standards for additional documentation needed to clarify
3  income documents by the loan integrity unit.
4  BY MS. LETCHER:
5    Q.   So from this point onward were demands for
6  documentation coming solely from the loan integrity unit?
7        MR. DUFFY:  Objection.  Vague and ambiguous.
8  Misstates testimony.
9        THE WITNESS:  The information would come from the
10  underwriter to the CAS, and then the CAS would notify the
11  borrower.
12  BY MS. LETCHER:
13    Q.   But the substance of the demands was coming from
14  the underwriter or from the loan integrity unit?
15    A.   The documentation requested was I believe notated
16  by the loan integrity unit to the underwriter.
17    Q.   Okay.  I'd like to direct you back to the letter
18  log which is Exhibit 85.
19    A.   Okay.
20    Q.   On page 1740 there's an entry for November 30th at
21  the top of the page that says:
22        "DOJ settlement milestone 11-28-12."
23        What does that mean?
24    A.   I'm not sure.
25    Q.   Are you aware of a DOJ settlement that governs

132

1  period.
2    Q.   And Chase has determined that the only acceptable
3  proof is canceled checks at this point?
4        MR. DUFFY:  Objection.  Vague and ambiguous.
5        THE WITNESS:  Again, I think after the review of
6  the pay stubs the borrower submitted, with the information
7  that was on there that needed clarification, that was
8  determined to be the proper documentation to ask for that
9  clarification.
10  BY MS. LETCHER:
11    Q.   Are there any other means of verifying her income?
12  Like such as seeing whether it hits the bank account?
13    A.   I believe at some point bank statements were
14  requested.  I believe there's a point where the borrower
15  started getting her pay wired, so that I think raised
16  additional questions regarding the consistency of the income.
17    Q.   Okay.  Were any other methods of verifying her
18  income considered by Chase?
19    A.   I'm not aware of any.  That's the only thing that
20  I've seen in the notes.
21    Q.   And was Chase relying on any written standards for
22  demanding income or was it making it up, the demands up as it
23  went along?
24        MR. DUFFY:  Objection.  Vague and ambiguous.
25  Argumentative.

131

1  Chase's handling of loss mitigation?
2    A.   I'm aware of that in general but nothing specific.
3  I haven't researched that really at all in my experience.
4    Q.   To your knowledge, does the DOJ settlement and the
5  servicing standards that are contained in the consent decree
6  in that settlement impose requirements for servicing of loans
7  with respect to loss mitigation?
8        MR. DUFFY:  Objection.  Vague and ambiguous.
9  Overbroad.
10        THE WITNESS:  Again, from my general understanding
11  I think there were guidelines or whatnot set out by that
12  taking place.  But as far as anything specific, I don't
13  remember.  I really haven't had any direct experience with
14  that.
15  BY MS. LETCHER:
16    Q.   So you know Chase's internal policies and
17  procedures but you are not familiar with other requirements
18  that it has to follow in the loss mitigation process?
19        MR. DUFFY:  Objection.  Vague and ambiguous.
20        THE WITNESS:  As they relate to that DOJ
21  settlement, I don't recall what was outlined in that
22  specifically.
23  BY MS. LETCHER:
24    Q.   Can you turn in the LMT notes to 2395.
25    A.   Okay.

133

34  (Pages 130 to 133)

SLG-Banks000241

1   Q.   So the first entry for December 4th has notes that
2   say:
3            "ADV" -- which I assume means
4            advised -- "I totally understand the
5            situation and however our investors
6            have guidelines and we need this
7            info" -- which in the previous entry
8            refers to three months canceled checks
9            for specific check numbers -- "to move
10           forward with the loan modification."
11           What guidelines is she referring to?
12   A.   I'm not sure what she's referring to in that note.
13   Q.   So does this indicate that there are
14   investor-imposed guidelines for what documentation is
15   required?
16   A.   Generally I believe investors just require that the
17   standard guidelines for documentation be followed for any type
18   of mod review.
19           I'm not aware of any specific investor document
20   requirements outside of what would be normally provided for a
21   HAMP modification and all the other modification options.
22   Q.   So these are Chase's internal guidelines that she's
23   referring to, not investor guidelines?
24   A.   I think it has just to deal with the guidelines
25   for, you know, HAMP, in which all the other modification

134

1   guidelines.
2   Q.   And what does that mean?
3   A.   They outline what a particular investor would allow
4   as far as terms on a modification.
5   Q.   Okay.  And does it have any other guidelines as to
6   how the modification review should be conducted?
7   A.   Other than whether or not modifications are
8   allowed, first of all, and then secondly, if so, what types of
9   terms are allowed, I'm not aware of any other guidelines.
10   Q.   Okay.  So the line that says about three-quarters
11   of the way down the page, "Party given consent modifications,
12   master servicer," does that mean that Chase is fully delegated
13   to make modification decisions about this loan?
14   A.   That's what I understand that to mean.
15   Q.   Okay.  And at the top it says that this set of
16   guidelines applies to "Washington Mutual Mortgage Securities
17   Corp., WMMSC, various deals."
18           And then to the right it says:  "Original loan
19   count: 34."
20           Does that mean that this set of standards governs
21   34 loans that are in various deals?
22   A.   I'm not sure on that one.
23   Q.   What's a pooling and servicing agreement?
24   A.   Just in general, it outlines the relationship
25   between I believe an investor and a servicer on how to conduct

136

1   options basically follow.
2   Q.   Okay.  At this point is she being considered for a
3   HAMP modification?
4   A.   I believe underwriters always review for HAMP first
5   as part of the regular underwriting waterfall, per se.
6   Q.   Yeah, and she was rejected for a HAMP months before
7   that, right?
8   A.   I -- at this time I don't think an underwriting
9   decision was run.  I don't think it was ever run, based on the
10   fact that we didn't have income for the borrower.
11   Q.   So she could have an application pending for HAMP
12   even though her unpaid balance exceeded the amount for HAMP?
13   A.   Again, I've explained a couple of times, that
14   application that she submits is used for all modification
15   programs, so not specifically for HAMP.
16           But in the event that HAMP guidelines do change,
17   perhaps the minimum amount is increased, that application
18   could be used for that as well.
19   Q.   Okay.  This is Exhibit 101.
20           (Plaintiff's Exhibit 101 marked for
21           identification and attached hereto.)
22           Do you recognize this?
23   A.   Yes.
24   Q.   What is it?
25   A.   These are what we spoke about before, the LISA

135

1   normal servicing operations.
2   Q.   You will be pleased to know that we're skipping a
3   lot of exhibits.  This is number 102.
4           (Plaintiff's Exhibit 102 marked for
5           identification and attached hereto.)
6           Do you recognize this?
7   A.   Yes.
8   Q.   What is it?
9   A.   This would be a printout from Agent Desktop.
10   Q.   And that's the program used to run NPV's, right?
11   A.   I refer to it as the underwriting engine that gives
12   decisions on loan modifications, and NPV's would be typically
13   part of that calculation or results, I guess you would say.
14   Q.   And this was run on December 14th?  I'm sorry, this
15   record is from December 14th?
16   A.   Yeah, the date December 14, 2012 is at the bottom
17   right of the page.  It says the interview date on the
18   right-hand side is also 12-14-12, so that's what I would say
19   is the day that it was run.
20   Q.   Okay.  And at the time this was run the current
21   principal balance on the upper right hand of the first page is
22   $852,236.49, right?
23   A.   That's what it says.
24   Q.   And on the third page, 1270, it says:
25           "Last mod step: OTH" --

137

35  (Pages 134 to 137)

SLG-Banks000242

1        Which I assume means "other."
2      A.   You will have to point me where you are talking,
3   what you're talking about.
4      Q.   Page 1270 at the top.
5      A.   At the top, okay.
6      Q.   (Reading:)
7           "Last mod step.  Decision not to run."
8           What does that mean?
9      A.   Well, it just says "decision not run" so I don't
10   think the "mod" -- the Agent Desktop was not run for a
11   modification decision.
12      Q.   And what does "DEN 777" under "denial reasons"
13   mean?
14      A.   Typically the comment right next to it is what it
15   means.  So "Your application is incomplete" is what it says.
16      Q.   Is there something special about that code that
17   differentiates it from other codes that relate to
18   incompleteness of the application?
19      A.   I'm not aware of all the denial codes.  Whether
20   there are more than one incomplete application code or not, I
21   don't know.
22      Q.   Okay.  And was Cheryl Ross the person who -- what
23   was Cheryl Ross' role in this process?
24      A.   It appears that she -- it says added, submitted and
25   approved the decline, it looks like.

                                                          138

1      Q.   Decline of the modification application?
2      A.   It was a -- it says:
3           "Denial 777.  Your application is
4           incomplete."
5           So that's what I would deduce from this document.
6      Q.   Do you know where she worked?
7      A.   I don't.
8      Q.   Is she an underwriter?
9      A.   I don't know what her status was at this time.
10      Q.   Who would be filling out this document ordinarily?
11      A.   An underwriter.
12      Q.   Okay.  Is there any indication where she works?
13      A.   From this document I don't see any other
14   information about that individual.
15      Q.   Where were Chase's underwriting operations in 2012?
16      A.   I believe they have several locations.  I'm aware
17   of one in Jacksonville.
18      Q.   Okay.  Can you tell if Cheryl Ross made the
19   decision not to run the NPV?
20      A.   Well, there's no income information included on
21   this document so it is not systematically possible to run for
22   NPV.
23      Q.   Okay.  In your experience would she have qualified
24   for a modification with $10,000 of income?
25      A.   I have no idea.  I did not speculate on any of

                                                          139

1   those or try to figure that out.
2      Q.   Okay.  We just looked at some BPO's before the
3   lunch break, right?
4      A.   Yes.
5      Q.   And the values that the bank assigned to the
6   property varied.  It started at $1,700,000 and varied after
7   that, correct?
8      A.   Yeah, from what I recall, I think anywhere from 1.6
9   to 1.8.
10      Q.   Okay.  Have you ever seen a modification on a first
11   lien for a residence where there was a million dollars' worth
12   of equity?
13      A.   I don't recall off the top of my head if I have.
14      Q.   Is there any way that an NPV could be positive if
15   the person has a million dollars' worth of equity?
16      MR. DUFFY:  Objection.  Vague and ambiguous.
17      THE WITNESS:  Again, there's so many variables that
18   go into this NPV calculation, I really can't estimate on that
19   even.
20   BY MS. LETCHER:
21      Q.   On the hundreds of loan modifications that you've
22   been involved in, have you ever seen one where the
23   loan-to-value ratio was even close to 50 percent?
24      A.   I don't really recall.  I don't -- I don't remember
25   that information.  I'm sorry.

                                                          140

1      Q.   If one of the purposes of loan modification review
2   is to determine whether a modification would be NPV
3   positive -- that is, to create a greater income stream for the
4   investor than foreclosing would -- would it be possible when
5   there's a million dollars' worth of equity for a modification
6   that reduces the income -- the interest rate ever to be NPV
7   positive?
8      MR. DUFFY:  Objection.  Vague and ambiguous.
9   Incomplete hypothetical.
10      THE WITNESS:  Again, I really can't speculate on
11   that.  All I know is in this case, I mean there was no income
12   in order to drive an NPV calculation.  If a borrower -- and in
13   this case we don't have any verifiable income.  Unfortunately,
14   I don't see how a modification can be granted.
15   BY MS. LETCHER:
16      Q.   Is there any training when Chase initially -- does
17   Chase train any of its front-line advisors who talk to
18   borrowers to advise them on their overall chances of
19   modification, given their income, the unpaid balance of the
20   loan, and their financial situation?
21      MR. DUFFY:  Objection.  Vague and ambiguous.
22      THE WITNESS:  It is my understanding, I mean what
23   I've always told individuals in my experience, it is really --
24   there are so many variables it is hard to give an estimate on
25   whether or not there would be approval or not.  They would

                                                          141

36  (Pages 138 to 141)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000243

1 have to go through the process.
2 BY MS. LETCHER:
3    Q.   So in your personal experience if someone came to
4 you and said "I have a 50 percent loan-to-value ratio and a
5 million dollars of equity," what would you estimate their
6 chances of getting a modification are?
7       MR. DUFFY:  Objection.  Vague and ambiguous.
8 Incomplete hypothetical.  Beyond the scope of the deposition
9 notice.
10       THE WITNESS:  Again, there are so many variables.
11 Using that hypothetical, if a person made a thousand dollars a
12 month they would not -- they would obviously not qualify for
13 any type of modification on a property because I would assume
14 their taxes and their insurance would be a lot more than that
15 on a monthly basis.
16 BY MS. LETCHER:
17    Q.   Given that she had in this property,
18 wasn't her income irrelevant?  Because no matter what, if
19 Chase foreclosed it would be paid out of the foreclosure
20 proceeds for the entire unpaid balance, any default advances
21 that had been made on the loan, any default fees that had been
22 paid on the loan, any late fees, any taxes, escrow and
23 insurance that it had paid while the loan was in escrow, and
24 any other costs and fees relating to the loan out of the
25 proceeds and recover every single penny.

142

1       MR. DUFFY:  Objection.  Vague and ambiguous.
2 Incomplete hypothetical.
3       THE WITNESS:  Yeah, you had multiple questions
4 there as well, so if you could break those down I'd appreciate
5 it.
6 BY MS. LETCHER:
7    Q.   If she had a million dollars' worth of equity
8 is it true that every single penny Chase was owed would be
9 paid out of the proceeds of a foreclosure sale?
10       MR. DUFFY:  Objection.  Vague and ambiguous.
11 Incomplete hypothetical.  Beyond the scope of the deposition
12 notice.
13       THE WITNESS:  I'm not sure.
14 BY MS. LETCHER:
15    Q.   Do you know if there was any way in which this loan
16 modification application was handled differently because of
17 the amount of equity that Miss Banks had in her home?
18    A.   From what I could tell, there were multiple
19 attempts spanning almost a two-year time frame to allow her to
20 modify.  I don't know of any -- I haven't seen any rush to
21 judgment, I guess, on a modification decision.
22    Q.   So they were giving her extra opportunities to try
23 to get a modification because of her equity?
24       MR. DUFFY:  Objection.  Vague and ambiguous.
25 Misstates testimony.

143

1       THE WITNESS:  I did not say it was because of her
2 equity.  I was just saying what you were implying, that Chase
3 was trying to get her to be foreclosed upon because of the
4 equity, I don't see that the case, that being the case at all.
5 I see that as being the opposite.
6 BY MS. LETCHER:
7    Q.   So I asked, is there any way in which this was
8 treated differently from an ordinary loan on the basis of
9 there being a great deal of equity.
10    A.   I don't see any differences other than, you know,
11 it is obvious there were multiple attempts to try to get her
12 modified.
13    Q.   I am going to show you what's been previously
14 marked as Exhibit 41.  This is a denial letter dated December
15 18, 2012.  And I'd like to have you compare it to the letter
16 log.
17    A.   It will take me a moment to find that.
18    Q.   Sure.
19    A.   Here it is.  I've got it.
20    Q.   On page 1739, toward the bottom there's a date that
21 says 12-20-12 and then it says "Denial HMP/CMP," which I
22 assume is for HAMP, the federal modification program, and
23 CHAMP, Chase's proprietary modification program.  And then
24 there's a last date that's 12-18.  Why are those dates
25 different?

144

1    A.   The date on the right is typically the date of the
2 letter.  The date in the left-hand column is the date that it
3 is mailed.
4    Q.   Okay.  Why was the sale postponed after that?
5    A.   I'm not sure other than any type of loss mitigation
6 activity I do see on this page, it does say place foreclosure
7 on hold on 12-31.
8       And then on 1-7-13 it says loss mitigation.  So
9 other than that I -- in my previous answer, I believe all the
10 holds were related to some type of loss mitigation, from what
11 I could tell.
12    Q.   Okay.  I'd like to take a step back here to take a
13 look at some of the things that Chase was doing to prepare for
14 foreclosure at this point.  I hand you Exhibit 103.
15       (Plaintiff's Exhibit 103 marked for
16         identification and attached hereto.)
17       Do you recognize this?
18    A.   I believe I've seen this in the documents, yes.
19    Q.   Okay.  What is this?  Why is Chase doing this
20 Corporate Assignment of Deed of Trust?
21    A.   Barring any, you know, legal meaning of this
22 particular document, it is my understanding that it basically
23 just memorializes the transfer.  Basically assigns the deed of
24 trust from one entity to another.
25    Q.   Because before it had been held by MERS as nominee

145

37  (Pages 142 to 145)

SLG-Banks000244

1  for Greenpoint Mortgage, and Greenpoint had gone out of
2  business years before. But MERS is making, is assigning --
3  where is it? Sorry. It is assigning the trust to --
4  assigning the loan, the deed of trust to Washington Mutual MSC
5  Mortgage Pass-Through Certificate Series 2003-AR3, right?
6      A.   Well, it assigns to US Bank National Association as
7  trustee, and then the remaining verbiage there.
8      Q.   For Series 2003-AR3. And that means that that
9  entity has the right to foreclose on this property, right?
10         MR. DUFFY: Objection. Vague and ambiguous. Calls
11 for legal conclusion.
12         THE WITNESS: Yeah, again, any legal -- again, I'm
13 not prepared to speak about any legal meanings of this
14 document.
15 BY MS. LETCHER:
16     Q.   Okay. This has previously been marked as Exhibit
17 10. That's a notice of default filed by Barrett Daffin
18 Frappier Treder & Weiss in July of 2012, right?
19     A.   I don't believe I've seen this document before.
20 But it is a notice of default. It has an amount in this July
21 6, 2012.
22     Q.   And what's the amount that's overdue at that point?
23     A.   It says in the second paragraph this amount is
24 $42,530.04.
25     Q.   Okay. So that starts the foreclosure process,

146

1  just referencing or memorializing that there's a new trustee
2  handling the foreclosure.
3      Q.   So this is the document that gives Barrett Daffin
4  Frappier Treder & Weiss the right to conduct nonjudicial
5  foreclosure proceedings on behalf of US Bank as trustee for
6  the WaMu Pass-Through Certificate Series 2003-AR3, right?
7          MR. DUFFY: Objection. Vague and ambiguous. Calls
8  for legal conclusion.
9          THE WITNESS: Yeah, as far as any legal meaning of
10 this document, I don't really know.
11 BY MS. LETCHER:
12     Q.   Okay. But in your passing familiarity with the
13 nonjudicial foreclosure process, does there have to be a
14 public record of a notice to foreclose on your house or can
15 just anybody foreclose on your house?
16         MR. DUFFY: Objection. Vague and ambiguous.
17 Beyond the scope of the deposition notice. Calls for a legal
18 conclusion.
19         THE WITNESS: My knowledge of this particular
20 document is just a notice, I guess, that the trustee has
21 changed.
22         (Plaintiff's Exhibit 106 marked for
23         identification and attached hereto.)
24 BY MS. LETCHER:
25     Q.   And then Exhibit 106 is a Notice of Trustee's Sale

148

1  right?
2      A.   I believe as far as the trustee is concerned it
3  does.
4      Q.   This will be Exhibit 104.
5          (Plaintiff's Exhibit 104 marked for
6          identification and attached hereto.)
7          Are these e-mails by the trustee trying to -- or
8  sorry. By someone at Chase trying to determine what name to
9  foreclose in?
10     A.   It appears it is an e-mail to what I previously
11 referred to as an investor relations department that -- yes.
12 It says: "Please let me know who" -- this is improper grammar
13 but I will read you exactly what it says.
14         "Please let me know who is name to foreclose in,"
15 is what it states in that below e-mail.
16     Q.   And the response is US Bank as trustee for
17 Washington Mutual MSC Mortgage Pass-Through Certificates
18 Series 2003-AR3, right?
19     A.   Yes, that appears to be the response.
20     Q.   And then I will show you Exhibit 105.
21         (Plaintiff's Exhibit 105 marked for
22         identification and attached hereto.)
23         What's a Substitution of Trustee?
24     A.   I believe when they are -- in this case there was
25 an initial trustee handling the foreclosure sale, and this is

147

1  filed on October 18th, 2012, correct?
2      A.   Looks like it was signed October 15th, 2012. Is
3  that what you said? I'm sorry.
4      Q.   No, let's go off the record because we are running
5  out of tape.
6          THE VIDEOGRAPHER: Going off the record at 2:42
7  p.m. This is the end of media number 2.
8          (Discussion off the record.)
9          (Recess taken.)
10         THE VIDEOGRAPHER: And we are back on the record at
11 2:49 p.m., the start of media number 3.
12 BY MS. LETCHER:
13     Q.   So when we left off we were discussing the Notice
14 of Trustee's Sale that was signed on October 15th and recorded
15 on October 18th that was Exhibit 106, right?
16     A.   And where do you see the recording information on
17 this particular document? I am not --
18     Q.   I was looking at the bar code on the top.
19     A.   Because on the back it has a cover sheet. I don't
20 know if that's part of this document or not. But this appears
21 to be March 25th, 2013, so --
22     Q.   Okay. So do you know what the bar code is?
23     A.   On which document?
24     Q.   On the front page.
25     A.   I've seen that before. But I'm -- I'm used to

149

38   (Pages 146 to 149)

SLG-Banks000245

1  seeing some type of cover sheet like this, though, but -- in
2  conjunction with that. But I would not doubt you that it was
3  recorded on that date.
4      Q.   Okay. I don't know. I'm asking you.
5      A.   I just wanted to be clear that there was this page
6  attached that looks like March, you know, 2013, and it doesn't
7  appear to go with this document. That's all.
8      Q.   Okay. Barrett Daffin Frappier Treder & Weiss was
9  substituted in as the trustee for WaMu Trust AR 2003 --
10 2003-AR3, right?
11     A.   Yeah, I believe that's the name of the trust, yes.
12     Q.   So was the loan part of that trust?
13     A.   From -- I didn't do any independent verification of
14 the loan being part of a particular trust. I didn't go and
15 view that MSP. It is relatively easy to find but I did not do
16 that in this case.
17     Q.   I'd like you to turn to the foreclosure processing
18 notes, Exhibit 90, and start at page 2209 from the June 3rd
19 entries. And actually, I'm just going to read some of these
20 entries to you and then ask your opinion of what they mean.
21     A.   Okay. What page are you reading off of?
22     Q.   I'm going to start at 2208, the June 6th entry.
23     A.   Of 2014?
24     Q.   Yes.
25     A.   Okay.

                                                          150

1      Q.   James Cantwell writes about halfway down that
2  paragraph:
3          "Does LISA NTFI entity match LPSD AITNO
4          entity: Yes."
5          "Is LISA NTFI entity a successor entity
6          to LPSD AITNO entity."
7          What does that mean?
8      A.   I'm not sure.
9      Q.   Okay. Then on page 2206, my understanding from the
10 timestamps is that you read from the bottom of the page up,
11 right?
12     A.   Yes.
13     Q.   So, "E-Mailed GM investor for" -- I am just going
14 to say "AITNO" for AITNO -- "per LISA." What does that mean?
15     A.   I don't know what the "AITNO" means. GM investor I
16 believe, as we saw in that previous e-mail that we looked at,
17 I believe that's the investor relations department.
18     Q.   Then just above that it says:
19          "Does file need legal review because
20          entities don't match and can't be
21          connected."
22          And then colon: "Yes."
23     A.   I'm sorry, you are going to have to direct me to
24 where you are looking so I can read.
25     Q.   Just the sentence right above that in the preceding

                                                          151

1  paragraph.
2      A.   Okay. And what specifically in that paragraph?
3      Q.   (Reading:)
4          "Does file need legal review because
5          entities don't match and can't be
6          connected: Yes."
7      A.   Okay.
8      Q.   What does that mean?
9      A.   I don't know.
10     Q.   Has someone determined that the file needs legal
11 review?
12         MR. DUFFY:  Objection. Vague and ambiguous.
13         THE WITNESS:  I don't know any other information
14 other than what that note says.
15 BY MS. LETCHER:
16     Q.   On page 2204, on the June 9th, 2014 entry at the
17 top, about two-thirds of the way down, that dense paragraph,
18 it says:
19          "KCR market value: 1740000. Final bid
20          amount: 981796.66."
21          What does that mean?
22     A.   As far as -- I don't know what "KCR" means. Market
23 value appears to be what the value of the property is
24 estimated to be. The final bid amount appears as generally
25 what is bid at the foreclosure sale, final bid amount.

                                                          152

1      Q.   And that's a credit bid, right?
2      A.   On this I'm -- I don't know what that's referring
3  to in this note.
4      Q.   Is that generally the amount, the entire amount
5  that Chase is owed on the loan, including all kinds of escrow
6  advances, fees, any amounts that they are owed under the loan
7  note?
8      A.   I believe I've seen some reinstatement numbers,
9  that type of thing, that reflect a figure around that 980,000.
10     Q.   Okay. A little further down, the penultimate entry
11 says:
12          "Presale review escalation for missing
13          dart form."
14          Do you know what a dart form is?
15     A.   I do not.
16     Q.   On page 2202, for June 9th, it says:
17          "Mary M. Bonifacio, user, has edited
18          bid cal completed data form with the
19          following entries: FC and REO vesting:
20          U.S. National Bank Association as
21          trustee for Washington Mutual MSC
22          Mortgage Pass-Through Certificates
23          Series 2003-AR4."
24          What does that mean?
25     A.   I'm not sure what that form is referencing and why

                                                          153

                              39  (Pages 150 to 153)

SLG-Banks000246

1 that information would be put into that form. I don't know.
2     **Q.**  **On page 2200 at the top, the first paragraph says:**
3       **"Sherry Aston, user, has completed the**
4       **invest change RCD" --**
5       **Is that how you would read that?**
6    **A.**  I don't know what that is.
7     **Q.**  **Okay.**  **It says something about the following entry.**
8   **"Please choose from the dropdown how**
9   **this change will be accommodated.**
10   **Assignment needed to correct investor**
11   **name change."**
12   **What does that mean?**
13    **A.**  I'm not sure what that means in that context of
14 that note. I don't know.
15     **Q.**  **Is a Corporate Assignment of Deed of Trust needed**
16 **to ensure that the right entity is taking foreclosure**
17 **activity, if it is a different foreclosing entity?**
18     MR. DUFFY: Objection. Vague and ambiguous. Calls
19 for a legal conclusion.
20     THE WITNESS: I don't know.
21 BY MS. LETCHER:
22     **Q.**  **Page 2199.**  **On June 12th there's an entry for**
23 Wendy, last name M-C-E-W-E-N.
24     "User has completed the AITNO update-1
25     data form with the following entries:

154

1     **Action in the name of update needed.**
2     **Please be aware an AOM is not needed**
3     **for cosmetic change."**
4     **What does that mean?**
5    **A.**  I'm not sure other than what it says there. It
6 says "no AOM needed." I don't know.
7     **Q.**  **Is AOM "assignment of mortgage"?**
8    **A.**  Yes, that's what I would believe that would mean.
9     **Q.**  **So what does she mean by saying it is a cosmetic**
10 **change to be in one mortgage-backed security or another?**
11     MR. DUFFY: Objection. Misstates the document.
12     THE WITNESS: I really don't know what it is
13 referring to there. It says a cosmetic change, but I really
14 don't know what that means.
15 BY MS. LETCHER:
16     **Q.**  **What trust was Miss Banks' loan in?**
17     MR. DUFFY: Objection. Beyond the scope of the
18 deposition notice.
19     THE WITNESS: Again, I did not review that
20 information prior to this deposition. I didn't.
21 BY MS. LETCHER:
22     **Q.**  **And generally, securitized trusts are groups of**
23 **loans where the trust sells the income stream from that pool**
24 **of loans to the public based on descriptions of the loan and**
25 **their characteristics that are made public through the SEC,**

155

1 right?
2     MR. DUFFY: Objection. Vague and ambiguous.
3 Overbroad. Beyond the scope of the deposition notice.
4     THE WITNESS: I'm not aware of that.
5 BY MS. LETCHER:
6     **Q.**  **On page 2196, there's an entry that says, I think**
7 **it starts at -- it looks like the top of this entry is the**
8 **bottom of an entry that starts on page 2195.**  **Is that correct?**
9    **A.**  Appears to be.
10     **Q.**  **And it looks like that entry is an e-mail about --**
11 **or some kind of pasted communication about foreclosure sale**
12 **results, right?**
13     **Actually, maybe that's kind of a peripheral**
14 **question to what interested me about this entry.**  **It says:**
15     **"Washington Mutual Mortgage Securities**
16     **Corp., a wholly owned subsidiary of**
17     **JPMorgan Chase Bank, N.A."**
18     **Is the investor for this loan owned by JPMorgan**
19 **Chase?**
20     MR. DUFFY: Objection. Vague and ambiguous.
21 Beyond the scope of the deposition notice.
22     THE WITNESS: It appears from this note that
23 that's -- this individual Susan Peterson's signature line,
24 that she's a vice-president, default management, Washington
25 Mutual Mortgage Securities Corp., a wholly owned subsidiary of

156

1 JPMorgan Chase Bank, N.A., and then it has her address and
2 everything. I think that's what that is referring to.
3 BY MS. LETCHER:
4     **Q.**  **Yeah, but the question was:**  **Is the investor a**
5 **subsidiary of JPMorgan Chase?**
6     MR. DUFFY: Objection. Beyond the scope of the
7 deposition notice.
8     THE WITNESS: Well, I refer to the investor on this
9 as US Bank, the trustee. That's what I normally refer to the
10 investor as.
11 BY MS. LETCHER:
12     **Q.**  **On page 2191 -- the entry starts on 2190 and**
13 **continues on to 2191 for June 19th.**  **It says:**
14     **"Third party funds received.**  **Sent to**
15     **client.**  **Completed 6-19-2014."**
16     **Then it lists the tracking number, allowable**
17 **attorney's fees costs, outstanding attorney's fees costs,**
18 **principal, comments.**
19     **And under "comments" it says: "Check amount**
20 **982492.50." Is that how much money Chase eventually received**
21 **after the foreclosure on the loan?**
22    **A.**  I can't say for sure. I haven't verified that
23 amount in any other context. It appears the check was sent in
24 that amount, though, from this note.
25     **Q.**  **And 2189, there's an entry from June 25th, 2014**

157

40 (Pages 154 to 157)

SLG-Banks000247

1 that says:
2    "Attorney confirms change: Yes.
3    Detailed explanation of action taken:
4    Advised no assignment needed. Please
5    be advised the recorded assignment
6    shows State Street Bank and Trust and
7    the new entity does not. We will close
8    out the assignment request, but please
9    double-check and let us know if you
10    need the assignment."
11    What does that mean?
12    A.   I'm not sure, other than it being a communication
13 between Chase and the trustee, or the other way around. I
14 don't know.
15    Q.   So I will hand you what's been previously marked as
16 Exhibit 44. When we left off on our chronology Miss Banks had
17 been -- received a denial letter for her application, but then
18 is this -- this is a solicitation for another modification
19 application, isn't it?
20    A.   This is another -- this is a blank modification
21 package that was sent to the borrower, yes.
22    Q.   But it is an invitation to apply, right?
23    A.   I don't know what resulted of the issuance of this
24 particular set of documents, whether it was the borrower
25 calling or Chase soliciting. But it basically is an offer to

158

1 fill out and reapply for a modification, it appears.
2    Q.   Okay. What determined whether she would be invited
3 to apply again?
4    MR. DUFFY: Objection. Vague and ambiguous.
5    THE WITNESS: A borrower can always contact Chase
6 and try to reapply for a modification. Perhaps their
7 circumstances have changed or something like that.
8 BY MS. LETCHER:
9    Q.   Can they only request a modification when there are
10 changed circumstances?
11    A.   I believe that's the driving factor for any new
12 review, if their circumstances have changed.
13    Q.   Because ordinarily the process has to stop
14 somewhere, right? There's a denial, there's an appeal period
15 and then the foreclosure goes forward?
16    MR. DUFFY: Objection. Vague and ambiguous.
17 Overbroad.
18    THE WITNESS: Well, I think there are certain -- I
19 don't know if safeguards are the right word, but for a
20 customer just to continue to apply and apply and apply for,
21 you know, what could be years, so I think an important factor
22 would be a change in circumstance.
23 BY MS. LETCHER:
24    Q.   Okay. And on page -- this, which was previously
25 used as an exhibit, doesn't have Bates-stamp numbers but it is

159

1 on page 2 of the RMA. It lists documents required. And those
2 documents aren't in any way specific to Miss Banks, are they?
3    MR. DUFFY: Objection. Vague and ambiguous.
4    THE WITNESS: I'm looking at page 3 right here. Is
5 this what you have? So "documents needed"?
6 BY MS. LETCHER:
7    Q.   Are we looking at the same thing?
8    MR. DUFFY: Which exhibit number are you on?
9    MS. LETCHER: Previously marked as exhibit --
10 previously marked as 44.
11    THE WITNESS: Yeah, but items needed on the third
12 page.
13 BY MS. LETCHER:
14    Q.   Yes. All right. Sorry, third page. Does this
15 list anything about canceled checks?
16    MR. DUFFY: Objection. Vague and ambiguous.
17    THE WITNESS: I don't see anything about canceled
18 checks on what would be the initial documents requested.
19 BY MS. LETCHER:
20    Q.   Okay. Go back to the loss mitigation note --
21 sorry. Loss mitigation notes, 2391. So on the January 25th
22 entry, in response to an application they call her and tell
23 her that she needs to submit two most recent bank stubs or
24 three months canceled checks. Bank statements with paycheck
25 deposits or three months canceled checks.

160

1    Is that right?
2    A.   That's what that says on that note.
3    Q.   So they are asking her to submit additional
4 documents, right?
5    MR. DUFFY: Objection. Vague and ambiguous.
6 Misstates the document.
7    THE WITNESS: That's what it says, they -- the note
8 was they tried to call, appears called the borrower. No
9 message left. And it says:
10    "Docs needed are two most recent bank
11    statements with paycheck deposits or
12    three months canceled checks. 4506-T
13    cannot be altered."
14    And then they had a question: Has the borrower
15 filed 2011 taxes and year-to-date isn't adding up on pay
16 stubs.
17 BY MS. LETCHER:
18    Q.   Okay. I'd like you to grab your CCW notes which
19 are Exhibit 91.
20    A.   I just saw those somewhere, so bear with me a
21 moment.
22    Q.   I can't find mine in this ridiculous mountain of
23 paper.
24    On page 2142, about halfway down the page on
25 January 28th it says:

161

41   (Pages 158 to 161)

SLG-Banks000248

**Page 162**

1    "Template and DW case closed as
2    requested."
3    What does that mean?
4    I'm sorry, it goes with the prior entry on 1-28.
5    "Customer has reapplied and hasn't
6    gotten in the required documents from
7    what the LIO department requested.
8    This new template should be closed out
9    ASAP."
10   A.  Okay.
11   Q.  What does it mean?
12   A.  From what it appears, it looks like the template,
13   basically the loss mit template is requested to be closed
14   within MSP as far as a loss mit process is concerned.
15       I really don't have any other information other
16   than what that says.
17   Q.  Does this mean that someone thinks that she should
18   not be allowed to reapply because she did not provide the
19   documentation required by the LIO department?
20   A.  I'm not sure what specific template that that's
21   referring to.  I mean it may not be referring to the standard
22   loss mit template, but I really can't tell by this particular
23   note.
24   Q.  Okay.  So the only thing that you can testify to is
25   not what actually happened in this case but -- or the reasons

**Page 163**

1    for it, but just what the notes say.  But you can't read the
2    notes.
3        MR. DUFFY:  Objection.  Overbroad.  Vague and
4    ambiguous.
5        THE WITNESS:  I mean I use the notes to get an idea
6    of what happened, and if I can analyze those notes and figure
7    out what happened reasonably then I will do so.
8        But I see this particular note is in there twice.
9    I don't really have any other information other than what's in
10   these notes.
11   BY MS. LETCHER:
12   Q.  They are simultaneously -- it looks like these
13   notes are saying they are simultaneously trying to close the
14   loan modification template, meaning not consider her for a
15   modification, and asking her for three months canceled checks.
16   And then in parentheses, pay stubs and two most recent bank
17   statements.
18       So is this the case, that they're trying to close
19   the loss mitigation process and demand more documents at the
20   same time?
21       MR. DUFFY:  Objection.  Vague and ambiguous.
22       THE WITNESS:  I'm not really certain what that
23   particular note would mean in this case.
24   BY MS. LETCHER:
25   Q.  And does this note indicate that for at least the

**Page 164**

1    person reading, making this note, canceled checks and pay
2    stubs are the same?
3    A.  It just states employee to provide recent three
4    months canceled check and pay stubs in parentheses.
5    Q.  Are parentheses commonly used to show that one
6    thing is equivalent to another in that context?
7        MR. DUFFY:  Objection.  Vague and ambiguous.
8        THE WITNESS:  I mean in looking at this, it would
9    be reasonable to think that the check that they are referring
10   to would be the pay stubs.
11   BY MS. LETCHER:
12   Q.  Okay.  I'd like to take you back to the letter log
13   history, Exhibit 85.
14   A.  Okay.
15   Q.  So there's an entry on January 23rd, 2013, it says
16   "Started loss mit," and then another one on January 28th that
17   says "Added an error."  So what's the connection between those
18   two?
19   A.  I don't know if there is one, if those are related
20   or not.
21   Q.  Okay.  Going back to the LMT notes.  On 2390, the
22   first entry describes a call and it says there's a call
23   recording disclaimer.  Does that mean she advised, that the
24   person writing these notes advised Miss Banks that the call
25   would be recorded?

**Page 165**

1    A.  It could be.  I mean the standard verbiage is "This
2    call may be recorded for" -- and it is typically something
3    like "quality and training purposes."
4    Q.  Okay.  Do you know if any recordings of Miss Banks'
5    calls exist?
6    A.  I do not.
7    Q.  Okay.  Who would?
8    A.  I don't know.
9    Q.  How would you find out?
10   A.  I guess the first person I would ask would be my
11   manager.
12   Q.  So on 2389, February 9th again, second entry says:
13       "Sent third CCW route to close template
14       due to customer has reapplied and
15       hasn't gotten in the required docs from
16       what the LIO department has requested.
17       This new template should be closed out
18       ASAP."
19       Does that mean that she is not permitted to
20   reapply?
21   A.  I don't see that here in the note.  I don't know if
22   that has any bearing on her ability to reapply pending the
23   results of that investigation.
24   Q.  So the entry on 2-11-13 says:
25       "Please break for immediate incomplete

42  (Pages 162 to 165)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000249

1      application.  Borrower has not complied
2      with prior MIL - per LOI findings
3      unable to proceed with any modification
4      without providing all documents
5      required from the previous MIL.  Per
6      CIC and LOI guidelines and if borrower
7      does not comply with prior MIL no
8      review is possible."
9      A.   Okay.
10     Q.   So does that mean that they are refusing to review
11  her application because she hasn't provided the documents from
12  the previous application?
13          MR. DUFFY:  Objection.  Vague and ambiguous.
14          THE WITNESS:  Apparently this note says that until
15  that investigation is complete that it's not possible for
16  another review.
17  BY MS. LETCHER:
18     Q.   So where does this refer to investigation?
19     A.   "Per LOI findings" is what it says in the note.
20  That's what I just -- I'm sorry, I used that term.
21     Q.   So does that mean that the investigation is
22  completed by this time?
23     A.   Well, this note says "per LOI findings" so I would
24  assume -- well, not assume.  But I would reasonably suggest
25  that if there are findings that it would be complete.

                                                          166

1      Q.   So they are not waiting for the investigation to be
2  done.  There were findings?
3          MR. DUFFY:  Objection.  Vague and ambiguous.  Asked
4  and answered.
5          THE WITNESS:  All I can tell you is what the note
6  says.  I don't have any other independent knowledge of the LOI
7  investigation or findings.
8  BY MS. LETCHER:
9      Q.   Okay.  And what is the CIC and LOI guidelines?
10          MR. DUFFY:  Objection.  Vague and ambiguous.
11          THE WITNESS:  I'm pretty sure I've already answered
12  that.  I don't know what those guidelines are, the LOI.  And I
13  don't know what CIC is.
14  BY MS. LETCHER:
15     Q.   Okay.  So what it looks like to me is that the
16  people making these entries -- first of all, who are they?  Do
17  you know?
18     A.   I don't.  There's a standard I.D. there, but I
19  don't know who that individual is.
20     Q.   Okay.  But you could find out?
21     A.   Yes, I could find out.
22     Q.   These two people are trying to stop further loss
23  mitigation on her loan because she had -- she has to provide
24  special documentation that Chase is asking for.
25          MR. DUFFY:  Objection.  I don't think that's a

                                                          167

1  question pending.
2          MS. LETCHER:  I'm sorry, could you read that back.
3          (The record was read as follows:
4          "Q.   These two people are trying to
5          stop further loss mitigation on her
6          loan because she had -- she has to
7          provide special documentation that
8          Chase is asking for.")
9      Q.   Is that correct?
10          MR. DUFFY:  Objection.  Vague and ambiguous.
11          THE WITNESS:  It appears that that documentation is
12  needed to clear up what was deemed to be inconsistencies in
13  the documentation prior to any modification review.
14  BY MS. LETCHER:
15     Q.   So on 2387, what does the entry:
16          "QC incomplete, disagree with
17          incomplete denial.  Re-ap doc recommend
18          13 more calls be made to comply with
19          re-ap procedure."
20     A.   (Reviewing document.)
21          It appears there was a quality control review of
22  the, what appears to be the -- it says "incomplete denial,"
23  so the denial that we spoke about with that other exhibit
24  within Agent Desktop is what I would say that that would be
25  referring to.  And it recommends --

                                                          168

1      Q.   So do you think this is referring to the December
2  denial or the effort to deny that's being made right now in
3  February of 2013?
4          MR. DUFFY:  Objection.  Vague and ambiguous.
5          THE WITNESS:  I mean it just references "disagree
6  with incomplete denial."  The only denial that I'm aware of by
7  this point in time is that one that we referenced earlier with
8  the Agent Desktop.
9          MS. LETCHER:  Okay.  I'm going to hand you Exhibit
10  107.
11          (Plaintiff's Exhibit 107 marked for
12          identification and attached hereto.)
13     Q.   Do you recognize this?
14     A.   I believe I've seen this document in my review.
15     Q.   What is QC Production?
16     A.   Quality control is just a separate area that would
17  review, in my experience, underwriting decisions.  I don't
18  know if they have any other functions that they review, but
19  they just -- it is basically another set of eyes reviewing a
20  decision.
21     Q.   And where are they located?
22     A.   Physically I don't know where they would have been
23  located at that time.
24     Q.   Okay.  And it lists an employee and employee
25  manager and an auditor.  What are their respective roles?

                                                          169

                                    43  (Pages 166 to 169)

SLG-Banks000250

1    A.   As far as the auditor and the employee, I believe
2 the auditor is the one that actually does the QC review, but
3 I'm not sure.
4    Q.   Okay.  What does it mean that the first thing says:
5         "Question:  Please select the type of
6         review."
7         And then answer, it says:  "Fail."
8    A.   I'm not sure.
9    Q.   So, for example on the second page it says:
10        "Question: Which group submitted the
11        loan to QC?"
12        And then it says:  "Fail."
13        And it says "CAS submitted for break" under "Error
14 Description."  Does that mean it was the CAS who made an error
15 by recommending that the loan modification application be
16 denied?
17   A.   I'm sorry, I don't see that on that page.
18   Q.   On the top of 1163.
19   A.   It looks like I have three copies of 1162.
20        MR. DUFFY:  I have three copies of 1163.
21        MS. LETCHER:  Awesome.  We will trade first pages.
22 You know what, we will trade first pages.
23        THE WITNESS:  Do you want this with the exhibit
24 stamp on it to remain the first page?
25 BY MS. LETCHER:

170

1    A.   I'm not sure that's what this report is.  I believe
2 they just analyzed a quality control review, the missing item
3 letter, it is my understanding of this document.
4    Q.   All right.  So on page 1265, the bottom full
5 question and bar graph says:
6         "Was the correct process followed for
7         underwriter clarification - soft
8         reject?"
9         What does that mean?
10   A.   I'm not sure what that would mean.
11   Q.   And then underneath it it says:
12        "Was recommendation for incomplete
13        application justified?"
14        And in the next it says:
15        "Agree with incomplete denial for non
16        received perfectible documents."
17        So the initial denial passed some sort of quality
18 control, right?
19   A.   (Reviewing document.)
20        It appears for those, I mean, specific questions
21 that have a pass, it appears they were reviewed and passed.
22   Q.   And then the last question on this page:
23        "Was the file underwritable at the time
24        of QC review (based on all docs preset
25        in LenderLive)."

172

1    Q.   Yes.  And then you can just have these last two
2 pages and we will have one good exhibit.
3    A.   Okay.
4    Q.   So that was intended to be pages 1162, 1163, and
5 1164.  Is that what you have now?
6    A.   I have two copies of 1162.  There you go.
7    Q.   So that highlighted entry at the top of 1163, what
8 does that mean?
9    A.   I'm not sure.  This was done in September 2012 so
10 we're kind of going back and forth on the time frame, so I'm
11 not sure in the context of this what that immediately means on
12 the page, or any surrounding aspects about the mod process I
13 don't know.
14        (Plaintiff's Exhibit 108 marked for
15        identification and attached hereto.)
16   Q.   Okay.  So the next exhibit, No. 108, will get us
17 closer to the time frame of the initial denial.
18        It is titled "MIL Denial Review."  What does that
19 mean?
20   A.   It appears this is some type of QC process for a
21 missing item letter review.
22   Q.   Okay.  So a missing item letter denial is when
23 somebody is denied a modification -- someone's modification
24 application is denied because they had missing items in their
25 application, right?

171

1 Does that -- and then the answer is:  "N/A."  So was that
2 question ever answerable?  Or answered?
3        MR. DUFFY:  Objection.
4 BY MS. LETCHER:
5    Q.   Was the file underwritable?
6        MR. DUFFY:  Objection.  Vague and ambiguous.
7        THE WITNESS:  On this form it is N/A, so I don't --
8 I don't know.
9 BY MS. LETCHER:
10   Q.   Okay.  So why didn't the foreclosure just happen in
11 February of 2013?  If you go back to the letter log, on
12 February 25th it says "declined modification."  Right?
13   A.   Well, it looks like -- I mean there were notations
14 on 3-12-2013 that says:  "Workout failed.  Restart
15 foreclosure."
16        And it appears that it was in active foreclosure
17 status two days later, and then that same day another restart
18 foreclosure task was put out.  But then they started loss mit
19 again on April 1st, 2013.
20   Q.   Okay.  Let's go back to a little more QC.  I'm
21 going to combine a couple exhibits so it goes a little faster.
22        109.
23        (Plaintiff's Exhibit 109 marked for
24        identification and attached hereto.)
25        I am going to hand you Exhibit 109 -- which can't

173

44  (Pages 170 to 173)

SLG-Banks000251

1  be right because now my piles are inconsistent.
2       (Brief pause.)
3       All right.  Here we go.  And hopefully what you
4  have in front of you is pages 1391 to 1399, 1400 to 1404, and
5  1405 to 1409.
6    A.  Yes.
7    Q.  All that to get them back in their original
8  sequence.  So are you familiar with this top page, the QC
9  Checklist Final Output?
10   A.  I've seen it before.
11   Q.  Okay.  And does -- so my understanding of these
12 documents -- actually, let's look at page 1395 which is part
13 of a review that took place on February 18th, 2013.
14      So it says:
15      "Reapplication review - underwriter
16      reject.  Minimum required outbound
17      contact attempts not made by CAS."
18      And they recommend 13 more calls to comply with the
19 procedure, right?
20   A.  That's what it says.
21   Q.  Okay.  And in the next one, which is on February
22 20th, on pages 2 to 3 it says --
23   A.  What page are you on?  I'm sorry.
24   Q.  Sorry.  It is 1402 to 1403.  It says:
25      "Was recommendation for incomplete

174

1      application justified?"
2      And at the top of the next page the answer is:
3      "This LN is labeled re-ap doc denial
4      code in DW.  Decline RSNS MSG doc.  If
5      loan needs to be closed for incomplete
6      ap recommend this case be closed and
7      the prior case needs to be reopened by
8      intake."
9      What does that mean?
10   A.  My best analysis of this is that the -- basically I
11 believe it is stating the new application needs to be closed
12 and the prior one needs to be reopened instead of having a
13 whole new application.
14   Q.  Okay.  So where does her application stand now?  Is
15 the first one that was denied in December reopened?  Or is a
16 new one being considered that was filed in January?
17   A.  I don't recall.  I mean I just see here that they
18 restarted the loss mit.  And it looks like in April, according
19 to the letter log, it was finally started again in April.
20   Q.  Is that a reopening of the old case or not?
21   A.  I'm not sure if that's a whole new application or
22 not at that point.  I would say that the documents, you know,
23 submitted several months prior would probably be stale at that
24 point so updates would be needed.  And I believe the LOI
25 requirements would still be in effect.

175

1    Q.  Okay.  Just to let you know, I skipped over the
2  application but she did submit copious new documents in
3  January.
4      But at this point in February when they are going
5  back and forth in QC to try to decide whether the initial
6  denial was justified, and they are still asking her for more
7  of the same documents, the check stubs/pay stubs, is this the
8  same application process as was started in 2012 or is this a
9  new application process that started in 2013?
10   A.  I don't think I researched that to be able to
11 determine one way or the other on that.  I don't know.
12   Q.  Who would know?
13   A.  I'm not sure.  I mean there are, as you know, quite
14 a few notes so I don't know if that would be included in the
15 notes or not.  I don't recall seeing that one way or the
16 other.  That's not something I looked for.
17   Q.  Who makes the determination of whether it is a --
18 it is one continuous application or a reapplication?
19   A.  I don't know if in the end that would really make a
20 difference.  If the borrower submits updated documents it
21 is going to be under review for modification.  If they submit
22 updated documents it is going to be reviewed again by an
23 underwriter.
24   Q.  So, so far as Chase is concerned, it is a continual
25 application so long as they are reviewing the same set of

176

1  documents, and it is all part of the same review of the same
2  documents?
3      MR. DUFFY:  Objection.  Overbroad.  Vague and
4  ambiguous.
5      THE WITNESS:  That's not what I was referring to.
6      MS. LETCHER:  It certainly is vague and ambiguous,
7  you are right.
8      THE WITNESS:  I'm sorry if that came across one
9  way, but that's not what I was referring to.
10      I mean like we said before, if the borrower has a
11 change in their circumstance, a new application can be
12 reviewed under that new information.  If they got a new job or
13 have more additional income on another application they can
14 reapply.
15 BY MS. LETCHER:
16   Q.  Okay.  But if they are reviewing her again in
17 January, given what we just read, is that a reopening of the
18 old application?  Because her circumstances hadn't changed.
19 She's submitting exactly the same information.
20   A.  Yeah.  Again, I don't focus on that so I really
21 don't know.  But like I said, I believe from the notes that
22 we've read, the LOI requirements would still be in effect
23 regardless if it is looked at as a brand new application or
24 not.
25      (Plaintiff's Exhibit 110 marked for

177

45  (Pages 174 to 177)

SLG-Banks000252

1   identification and attached hereto.)
2      Q.   Okay.  We are at Exhibit 110.  This is another QC
3   review dated February 25th, 2013.  And I'd like you to look at
4   page 1415?
5      A.   1415?
6      Q.   Yes.  Toward the bottom of the page the last
7   question is:
8      "Was the file underwritable at the time
9      of QC review based on all docs
10     preset" --
11     I have got to assume that is "present."  Do you
12  agree?
13     A.   I would believe so, yes.
14     Q.   Okay.  ". . .in LenderLive."  Then it says:
15     "Loan re-ap doc borrower did not comply
16     with prior MILs.  P&L not in
17     LenderLive."
18     Is that a correct interpretation of that sentence?
19     A.   Yes, that's what that says.
20     Q.   And what does it mean?
21     A.   From what it appears, there is a missing items
22  letter that requested a P&L statement and apparently this
23  review did not see one in LenderLive.
24     Q.   So ultimately in February 25th, the reason that she
25  was denied -- or they agree with the denial because she didn't

178

1   submit a profit and loss.
2      A.   This is just a QC review, so I don't know if that's
3   referencing the denial, if that was your question or not.
4      Q.   Okay.  So going back to the letter log, you've
5   already mentioned that she's declined a modification on
6   February 25th.  Did she ever get a denial letter related to
7   that decline?
8      A.   I'm not sure if I've seen one or not around that
9   time frame.
10     Q.   Okay.  And then there's a HAMP solicitation sent on
11  March 5th, right?
12     A.   It says:  "Follow HAMP solicitation."
13     I don't know if that is a follow-up or if that's
14  necessarily a new package or not.
15     (Plaintiff's Exhibit 111 marked for
16     identification and attached hereto.)
17     Q.   Okay.  I will hand you Exhibit 111.
18     And I apologize, counsel.  The other copies printed
19  small.
20     MR. DUFFY:  That's okay.
21  BY MS. LETCHER:
22     Q.   So given the history that we've just seen that she
23  submitted a new application in January and someone, possibly
24  the CAS, possibly the underwriter, asked for the template to
25  be closed repeatedly because she'd not submitted the documents

179

1   requested in the previous application, why is she being
2   re-invited to apply again in March?
3      A.   I'm not sure why specifically this package was
4   sent.  Again, it says:  "Follow HAMP solicitation."
5      I don't know if that is it means follow-up or what.
6   I don't know.
7      Q.   Okay.  And why at this point was the foreclosure
8   postponed again to March 20th?
9      A.   Again, I don't know any other reasons for the
10  postponement other than any type of loss mit activity.
11     Q.   If you look at the foreclosure timeline which is
12  Exhibit 99.
13     A.   Okay.
14     Q.   On page 4191, the first three times the loan was --
15  the foreclosure was postponed, it was postponed about a month
16  each time, 32 days or 31 days.  On January 7th there's no
17  postponement-to date.  And on March 20th there's no
18  postponement-to date.  Why is that?
19     A.   I'm not sure.
20     Q.   Is it being postponed indefinitely?
21     A.   I'm not sure at that point.  I don't know.
22     Q.   Who makes the decisions about whether to postpone?
23     A.   It is generally done through the foreclosure
24  department within Chase.
25     Q.   And would that be reflected in the foreclosure

180

1   notes?
2      A.   The foreclosure notes may indicate that
3   information.
4      Q.   These foreclosure process notes have nothing
5   between March of 2012 and May of 2013.  Why is that?  And I'm
6   referring to Exhibit 90.
7      A.   I don't know.
8      Q.   So in this time when there's kind of a struggle
9   about whether to decide to keep her loss mitigation template
10  open and her foreclosure is being postponed for reasons that
11  are not clear, there are no notes that would reflect the
12  reasons for that action, right?
13     MR. DUFFY:  Objection.  Vague and ambiguous.
14     THE WITNESS:  I don't see any notes from that time
15  frame.  I don't know why they are -- I don't know why.
16  BY MS. LETCHER:
17     Q.   So let's go back to the delinquency notes which is
18  Exhibit 89.  About a third of the way through 2490, what is
19  that entry 3-29-13?
20     "Inbound prim - WIP workout in
21     progress."
22     What does that mean?
23     A.   What it appears to me, it is an inbound call from
24  the primary borrower and then it just states "workout in
25  progress."

181

46  (Pages 178 to 181)

ELITE COURT REPORTING (949) 829-9222

SLG-Banks000253

1    Q.   Does that mean that she called in and somebody
2  updated her and said that the workout is in progress?
3    A.   Or the person could have reviewed the current
4  status of the loan at that time and notated there was a
5  workout in progress.  But anything other than that I really
6  wouldn't know.
7    Q.   So these notes, do these notes record what was
8  communicated to the caller?
9    A.   Other than that notation, I don't know.  I don't
10 have any other information on that date.  Or no other notes in
11 the system.
12   Q.   So we can't tell from the collections notes whether
13 she's being reassured that her workout is in progress or not?
14   A.   It just says there's an inbound call, and it says
15 "workout in progress."  That's the notation on that line.
16   Q.   Okay.
17   A.   And just to complete, just to complete my previous
18 answer, it looks like on page 2383 there are some notes
19 regarding a phone call.  So there is some additional
20 information that appears around that same time.  1823 is the
21 timestamp.
22   Q.   Okay.  That's for April 2nd.
23   A.   Yes, that was -- I was looking at a couple of pages
24 here.
25   Q.   Okay.  So for some of these "workout in progress"

182

1  entries there are corresponding notes in loss mitigation but
2  for some there aren't.
3    A.   I don't see anything there in LMT notes for 3-29.
4        (Plaintiff's Exhibit 112 marked for
5         identification and attached hereto.)
6    Q.   Okay.  So number 112, what are these?
7    A.   These are the SERN notes.
8    Q.   And what do they reflect?
9    A.   Basically this is the system that customer service
10 would utilize to input notes.  That's what they are generally
11 used for.
12   Q.   Okay.  So when would she be -- when would
13 Miss Banks be communicating with customer service?
14   A.   The main number to call regarding questions on a
15 loan would be a customer service function.
16   Q.   Okay.  So why are there notes from 2008 and 2009 on
17 page 2363 and then the next entries start on March 19th, 2013?
18   A.   I'm not sure.
19   Q.   Was customer service in existence and handling
20 calls between 2009 and 2013?
21   A.   Yes.
22   Q.   Is there any reason why there wouldn't be any notes
23 for her during that time?
24   A.   I'm not sure why there are no notes from that time
25 frame in these documents.

183

1        MS. LETCHER:  Will a privilege log reflect a
2  redaction of five years of notes?
3        MR. DUFFY:  I don't know if there are five years of
4  notes in this system or not.
5        MS. LETCHER:  Okay.
6    Q.   So on page 2362 there's -- it says -- what is
7  "VCELLO"?
8    A.   You will have to direct me where you are looking.
9    Q.   I am looking under March 29th, the entry.  There's
10 jargon at the front and then it says address and then it says
11 "VCELLO."
12   A.   I don't know.
13   Q.   And then it says:
14       "Borrower had notice placed on door of
15       sale for 4-19.  Borrower resending in
16       new docs to reapply.  Waiting for VOE."
17       What is VOE?
18   A.   That typically stands for verification of
19 employment.  And the "VCELL" is probably verified cell phone,
20 either number or something to that effect.
21   Q.   So foreclosure is finally starting, right?
22   A.   I'm sorry, you will have to be more clear on the
23 question.
24   Q.   If she got a notice on her door, does that suggest
25 that there's a foreclosure process starting?

184

1    A.   It has -- yes, it states:
2        "Borrower had notice placed on door.
3        Sale for 4-19."
4    Q.   And if you look back at the trustee's log, Exhibit
5  99, with the foreclosure status history it says that on March
6  29th, 2013 the foreclosure status was changed from
7  prepublication to publication.  So is that consistent with
8  foreclosure going forward at that point?
9    A.   Okay.  I'm sorry, I was looking at the bottom of
10 the page.  What date?
11   Q.   We've got for March 29th --
12   A.   I see that at the top, yes.
13   Q.   -- prepublication to publication.
14   A.   That's what it states, yes.
15   Q.   Does that mean foreclosure is starting?
16       MR. DUFFY:  Objection.  Vague and ambiguous.
17       THE WITNESS:  It looks like from the prior date too
18 it came off of a loss mit hold to prepublication; and on the
19 29th from prepublication to publication.  So that is part of
20 the foreclosure process that needs to be completed.
21 BY MS. LETCHER:
22   Q.   Okay.  And then I will just represent to you that
23 Miss Banks submitted voluminous application materials on April
24 1st and April 3rd.  Would those be reflected anywhere in the
25 records?  For example, the letter log history file?

185

47  (Pages 182 to 185)

SLG-Banks000254

1      A.   (Reviewing documents.)
2           It appears based on the LMT notes that there was
3  some activity on the 2nd regarding items needed and a missing
4  items letter being sent, that type of thing.  That would
5  reference a new application.
6      Q.   So was it Chase's policy to just keep accepting
7  applications and sending her the same list of documents that
8  was needed over and over in perpetuity?
9           MR. DUFFY:  Objection.  Vague and ambiguous.
10          THE WITNESS:  Well, from what I can tell,
11  especially in the RMA forms and the 4506-T form, the bank
12  statements, everything was incomplete and that the same
13  documents were being resent to Chase over and over.
14  BY MS. LETCHER:
15     Q.   Okay.  So did she eventually send bank statements
16  that showed direct deposit of her pay?
17     A.   There was I believe a wire transfer that was
18  notated in one of the bank statements, I believe a Wells Fargo
19  Bank statement.  I am not certain if -- because there were so
20  many and I don't recall seeing one that had all pages of the
21  bank statement being submitted.
22          (Plaintiff's Exhibit 113 marked for
23           identification and attached hereto.)
24     Q.   I'm going to hand you Exhibit 113.  So initially
25  Chase asked Miss Banks for check stubs.  She submitted check

                                                              186

1  stubs and here she's submitting updated check stubs on the
2  last few pages for January, February and March -- I'm sorry.
3  January and February of 2013.
4           And then there is a stub that says via wire
5  transfer from March of 2013.  On page 1505 there is a wire
6  transfer record that says, that describes the wire transfer
7  from Galaxy Gaming, her employer.
8           And in earlier notes she said that she didn't want
9  to ask her -- we didn't go over them but I will represent to
10  you that she stated she did not want to ask her employer for
11  canceled checks because she didn't want to lose her job.
12          So was this a different kind of proof that she was
13  trying to submit with this application?
14          MR. DUFFY:  Objection.  Vague and ambiguous.
15  Overbroad.
16          THE WITNESS:  Well, you mentioned check stubs.  The
17  check stubs that were being asked for were the canceled checks
18  from the employer and I don't -- and I haven't seen any
19  indication that those were ever provided.
20          So I believe she sent in some additional
21  information with these new paychecks or copies of paychecks,
22  with the correct Marina del Rey address and no tax
23  information, and one wire transfer in the middle of the month
24  where her other check she gets paid at the end of the month.
25          So I believe that the note was stating that the

                                                              187

1  wire transfer information did not really match up or was
2  complete, from what I can remember.  It says on this note a
3  wire did not have required info on pay stub.
4  BY MS. LETCHER:
5      Q.   Okay.  Let's look at LMT notes on 2382 and 2381.
6  It starts on 2382:
7           "Intake rejects.  No critical docs
8           received."
9           Then above that:
10          "Please make note LIO department
11          requested the below docs and borrower
12          hasn't provided the docs and this is
13          the third time I have requested the
14          template to be closed.  Thanks!
15          Customer has reapplied and hasn't
16          gotten in the requested docs from what
17          the LIO department has requested.  This
18          new template should be closed out ASAP.
19          Employer to provide recent three months
20          canceled check (pay stubs).  Borrower
21          to provide two most recent bank
22          statements to support receipt of this
23          income."
24          So does that mean that Chase is refusing to
25  consider her application or is it rejecting her application

                                                              188

1  because she's not providing documents that weren't listed in
2  the application sent to her?
3      A.   Again, I will just go back to the previous notes.
4  It appears that Chase is requiring those documents requested
5  by the Loan Integrity Operations unit in order to review the
6  customer for a modification.
7           Whether a new application was opened or not or they
8  reused the old one, I believe the overriding fact is they
9  still required those documents for clarification on what were
10  obvious inconsistencies in her prior documents.
11     Q.   And did anybody ever mention those inconsistencies
12  to her or describe why they needed the additional documents?
13     A.   Again, I answered earlier I seem to recall
14  something about the "Marina del Ray" address being spelled
15  R-A-Y, and again it being an address in Illinois but with a
16  California zip code.
17          I couldn't locate that in the notes prior to
18  answering that question, and I don't know where they are
19  exactly.  But I seem to recall something to that effect.
20     Q.   Okay.  But if they aren't in the notes, if that
21  explanation isn't in the notes that are given to us, which
22  should include all communications with her, then that was
23  never communicated to her, right?
24          MR. DUFFY:  Objection.  Vague and ambiguous.
25          THE WITNESS:  I'm sorry if you misunderstood what I

                                                              189

                                          48  (Pages 186 to 189)

SLG-Banks000255

1   just said.  I haven't looked at any other notes other than
2   what I believe were produced.  So I believe that was somewhere
3   that I have seen but I may be mistaken.
4         I did review the documents knowing that there were
5   LIO findings.  I didn't know, I don't know exactly what the
6   results of that investigation was.
7         But I do attend training on that.  All Chase
8   employees do as far as in the mortgage department looking for
9   those docs, and those were pretty obvious I would consider red
10  flags.
11  BY MS. LETCHER:
12      Q.   Okay.  Does Chase have any actual evidence that she
13  did not receive that income?
14      MR. DUFFY:  Objection.  Vague and ambiguous.  Calls
15  for -- go ahead.
16      THE WITNESS:  That she did not receive that income?
17  I don't understand.
18  BY MS. LETCHER:
19      Q.   So, so far what has been happening for the last
20  year is Chase has demanded a particular piece of paper,
21  canceled checks as verification of income, right?
22      A.   Well, yes, they want to verify that that
23  information is true and accurate and there's no what would be
24  considered fraudulent activity going on on the loan, to
25  protect the borrower if not the bank.

190

1   borrower for qualification for modification.  I don't know any
2   mechanism that Chase would use to go back and try to disprove
3   a borrower receiving that income.
4         On the contrary, they are trying to verify the
5   income that she did submit through her employer, which she did
6   submit a letter of employment from her employer.
7         So in my review, and this may be going into
8   opinion, but her employer already knew that she needed
9   information regarding her employment.  They sent in a
10  verification of employment.
11        So you mentioned the note and I did see that in the
12  notes, that she did not want to go back to her employer
13  because she thought she would be fired.  And I think that's
14  just a pretty unfair -- unfair speculation.
15      MS. LETCHER:  Could you read back my question.
16      (The record was read as follows:
17         "Q.  So you are talking about Chase's
18         documentation requirements and I'm
19         talking about the actual facts on the
20         ground.  Does Chase have any facts
21         showing that Miss Banks was not making
22         $10,000 a month, as opposed to failed
23         to submit documentation of that
24         income?")
25      THE WITNESS:  As far as any type of result of an

192

1       Q.   But does Chase have any actual evidence that she
2   did not receive the income?
3       A.   That she did not receive the income?
4       Q.   Right.
5       A.   Well, I think the initial documentation
6   requirements were for the paycheck stubs, so that's all that's
7   needed for modification review.
8       Q.   So you are talking about Chase's documentation
9   requirements and I'm talking about the actual facts on the
10  ground.  Does Chase have any facts showing that Miss Banks was
11  not making $10,000 a month, as opposed to failed to submit
12  documentation of that income?
13      MR. DUFFY:  Just for clarification, do you mean at
14  the time this decision was made?
15      MS. LETCHER:  Yes, I mean in March of 2013.
16      THE WITNESS:  At the time in order for a borrower
17  to qualify for a modification they submit paycheck stubs if
18  they are employed.  Not self-employed, but a W-2 employee.
19        She represented I believe that she was not
20  self-employed.  Unfortunately, her paycheck stubs did not have
21  any tax information on there, which would be typical for a W-2
22  borrower.
23        The information that was sent in initially by the
24  borrower were paycheck stubs that had obvious inconsistent
25  information on them.  That's what Chase utilizes to analyze a

191

1   investigation that may have that information, I'm not aware of
2   any other investigation by Chase to, I guess in your opinion,
3   try to disprove her income.  On the contrary, we just wanted
4   to make sure that income, that documentation that she
5   submitted was true and accurate.
6   BY MS. LETCHER:
7       Q.   So at that point Chase was focused solely on
8   getting documentation, and it did not take any additional
9   steps or find out any additional facts to find out whether she
10  actually made $10,000 a month?
11      MR. DUFFY:  Objection.  Vague and ambiguous.  Asked
12  and answered.
13      THE WITNESS:  I think that additional proof was
14  trying to verify the information that she put on her RMA form
15  and also the documents that she submitted initially.
16  BY MS. LETCHER:
17      Q.   Does Chase now have any evidence that she made or
18  did not make $10,000 a month?
19      MR. DUFFY:  And it is --
20  BY MS. LETCHER:
21      Q.   I don't want to hear any attorney-client privilege.
22      MR. DUFFY:  And it is beyond the scope of the
23  deposition notice.
24      MS. LETCHER:  Well, let's see.  Whether plaintiff
25  qualified for a loan modification at any point from January

193

49  (Pages 190 to 193)

SLG-Banks000256